DAVID J. VAN HAVERMAAT (Cal. Bar No. 175761)
Email: vanhavermaatd@sec.gov
DAVID S. BROWN (Cal. Bar No. 134569)
Email: browndav@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

Joseph G. Sansone, Unit Chief (Market Abuse Unit)
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281

Robert A. Cohen, Unit Chief (Cyber Unit)
Headquarters
100 F Street, N.E.
Washington, District of Columbia 20549

Michele Wein Layne, Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**FILED**
CLERK, U.S. DISTRICT COURT

5/22/18

CENTRAL DISTRICT OF CALIFORNIA
BY: CS              DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

5/22/18

CENTRAL DISTRICT OF CALIFORNIA
BY: CS              DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TITANIUM BLOCKCHAIN INFRASTRUCTURE SERVICES, INC.; EHI INTERNETWORK AND SYSTEMS MANAGEMENT, INC. aka EHI-INSM, INC.; and MICHAEL ALAN STOLLERY aka MICHAEL ALAN STOLLAIRE,<br><br>Defendants. | Case No.  CV18-4315-DSF(JPRx)<br><br>**COMPLAINT**<br><br>**(FILED UNDER SEAL)** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendant Michael Alan Stollery aka Michael Stoller aka Michael Stollaire resides in this district and the defendant entities each have their principal place of business in this district.

## SUMMARY

4.      This matter involves an investment fraud involving up to $21 million in cash and digital assets under the guise of an initial coin offering ("ICO") of a digital asset called "BAR" by Michael Alan Stollery aka Michael Stoller aka Michael Stollaire ("Stollaire") through two companies that he controls: Titanium Blockchain Infrastructure Services, Inc. ("TBIS") and EHI Internetwork and Systems Management, Inc. aka EHI-INSM, Inc. ("EHI") (collectively with Stollaire, "Defendants").

5.      Defendants employed a "create and inflate" scheme that enabled them to illegally profit both at the outset of the scheme (when raising money from investors through fraudulent statements in the ICO) as well as later (when continuing to make

1

1 unsubstantiated claims in hopes of selling their own digital asset, BAR, at inflated

2 values). Defendants' scheme entailed creating their digital asset for a newly conceived

3 business; orchestrating a social media campaign based on false corporate relationships

4 and false testimonials to establish a presence and seeming expertise; generating demand

5 for their digital asset by offering various incentives and creating urgency so investors

6 would invest in the ICO; and, after conclusion of the ICO, inflating the value of the

7 digital asset, which was freely tradeable.

8       6.    Between late November 2017 through at least January 25, 2018, the

9 defendants succeeded in raising as much as $21 million in the form of various digital

10 assets, such as Ether and Bitcoin, and cash from dozens of investors located in at least

11 18 states, including California, and abroad, who purchased BAR.

12       7.    Throughout this scheme, Defendants made false and misleading claims all

13 with the purpose of enticing investors and hyping BAR so that Defendants could profit.

14 Defendants' key misrepresentations included prominently identifying by name and logo

15 nearly thirty large well-known companies (and the Federal Reserve) as purported

16 customers, and would-be customers of TBIS's information technology ("IT") services.

17 One of the first images that bombarded investors in defendants' written offering

18 materials depicted a full page chart with the following names and logos:



Figure 2: The EHI ⇔ Titanium Connection

1   The lure of the companies' names and logos was such that Stollaire himself tweeted

2   out this chart on November 6, 2017 (which remains on his Twitter feed to this day)

3   and mentioned several of these companies by name in the many online interviews he

4   gave about TBIS.  TBIS's website also listed names and logos of other companies as

5   purported customers, and would-be customers of TBIS -- Verizon, McDonald's,

6   Cisco, Pfizer, SAP, HP, and Acxiom.

7       8.     The defendants did not have relationships with these companies (or the

8   Federal Reserve) and had no basis to represent that any of them were customers of

9   TBIS's services, or even would-be customers of TBIS's services.

10      9.     Defendants also advertised in TBIS's whitepaper and other marketing

11  materials a bevy of trademarked products and services TBIS would purportedly

12  provide; however, defendants had no actual trademarks.

13      10.    While raising funds from investors on these false pretenses, Stollaire

14  commingled some of the ICO investors' funds with his personal funds, using at least

15  a portion of the offering proceeds for expenses unrelated to TBIS, such as credit card

16  payments and the payment of bills for Stollaire's Hawaii condominium.

17      11.    Shortly after completion of the ICO, Stollaire and TBIS began to receive

18  demands from some of the companies in February 2018 that he and TBIS

19  immediately stop referencing the companies and their logos.  The defendants

20  removed from TBIS's offering materials the names and logos of the companies, with

21  Stollaire responding to at least one company "I did not know that a procedure would

22  need to have been followed, etc." As of May 21, 2018, the logos of several of the

23  companies are still present on EHI's website.

24      12.    In addition to falsely promoting TBIS's and EHI's supposed

25  relationships with the well-known companies, the defendants fictionalized a series of

26  client testimonials that they used on TBIS's and EHI's websites.  The testimonials

27  were false and misleading in several ways: either the person quoted no longer worked

28  at the company, the person's quoted name and/or title was fake, and/or the company

had not authorized the publication of any testimonials.

13.     Around the same time that the defendants were receiving cease-and-desist letters from the companies whose names and logos they were improperly using, the defendants announced that in "a malicious act," approximately 16 million BAR digital assets held by TBIS that could be sold at any time, were stolen in an "illegal theft" thereby devaluing BAR.  To address the theft, defendants created a replacement digital asset, TBAR, to issue to BAR investors on a 1:1 basis.

14.     Faced with a conundrum following the company demand letters and BAR theft, defendants needed to shift their marketing campaign in order to continue with their scheme to promote TBIS and inflate the value of BAR/TBAR, which the defendants themselves still held.  The defendants deflected attention away from TBIS's ersatz customers that had been the centerpiece of its touting: the well-known companies' names and logos.  Now, the defendants tout purported meetings Stollaire has had with unidentified people from unidentified companies based abroad, only describing the entities as "billion-dollar companies" in emerging non-U.S. markets.

15.     The defendants also touted various trademark-protected intellectual property, services, products, and a slogan that were mentioned in earlier materials, and created a new one to tout, "VORDEX™," a purported peer-to-peer cryptocurrency exchange.  Each of these trademarked names and phrases was intended to validate TBIS's purported business as a provider of a vast number of blockchain-based IT services.  Critically, however, the defendants never owned any of these trademarks.  Nevertheless, following the changed marketing campaign, the defendants now highlight these services, including in TBIS's weekly update.  As recently as April 20, 2018, TBIS announced it "is proud to present VORDEX!"

16.     Stollaire continues to appear for interviews about TBIS and the defendants continue to regularly post on social media in furtherance of the "inflate" part of this scheme.  For example, to attempt to create interest and drive up trading volume for BAR/TBAR, on April 27, 2018, the defendants announced a "South

Korean Liaison" to promote TBIS "in one of the world's largest crypto markets" and to focus on "large South Korean exchanges."  On May 4, 2018, the liaison stated she was "getting our token listed on the largest Korean exchanges" and "sourcing Korean crypto influencers to help get the word out."

17.     Also on May 4, 2018, TBIS hinted about TBAR trading developments stating, "We are excited to announce that TBAR will be listed on a well known exchange soon.  We will make an official announcement after TBAR is live on their platform."  TBIS followed up with an announcement on May 14, 2018: "TBAR Listed on HitBTC!," a digital asset platform.

18.     By lying to investors and perpetrating a fraudulent scheme through the TBIS ICO, each of the defendants violated the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  In addition, Stollaire and TBIS also violated the securities offering registration provisions of Section 5 of the Securities Act.

## THE DEFENDANTS

19.     **Titanium Blockchain Infrastructure Services, Inc.**, a California corporation, is based in Sherman Oaks, California.  TBIS's website is registered to Stollaire.  TBIS has never been registered with the SEC in any capacity, and has neither registered any securities with the SEC nor filed any Forms D covering its offering of securities in the form of digital assets.  In addition to being incorporated in California, TBIS filed Articles of Incorporation with Wyoming on February 20, 2018, and on March 5, 2018 it filed to become a foreign corporation operating in Oregon.

20.     **EHI Internetwork and Systems Management, Inc.**, a California corporation, was based in Stollaire's residence in Sherman Oaks, California, until about March 2018 when it moved to an office in Sherman Oaks.  It is also known as EHI-INSM, Inc., which is not incorporated in any jurisdiction.  EHI's website is registered to Stollaire.  EHI has never been registered with the SEC in any capacity.

21.     **Michael Alan Stollery**, age 50, resides in Sherman Oaks, California.

He commonly uses the alias Michael Stollaire, and has also used the alias Michael Stoller.

22.     Stollaire is the founder, CEO, president, and sole director of TBIS, and is the president and sole director of EHI.  He is not registered with the SEC in any capacity.

## FACTUAL ALLEGATIONS

### A.     Background on Initial Coin Offerings

23.     An initial coin offering or "ICO" is a fundraising event in which an entity offers participants a unique "coin" or "token" or "digital asset," in exchange for consideration, often in the form of virtual currency—most commonly Bitcoin and Ether—or fiat currency.

24.     The digital assets are issued on a "blockchain" or cryptographically secured ledger.

25.     A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks.  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain.  The system relies on cryptographic techniques for secure recording of transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  The Bitcoin blockchain is an example of a "non-permissioned," or public and open access blockchain.  Anyone can download the Bitcoin open-source software and join.  All participants share a single view of the Bitcoin blockchain, which is updated when Bitcoin network participants reach a consensus on the validity of transactions under review.  "Permissioned" or private blockchains are modifications to that model and require permissioned servers to be approved to participate on the network or to access particular information on the blockchain.  Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a

contract when certain triggering conditions are met.

26.    Generally, digital assets entitle holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  These digital assets may also be listed on online platforms, often called virtual currency exchanges, and tradeable for virtual or fiat currencies.  Often, the digital assets are immediately tradeable.

27.    ICOs are typically announced and promoted through public online channels.  Issuers usually release a "whitepaper" describing the offering and the terms of the ICO.  To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account.  After the completion of the ICO, the issuer distributes its unique digital assets, commonly known as "tokens," to the participants' unique addresses on the blockchain.

28.    On July 25, 2017, the SEC issued a Report of Investigation pursuant to Section 21(a) of the Exchange Act that put the digital asset industry on notice that many digital assets are securities and subject to the federal securities laws and the registration requirements, regardless of whether the issuing entity is a traditional company or a distributed ledger or blockchain-enabled means of capital raising, regardless of whether the securities are purchased with U.S. dollars or virtual currencies, and regardless of whether the securities are distributed in certificated form or through distributed ledger technology.

**B.    Defendants Create BAR**

**1.    Stollaire Lays the Foundation for the Scheme**

29.    On August 14, 2017, Stollaire announced on his personal Twitter feed "I just came up with a new idea for an Initial Coin Offering (ICO).  Blockchain developers needed.  Stay tuned."  From that point, Stollaire increasingly tweeted about digital assets generally, and embarked on a social media campaign to grow his followers and establish an online presence.

30.    Within weeks of announcing he "just came up with a new idea" for an

ICO, Stollaire mentioned TBIS for the first time.  One of these posts, on Facebook, depicted a picture of the TBIS logo and a photo showing the cover of a TBIS "White Paper."  A little more than a week after these posts, Stollaire incorporated TBIS on October 10, 2017.

31.    On the same day he incorporated TBIS, Stollaire also created an official TBIS Twitter account, published the link to the official TBIS Telegram channel and asked his followers to join, and posted an announcement on TBIS's Facebook page to a YouTube video titled "TBIS Introduction."

32.    TBIS portrayed itself as a start-up company seeking to develop an IT platform using blockchain technology.  On its various social media accounts, TBIS's profile is some variation of the following: "Just as steel changed the building industry forever, Titanium will usher in a new era of network construction, based on blockchain technology."

33.    Soon after establishing TBIS's social media accounts/channels, on October 30, 2017, Stollaire tweeted "The Titanium BAR Token, now listed on @CryptoCompare –."  Stollaire also retweeted a post from CryptoCompare (a website devoted to digital assets): "BAR added to Upcoming ICO list."  The next day Stollaire tweeted that the TBIS ICO had been rated and listed on Coin Telegraph (another website that provides news regarding digital assets and blockchain).

### 2.    The TBIS ICO

34.    The TBIS ICO purportedly was designed to "crowdfund" to raise money to create products and services for the TBIS platform.  Stollaire admitted as much in a video called "Titanium This Week" posted on YouTube on December 23, 2017.  In the video, Stollaire said that ICOs are "simply a miracle" because they allow projects like TBIS to obtain "start-up funding."  In a print interview posted online in December 2017 Stollaire publicly described BAR as a "token we are using to raise money via the ICO method."

35.    Stollaire undertook an extensive social media and marketing campaign

as a precursor for the ICO launch on January 1, 2018.  This campaign included self-produced YouTube videos, frequent social media posts, paid-for interviews and online ads on Facebook, and downloadable materials posted online.  Stollaire's promotion included prolific tweets, such as the following illustrative list of announcements in a one week period:

| Date | Subject |
|---|---|
| November 10, 2017 | TBIS "pre-sale" to ICO would be open until December 31st and includes link to TBIS's website, www.tbis.io |
| November 13, 2017 | Details for TBIS ICO listed on website CryptoCanuks.com |
| November 13, 2017 | Stollaire appearance on "The Larry & Joe Show," a talkshow on You Tube where Stollaire will talk "Titanium" |
| November 14, 2017 | TBIS ICO information listed on ICOQuest.com (a website that provides information regarding ICOs) |
| November 14, 2017 | Asks followers to join TBIS Telegram community group |
| November 15, 2017 | TBIS ICO listed on Smith + Crown (a blockchain research organization) |
| November 17, 2017 | TBIS ICO listed on CoinDelite.com (a website that provides information and price charts on ICOs) |

36.    The defendants employed various high pressure sales tactics even before the official launch of the TBIS ICO on January 1, 2018.  On November 24, 2017, the defendants announced a "special offer" that TBIS was waiving the minimum

purchase amount of $5,000 and allowing BAR purchases in any amount, saying
supplies are limited and will not last long.  The next day Stollaire tweeted "Over
$100,000 raised in less than 24 hours!"

37.     To further generate investor demand in BAR, the defendants devised other
incentives.  On November 27, 2017, they announced a "Cyber Week Sale" (and include
a "cyber Monday" hashtag) where investors will receive a 30% bonus, allowing
investors to receive additional BAR, which will decrease by one percent each day
during the sale.  Later, they offered a free TBIS logo t-shirt or TBIS gear box filled with
TBIS logo-emblazoned items when certain quantities of BAR are purchased.

38.     Meanwhile during this time period, Stollaire or TBIS are mentioned in
articles published by *Forbes, Inc.*, and *The Bitcoin News*, and Stollaire, who described
himself as a "blockchain evangelist," is interviewed on shows hosted by cryptocurrency
and ICO followers and posted on their YouTube channels.

39.     Throughout, the defendants distinguished TBIS by highlighting its use of
blockchain technology to develop an IT platform, and in online interviews Stollaire
framed TBIS as competing with cloud computing services provided by Amazon Web
Services and Microsoft Azure.

40.     Stollaire promotes TBIS as an investment and emphasizes that holders of
BAR (investors, Stollaire, and TBIS personnel) would share in TBIS's future earnings
and in appreciation in the value of the BAR digital assets.  In a transcript of an online
interview posted on January 11, 2018, Stollaire stated, "there's been multi-generation
investments…You know, purchases have taken place where a son or daughter has
introduced their mom and their grandmother to Titanium and they've purchased
it….It's a good investment."  Stollaire even compared investing in TBIS to purchasing
Google stock early on at $75 per share: "I've gone outside the subculture of blockchain
and people on the street are investing in it like they would buy stocks and, you know,
Intel or Google on Wall Street….[L]ike Google I was one of the lucky that was invited
to the lottery, and I bought it at $75….And so that's the way I view Titanium."

### 3.       The TBIS Whitepapers

41.     To explain its ICO, TBIS issued several versions of its whitepaper, including one on December 14, 2017 and a revised version of the whitepaper on January 16, 2018.  Another revised, undated version of the whitepaper was available on the TBIS website as of April 20, 2018.  The website now states "New whitepaper is forthcoming."

42.     Stollaire is the lead author of the TBIS whitepapers and was involved in every revision to the whitepapers through at least the January 16, 2018 whitepaper.

43.     In its whitepapers, TBIS represents that, once built, the TBIS platform's goals will be to provide a variety of IT services, including network infrastructure, and to launch new ICOs.

44.     Although BAR was characterized in the TBIS whitepapers as a "utility token," it did not have any functionality at the time of the ICO (nor does it currently), and was sold as an investment.

45.     None of the services that Stollaire and TBIS said that TBIS would offer existed at the time of the ICO, and there was no platform to access and no way to "use" BAR at the time of the ICO.

46.     The December 2017 and January 2018 TBIS whitepapers represented that the total overall supply of BAR would be 60 million digital assets, distributed as follows: 60% for investors; 20% held by TBIS (including Stollaire) for incentives and other uses; 10% as "community bounties"; and 10% as a reserve pool.

47.     The December 2017 and January 2018 whitepapers represented that the funds raised may be spent on the company during its "maturation and advancement." The TBIS ICO pooled investor funds for these purposes.

48.     The December 2017 and January 2018 TBIS whitepapers outlined the ICO's minimum fundraising goals, which they describe as a "soft cap" of $1 million. The whitepapers describe that target as the "runway" necessary for the TBIS platform to be finished and released.  The whitepapers also describe a "hard cap" of $35

1  million, which ostensibly is the ICO's maximum fundraising amount.

2      49.    The TBIS whitepapers set forth the price at which BAR digital assets

3  would be offered as 1 BAR per U.S. Dollar along with various bonuses depending on

4  the timing of purchases of the digital assets or investor referrals.

5      50.    The defendants successfully managed the first half of their scheme by

6  creating BAR and raising as much as $21 million from dozens of investors in the

7  United States (including California) and abroad through the TBIS ICO.  From just

8  those investors who invested cash, at least 75 investors purchased BAR, including 18

9  who reside in the U.S.  Because TBIS also accepted investments in the form of digital

10  assets Ether, Bitcoin, Bitcoin Cash, Litecoin, and Dash, the total number of investors

11  who purchased BAR is not known.

12      51.    Stollaire commingled some of the ICO investors' funds with his

13  personal funds.  Of more than $300,000 that the defendants received from investors

14  in cash, more than $200,000 was transferred to Stollaire's personal bank account.  Of

15  the remainder, approximately $50,000 was used to pay credit card bills and $50,000

16  was sent to EHI.  Stollaire used at least a portion of the offering proceeds for

17  expenses unrelated to TBIS, such as the payment of bills for Stollaire's Hawaii

18  condominium.

19      52.    BAR digital assets became immediately tradeable on digital asset

20  platforms and, shortly after the ICO ended, BAR traded actively on several digital

21  asset platforms.  Based on data obtained from a blockchain transaction monitoring

22  website, as of May 21, 2018 the current value of one BAR was $0.004253, and the

23  current value of one TBAR was $0.243117.  Both BAR and TBAR continue to trade

24  on several digital asset platforms.

25  **C.**    **The Defendants Made Material Misrepresentations and Omissions**

26          **in Connection with the TBIS ICO**

27        **1.**    **Fictitious business relationships and testimonials**

28      53.    To buttress the defendants' claims that the TBIS platform would be

widely accepted by users and TBIS would grow to compete with Amazon and Microsoft, the December 2017 whitepaper represented, under a heading "Business Growth and Development," that "We will be marketing our platform to ensure healthy growth.  This is not only important for ensuring that TBIS remains the best platform…but also for marketplace participants, as their ability to earn BAR will depend entirely on the size of the user base."

54.    The December 2017 whitepaper goes as far as containing five-year financial projections that projected TBIS's sales progressing from $25 million in 2018 to $51.8 million by 2022.

55.    To support claims of widespread user acceptance and growth, the December 2017 and January 2018 TBIS whitepapers falsely claim that its "sister-company" EHI had relationships with more than two dozen well-known companies and the Federal Reserve.

56.    The defendants plainly admit to the importance that TBIS has users of its blockchain-based IT services.  The whitepapers matter-of-factly state that "Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service:  finding companies and people that will actually use them" and then boldly – and falsely – proclaim "Titanium will not have this problem."

57.    In its December 2017 whitepaper, to establish why TBIS will not have "this problem," TBIS falsely says that it "will simply inherit" EHI's clientele and "will leverage" these relationships "immediately."  The whitepaper further touts the purportedly critical benefit of this relationship as "The EHI Advantage" and "The EHI ↔ Titanium Connection."

58.    It was clear that the defendants considered it important that investors believe TBIS will tap a ready stable of customers through EHI.  On the third substantive page of the December 2017 whitepaper, under a section titled "TITANIUM: The EHI Advantage," the defendants falsely proclaim:

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately.

CLIENTS

- Accenture
- APPLE
- Applied Materials
- Boeing
- Cargill
- Citizens Bank
- eBay
- ERCOT
- Exelon
- General Electric
- Hewlett-Packard
- Honeywell
- IBM
- Intel
- Microsoft
- PayPal
- Pfizer
- Santa Barbara Bank and Trust
- Synchrony Financial
- The Bank of Scotland in Ireland
- The Federal Reserve Bank
- The Royal Bank of Scotland
- TrueCar.com
- Universal Studios
- Walt Disney

59.    The December 2017 and January 2018 whitepapers included a full page chart containing the logos of all but one of the listed companies with which EHI purportedly maintained business relationships, as well as the Federal Reserve, as depicted below:



60.    On TBIS's website as of January 29, 2018, TBIS similarly made false statements about its relationships with numerous specific blue-chip companies.  TBIS identified by name and corporate logo nearly thirty well-known companies as clients of EHI – additionally including Verizon, McDonald's, Cisco, Pfizer, SAP, HP, Acxiom – and included a hyperlink to EHI's website for its client list and testimonials.  The TBIS website falsely represented specifically with respect to these clients: "*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger*." (Emphasis in original).

61.     In the January 2018 whitepaper, TBIS continued making false claims of relationships with top corporations by showcasing once more the corporate logos, and describing the companies as "EHI's customers, which Titanium could potentially leverage immediately."

62.     In addition to TBIS prominently highlighting its fabricated business relationships with the well-known companies in its whitepapers, which were accessible on TBIS's website, and on TBIS's and EHI's websites themselves, Stollaire emphasized these fake relationships in interviews about the company's ICO.

63.     For example, Stollaire responded in an interview on a YouTube channel, "P2P Cryptoz" on January 11, 2018, when asked how TBIS would compete with the "giants" in the industry:  "[i]t's the inroad that I previously had with my first company, EHI.  These relationships are real.  We're in talks with McDonald's, with Walt Disney, with Intel, with Verizon right now….We've got quite a client list."

64.     In another interview on February 12, 2018, which was posted online, Stollaire claimed that "EHI's clients are household names from the Fortune 500, Government and Education, which is a huge advantage for Titanium.  I envisioned Titanium as 'EHI v2.0' that would provide Infrastructure as a Service (Iaas) to EHI's existing clientele, which will be a warm handoff from a known, trusted source…"

65.     In fact, and inconsistent with Stollaire's descriptions, EHI was merely an entity through which Stollaire performed contracted-for IT services on discrete assignments or resold certain IT gear.

66.     Contrary to the defendants' representations in the whitepapers, on TBIS and EHI websites, and in interviews, none of these entities had any business relationship with TBIS, and none of them had any business relationship that involved blockchain technology, digital assets, or an ICO.  Nothing about their connections with EHI warranted the false claims that TBIS would benefit from their business. And critically, none of the entities had authorized use of their name or logo in connection with the TBIS ICO or for any other related purpose, or had even heard of

TBIS.

67.     By emphasizing these purported relationships, the defendants falsely told investors that TBIS would "immediately" receive business from these entities, and included baseless financial projections, thereby seemingly generating expected future returns for TBIS and for BAR purchasers.

68.     In February 2018, Stollaire began receiving cease-and-desist letters from some of the companies whose names and logos he was using with neither their permission nor any factual basis for doing so.  He vowed to several such companies that he would remove their names and logos at once—in effect conceding he had no basis for using them.

69.     Stollaire knew that TBIS had no such clients or prospects, and he knew that using their logos infringed on the companies' trademarks.  In responding to a cease-and-desist letter from one company on March 15, 2018, Stollaire claimed "we were not aware that this constituted infringement," even though he had been notified by a different company the month before that the use of its trademark constituted infringement.

70.     The misrepresentations regarding TBIS's purported clients are material. The misrepresentations about business relationships between TBIS, EHI, and Stollaire and the multinational corporations go to the core of TBIS's purported IT platform and claimed business operations.  They are likely to alter a reasonable investor's view of the legitimacy and viability of TBIS's securities offering because they relate to TBIS's ability to develop and market its platform, and consequently, the likelihood that investors will receive any return on their investment or the return of their principal.

71.     Each of the defendants knew or was reckless in not knowing, or acted negligently in not knowing that their representations that TBIS was positioned to inherit EHI's purported clients were false.  The defendants also knew or were reckless in not knowing, or acted negligently in not knowing that the well-known

companies identified by name and logo in TBIS's whitepapers and linked through EHI's website did not have any business relationship with TBIS and had not authorized the use of their name or logo in connection with the TBIS ICO.

72.    TBIS's website also linked to EHI's website, which contained several testimonials from individuals purporting to be associated with the various companies and the Federal Reserve.  The defendants' use of testimonials served to give credence to the existence of the corporate relationships.

73.    These testimonials, however, were false and misleading in several ways: (a) for at least two of the companies, the person never gave the testimonial that defendants posted; (b) for at least two of the companies, the person quoted as providing a testimonial never held the position listed in the testimonial; (c) for at least four of the companies, the person quoted as providing a testimonial no longer worked at the company when the defendants posted their testimonial; and (d) for at least four of the companies, the company did not authorize the posting of the testimonial.

74.    For example, one of the illegitimate testimonials was from a purported "Director of Network Engineering" for eBay.  The testimonial stated that "EHI is all about doing a quality job and delivering the results without delay.  It has been a pleasure working with EHI."  In reality, the purported source of the testimonial never held or used the title that was attributed to him, and he denied providing the testimonial that was attributed to him.  Moreover, eBay did not authorize the use of the testimonial or the company's name or logo on the TBIS website.

75.    Another testimonial was attributed to a purported operations manager named "Gibson" at TrueCar.com.  That testimonial stated that EHI "installed and managed a sophisticated set of tools" and that TrueCar was "able to better manage and administer the complex system with the help of EHI's expertise."  But there is no record of any individual with the last name of Gibson having worked at TrueCar or its predecessor since September 2015.  Moreover, TrueCar would not have approved the use of the testimonial in any event, given the absence of any ongoing business

1    relationship between the company and TBIS, EHI, or Stollaire.

2         76.    Another example further highlights the defendants' fraudulent use of the

3    testimonials.  A testimonial attributed to a "Director of Enterprise Technology" at

4    Santa Barbara Bank and Trust stated that EHI "provided expert level assistance in

5    getting our enterprise management and IT Security installation customized to our

6    requirements….I would definitely use his (sic) services again if I had the opportunity

7    to."  A second testimonial attributed to a senior systems administrator at the same

8    bank stated that "EHI was the lead on some major projects…[h]is professionalism

9    and technical skills were far above what we were used to….[h]e was able to

10   implement and troubleshoot issues far better than anyone I've ever worked with."

11   But no one with the names of the purported authors of the testimonials worked at the

12   bank at least as far back as August of 2012, when the bank merged with Union Bank,

13   NA.  Moreover, neither Santa Barbara Bank and Trust nor Union Bank ever

14   authorized TBIS, EHI, or Stollaire to use the bank's name or logo in their marketing

15   or advertising or for any other purpose, nor did they authorize the use of the

16   purported testimonials.

17        77.    One more example of the egregious nature of the defendants' use of the

18   testimonials is the purported testimonial from a "service delivery manager" with the

19   Federal Reserve Bank.  The testimonial states, in its entirety, "Best enterprise

20   management team I have ever worked with.  Talented, conscientious, hard worker,

21   excellent communication skills.  The entire package!"  The purported author of the

22   testimonial, however, was not an employee of the Federal Reserve Bank, nor

23   authorized to speak on its behalf, but rather was a contractor from May 2010 to

24   September 2012.

25        78.    The misrepresentations regarding the testimonials are material.  The

26   illegitimate testimonials and recommendations from representatives of purported

27   large users of IT services attesting to Stollaire's and EHI's expertise, knowledge, and

28   dedication as IT providers relate to TBIS's ability to develop and market its platform,

and consequently, the likelihood that investors will receive any return on their investment or the return of their principal.

79.   Each of the defendants knew or was reckless in not knowing, or acted negligently in not knowing that their representations that the testimonials lauding TBIS were fabricated, misleading, and/or unauthorized.

### 2.   Defendants falsely represent that they own intellectual property

80.   The TBIS whitepapers and other marketing materials included detailed descriptions of several products and services that would be available on the TBIS platform, as well as slogans that TBIS used:  Company as a Service™, Bring Your Own Cloud™ (BYOC™), DEXchange™, Mining as a Service™,  Instant ICO Incubator™, Desktop as a Service™ (DaaS™), CryptoEscrow™, The Ultimate Strength of the Blockchain … Unleashed™, VORDEX™.

81.   The whitepapers listed these purportedly trademark-protected items along with other products under the heading "CORE OBJECTIVES, PRODUCTS AND SERVICES."

82.   By affixing the "™" symbol to TBIS's core products and services, the defendants represented these to be trademark-protected.

83.   None of the claimed trademarks belong to the defendants.  And with one exception, none of the claimed trademarks even has an application pending with the U.S. Patent and Trademark Office ("PTO").  The chart below lists the services or phrases claimed by TBIS, and their statuses under the PTO:

| Service Name or Slogan | U.S. Patent and Trademark Office Status |
| --- | --- |
| Company as a Service™ | applications filed by EHI and an unrelated entity pending |
| Bring Your Own Cloud™ (BYOC™) | Not registered to defendants |
| DEXchange™ | Not registered to defendants |
| Mining as a Service™ | Not registered to defendants |
| Instant ICO Incubator™ | Not registered to defendants |
| Desktop as a Service™ (DaaS™) | Not registered to defendants |

| Service Name or Slogan | U.S. Patent and Trademark Office Status |
|---|---|
| Company as a Service™ (CaaS™) | Not registered to defendants |
| CryptoEscrow™ | Not registered to defendants |
| The Ultimate Strength of the Blockchain… Unleashed™ | Not registered to defendants |
| VORDEX™ | Not registered to defendants |

84.   In addition, the legitimacy of another TBIS core product listed, "Infrastructure as a Service (IaaS)," is dubious.  According to the December 2017 and January 2018 whitepapers, in a "Development Roadmap" chart setting out milestones and timeframes, TBIS represents it would release the "Core Platform IaaS" shortly after the ICO, and well within the first half of 2018.  Despite claiming only $1 million was needed as the "runway" necessary for the TBIS platform to be finished and released, and even though it raised as much as $21 million, TBIS inexplicably claimed that it would release a "demonstration" of this self-described proprietary and core product on or before March 1, 2018.  By April 2018 TBIS had changed the milestone on the development roadmap from "Core Platform IaaS" to "Minimum Development Product (MVP)".

85.   TBIS released a demonstration of product on or before March 1, 2018, but significant questions exist regarding what it released because TBIS's Chief Technology Officer at the time of the release denounced the demonstration as "fake" in an interview posted on YouTube around March 13, 2018.

86.   Following the interview, the CTO was terminated.

87.   If nothing else, the "demonstration" revealed on March 1, 2018 did not constitute any working product or service ready for any customer.  The lack of any working product or service, lack of any trademark protected product or service, and lack of any customer reveals that TBIS baselessly projected revenue to reach $25 million in 2018.

88.   The misrepresentations regarding TBIS's purported intellectual property are material, in that they relate to the legitimacy of TBIS's products, services, and

slogans, and consequently to TBIS's ability to develop and market its platform and the likelihood that investors will receive any return on their investment or the return of their principal.

89.    Each of the defendants knew or was reckless in not knowing, or acted negligently in not knowing that the products and services that they claimed were trademarked were not.

**D.    The BAR Theft and the Creation of TBAR**

90.    Shortly after completion of the ICO, and after receiving demand letters that Stollaire and TBIS cease using companies' names and logos, on February 22, 2018, TBIS announced that 16 million BAR digital assets had been "taken" from TBIS digital wallets "in a malicious act" and issued a notice to the digital asset platforms to halt BAR trading as a result of the "illegal theft."

91.    In response to the theft and to avoid dilution of BAR, TBIS announced it created a second digital asset, called TBAR, to replace BAR on a 1:1 ratio. TBIS announced that it would issue TBAR to all investors who had purchased BAR from TBIS during the ICO, and to investors who had purchased BAR through digital asset platforms.

92.    In one of the few interviews Stollaire gave in the few weeks following the theft, he claimed that he had reported the BAR theft to the Los Angeles Police Department.

93.    As of May 14, 2018, TBIS acknowledged that BAR remained trading on digital currency exchanges in response to an investor's question and comment that the continued trading of BAR made it confusing to "new investors and also draws attention from TBAR."

**E.    Defendants' Attempts to Prop Up or Inflate TBAR**

94.    TBIS's purported business model underwent an abrupt change following the cease-and-desist letters and the reported BAR theft. Instead of promoting TBIS's connections to U.S. blue-chip companies, Stollaire has begun touting connections to

"billion dollar companies" in non-U.S. emerging markets, and claiming that TBAR is available for purchase by Chinese citizens only.

95.    The defendants increasingly appear to be focused on generating trading activity in TBAR, including overseas.  On April 27, 2018, TBIS announced it had "recruited" an individual as its new "South Korean Liaison" who would promote TBIS "in one of the world's largest crypto markets."  Her responsibilities include "immediately . . . focusing on large South Korean exchanges, social media influencers . . ."

96.    In a May 4, 2018 update from TBIS, the liaison stated she was "getting our token listed on the largest Korean exchanges" and "sourcing Korean crypto influencers to help get the word out" in response to a question about her progress.

97.    In the same update, TBIS also stated "we are excited to announce that TBAR will be listed on a well-known exchange soon.  We will make an official announcement after TBAR is live on their platform."

98.    On May 14, 2018, TBIS announced "TBAR Listed on HitBTC!"

###    F.    TBIS's ICO and the BAR and TBAR digital assets were not registered with the SEC

99.    Federal securities laws require that companies disclose certain information through the registration of the offer or sale of securities with the SEC. This information allows investors to make informed judgments about whether to purchase a company's securities.

100.    The TBIS ICO is an offering of securities, in the form of BAR (and later TBAR) digital assets, which must be registered with the SEC unless an exemption applies.  No registration exemption applies to the TBIS ICO or to the BARs or TBARs.  The TBIS ICO was not limited by number of investors, or investor accreditation status.  TBIS and Stollaire offered and sold securities in the form of BAR (later TBAR) digital assets to the general public, including to investors throughout the United States.

23

101.   TBIS is liable for the registration violations because it was the issuer of the BAR (and later TBAR) digital assets.  Investors sent funds and digital assets to TBIS accounts to purchase the BAR digital assets.  Stollaire is liable under for the registration violations because he was a necessary participant and a substantial factor in the offer and sale of securities in the form of BAR digital assets.  The BAR digital assets were sold through the TBIS website that Stollaire set up to attract investors.  Stollaire incorporated TBIS, created TBIS's social media accounts, was the lead author of TBIS's whitepapers, and was the sole signatory on TBIS's bank accounts during the ICO.  But for Stollaire's actions, the unregistered offers and sales of BAR digital assets would not have occurred.

102.   The defendants' offer and sale of BAR and TBAR digital assets was not registered with the SEC in any way.

### FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10b of the Exchange Act**

**And Rules 10b-5(a) and 10b-5(c) Thereunder**

**(Against All Defendants)**

103.   The SEC realleges and incorporates by reference paragraphs 1 through 102 above.

104.   As alleged above in paragraphs 29 through 98, each of the defendants participated in activities with the principal purpose and effect of creating a false appearance regarding TBIS's ability to obtain as customers the companies with which EHI purportedly had an existing business relationship, and the intellectual property status of TBIS's purported trademarks, in order to, among other things, convince investors to invest in TBIS.

105.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities

of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

106.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### (Against All Defendants)

107.   The SEC realleges and incorporates by reference paragraphs 1 through 102 above.

108.   As alleged above in paragraphs 29 through 98, each of the defendants made material misrepresentations and omissions to investors and prospective investors regarding TBIS's ability to obtain as customers the companies with which EHI purportedly had an existing business relationship, and the intellectual property status of TBIS's purported trademarks in order to, among other things, convince investors to invest in TBIS.

109.   By engaging in the conduct described above, each of the defendants directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

110.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act**

**(Against All Defendants)**

111.   The SEC realleges and incorporates by reference paragraphs 1 through 102 above.

112.   As alleged above in paragraphs 29 through 98, each of the defendants participated in a scheme to defraud purchasers of TBIS's securities by falsely characterizing TBIS's ability to obtain as customers the companies with which EHI purportedly had an existing business relationship, and the intellectual property status of TBIS's purported trademarks in order to, among other things, convince investors to invest in TBIS.

113.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) with scienter, employed devices, schemes, or artifices to defraud; and (c) with scienter or negligently, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

114.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3).

**<u>FOURTH CLAIM FOR RELIEF</u>**

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(2) of the Securities Act**

**(Against All Defendants)**

115.   The SEC realleges and incorporates by reference paragraphs 1 through 102 above.

116.   As alleged above in paragraphs 29 through 98, each of the defendants

obtained money by means of untrue statements and omissions regarding TBIS's ability to obtain as customers the companies with which EHI purportedly had an existing business relationship, and the intellectual property status of TBIS's purported trademarks.

117.   By engaging in the conduct described above, each of the defendants, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, with scienter or negligently, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118.   By engaging in the conduct described above, each of the defendants violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

### FIFTH CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(Against TBIS and Stollaire)**

119.   The SEC realleges and incorporates by reference paragraphs 1 through 102 above.

120.   As alleged above in paragraphs 29 through 52 and 99 through 102, defendants TBIS and Stollaire directly or indirectly offered and sold securities of TBIS in an offering or offerings that were not registered with the SEC.

121.   By engaging in the conduct described above, defendants TBIS and Stollaire directly or indirectly, singly or in concert with others, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of

transportation, securities for the purpose of sale or for delivery after sale, when no
registration statement had been filed or was in effect as to such securities, and when
no exemption from registration was applicable.

122.   By engaging in the conduct described above, defendants TBIS and
Stollaire violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c)
of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c)

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that the defendants committed the
alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of
Civil Procedure, temporarily, preliminarily, and permanently enjoining Defendants and
their officers, agents, servants, employees and attorneys, and those persons in active
concert or participation with any of them, who receive actual notice of the judgment by
personal service or otherwise, and each of them, from violating Section 17(a) of the
Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C.
§§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and enjoining
defendants TBIS and Stollaire and their officers, agents, servants, employees and
attorneys, and those persons in active concert or participation with any of them, who
receive actual notice of the judgment by personal service or otherwise, and each of
them, from violating Sections 5 of the Securities Act [15 U.S.C. §§ 77e].

## III.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order
and a preliminary injunction freezing the assets of Defendants, requiring accountings
from each of the Defendants, appointing a receiver over TBIS, prohibiting each of the
Defendants from destroying documents, and granting expedited discovery.

## IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Stollaire from participating, directly or indirectly, in an offering of digital or other securities.

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  May 22, 2018

/s/ *David J. Van Havermaat*
David J. Van Havermaat
David S. Brown
Attorneys for Plaintiff
Securities and Exchange Commission