**FILED**
CLERK, U.S. DISTRICT COURT

5/22/18

CENTRAL DISTRICT OF CALIFORNIA
BY: CS                    DEPUTY

1   DAVID J. VAN HAVERMAAT (Cal. Bar No. 175761)
    Email: vanhavermaatd@sec.gov
2   DAVID S. BROWN (Cal. Bar No. 134569)
    Email: browndav@sec.gov
3

4   Attorneys for Plaintiff
    Securities and Exchange Commission
5

6   Joseph G. Sansone, Unit Chief (Market Abuse Unit)
    New York Regional Office
7   200 Vesey Street, Suite 400
    New York, New York 10281

8   Robert A. Cohen, Unit Chief (Cyber Unit)
    Headquarters
9   100 F Street, N.E.
    Washington, District of Columbia 20549

10  Michele Wein Layne, Regional Director
    Amy Jane Longo, Regional Trial Counsel
11  444 S. Flower Street, Suite 900
    Los Angeles, California 90071
12  Telephone: (323) 965-3998
    Facsimile: (213) 443-1904
13

**LODGED**
CLERK, U.S. DISTRICT COURT

5/22/18

CENTRAL DISTRICT OF CALIFORNIA
BY: CS                    DEPUTY

14              **UNITED STATES DISTRICT COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16

17  SECURITIES AND EXCHANGE          Case No.  **CV18-4315-DSF(JPRx)**
    COMMISSION,
18                                    **DECLARATION OF DAVID S. BROWN**
                     Plaintiff,
19                                    **(FILED UNDER SEAL)**
20          vs.

21  TITANIUM BLOCKCHAIN
    INFRASTRUCTURE SERVICES, INC.;
22  EHI INTERNETWORK AND
    SYSTEMS MANAGEMENT, INC. aka
23  EHI-INSM, INC.; and MICHAEL
    ALAN STOLLERY aka MICHAEL
24  STOLLAIRE,

25
                     Defendants.
26

27

28

### <u>DECLARATION OF DAVID S. BROWN</u>

I, David S. Brown, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am an attorney admitted to practice law by the State Bar of California. I am employed by the U.S. Securities and Exchange Commission (the "Commission") as a staff attorney in the Division of Enforcement in the Los Angeles Regional Office in Los Angeles.  I make this declaration in support of the Commission's *Ex Parte* Application For Temporary Restraining Order and Orders: (1) Freezing Assets; (2) For Accountings; (3) Prohibiting the Destruction or Alteration of Documents; (4) Expediting Discovery; (5) Appointing a Temporary Receiver; and Order To Show Cause Why A Preliminary Injunction Should Not Be Granted and Appointment of a Permanent Receiver.  I have personal knowledge of each of the matters set forth below based on the files and records the Commission has obtained, and, if called as a witness, I could and would competently testify to the facts stated herein.

2.     In the course of my duties with the Commission, I conduct inquiries and investigations into possible violations of the federal securities laws.  My responsibilities include: (1) obtaining and analyzing documents; (2) subpoenaing witnesses and taking testimony; and (3) applying statutes and regulations promulgated by the Commission.

3.     The Commission issued a Formal Order of private investigation in this matter on February 12, 2018 entitled <u>In The Matter Of Titanium Blockchain Infrastructure Services, Inc</u>., Commission File No. LA-4901.  Pursuant to the Formal Order, the Commission directed that an investigation be conducted to determine whether Titanium Blockchain Infrastructure Services, Inc. ("TBIS"), or any other persons or entities, have engaged in, or are about to engage in, the offer and sale of securities to investors in violation of the securities registration and antifraud provisions of the federal securities laws, specifically, Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Pursuant to the Formal Order and as otherwise permitted under the federal securities laws, the Commission staff sought information regarding, among other things, possible violations of the securities registration and antifraud provisions of the federal securities laws in the offer, purchase, or sale of securities by TBIS, EHI Internetwork and Systems Management, Inc. ("EHI"), Michael Alan Stollery aka Michael Stollaire or Michael Stoller ("Stollaire"), and others. Pursuant to Section 19(b) of the Securities Act and Section 21(b) of the Exchange Act, the Formal Order designates certain individuals, including me, as officers of the Commission that are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, or other records which are relevant or material to the inquiry and to perform all other duties in connection therewith as prescribed by law.

4. In the course of the Commission's investigation in this matter, I and other members of the Commission staff sought and obtained documents and other materials regarding the activities of the individual and entities that have been named as defendants in this action. As part of my duties in connection with the Commission's investigation, I frequently instructed other Commission staff to download publicly-available documents from the Internet, including documents retrieved from the websites maintained by the Defendants in this matter.

**Background on Digital "Tokens" or "Coins"**

5. On July 25, 2017, the Commission publicly issued an investigative report and other materials cautioning that market participants that offer and sell digital assets by virtual organizations are subject to the requirements of the federal securities laws. A true and correct copy of the Commission's Report of Investigation, Release No. 81207, issued on July 25, 2017, also known as the DAO Report, is attached hereto as Exhibit 1. The report stated, among other things, that such offers and sales are conducted by organizations using distributed ledger or blockchain

technology often referred to as "Initial Coin Offerings" ("ICOs") or "Token Sales," and that whether a particular investment transaction involves the offer or sale of a security – regardless of the terminology or technology used – will depend on the facts and circumstances, including the economic realities of the transaction.

6.      On July 25, 2017, the Commission publicly issued a Statement by the Commission's Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO, a true and correct copy of which is attached hereto as Exhibit 2, which contains, among other things, information on emerging technologies like distributed ledger and the federal securities laws, and a statement that the DAO tokens are securities.

7.      On July 25, 2017, the Commission publicly issued an Investor Bulletin on ICOs, a true and correct copy of which is attached hereto as Exhibit 3, which provides, among other things, a background on ICOs and descriptions of a blockchain, virtual currency, virtual tokens or coins, virtual currency exchange, and information on the issuance of tokens and coins.

**TBIS, EHI, and Stollaire Have No Securities Registrations**

8.      The Commission's Office of Records Management Services has attested that the records and files of the Commission has not disclosed that any filings have been received under TBIS's, EHI's, or Stollaire's name pursuant to any of the provisions of any of the Acts administered by the Commission.  Attached hereto as Exhibit 4 are true and correct copies of the Attestations from the Commission's Office of records Management Services, dated April 20, 2018.

**TBIS's and EHI's Incorporation Records**

9.      Attached hereto as Exhibit 5 are true and correct copies of TBIS's California incorporation records that were downloaded at my direction from publicly available sources.

10.     Attached hereto as Exhibit 6 are true and correct copies of TBIS's Wyoming incorporation records that were downloaded at my direction from publicly available sources.

11.     Attached hereto as Exhibit 7 are true and correct copies of TBIS's foreign business corporation filing in Oregon that were downloaded at my direction from publicly available sources.

12.     Attached hereto as Exhibit 8 are true and correct copies of EHI's California incorporation records that were downloaded at my direction from publicly available sources.

**TBIS's and EHI's Websites During the ICO**

13.     Attached hereto as Exhibit 9 are true and correct copies of TBIS's and EHI's website registrations, which were downloaded at my direction from the domain registry search tool located on www.nic.io.

14.     Attached hereto as Exhibit 10 are true and correct copies of excerpts of the TBIS website, tbis.io, which were downloaded at my direction on January 29, 2018.

15.     Attached hereto as Exhibit 11 is a true and correct copy of the document entitled "2017 EHI Recommendations and Testimonials - EHI Stollaire" that was downloaded at my direction from the TBIS website on January 29, 2018.

16.     Attached hereto as Exhibit 12 is a true and correct copy of excerpts of the EHI website, ehiinsm.com, which were downloaded at my direction on January 29, 2018.

17.     Attached hereto as Exhibit 13 are true and correct copies of testimonials that were downloaded at my direction from the EHI website on January 29, 2018

**TBIS's Whitepapers**

18.     Attached hereto as Exhibit 14 is a true and correct copy of the TBIS whitepaper identified as "v2.6 - December 14, 2017" that was available on TBIS's website, which was downloaded at my direction on or about January 22, 2018.

4

19.     Attached hereto as Exhibit 15 is a true and correct copy of the TBIS whitepaper identified as "v2.7 - January 16, 2018" that was available on TBIS's website and was downloaded at my direction on January 29, 2018.

20.     Attached hereto as Exhibit 16 is a true and correct copy of the TBIS whitepaper identified as "v2.7 - January 16, 2018" that was available on TBIS's website and was downloaded at my direction on March 21, 2018.

21.     Attached hereto as Exhibit 17 is a true and correct copy of the TBIS whitepaper, which was not identified with a version number, which was available on TBIS's website and was downloaded at my direction on April 20, 2018.

**TBIS's Press Releases**

22.     Attached hereto as Exhibit 18 is a true and correct copy of a press release entitled "Titanium Blockchain Named a BBB Accredited Business" issued by TBIS on November 27, 2017, which was available publicly.

23.     Attached hereto as Exhibit 19 is a true and correct copy of a press release entitled "Titanium Raises First $1M in ICO Token Pre-Sale" issued by TBIS on December 21, 2017, which was available publicly.

24.     Attached hereto as Exhibit 20 is a true and correct copy of a press release entitled "Titanium completes Initial Coin Offering in 18 Days, 41 days Ahead of Plans" issued by TBIS on January 19, 2018, which was available publicly.

**Request for Information to Federal Reserve Banks and Board of Governors of the Federal Reserve System**

25.     As an officer of the Commission acting pursuant to the Formal Order, I issued subpoenas duces tecum each of the following entities for information about TBIS, EHI, and Stollaire: Federal Reserve Bank of San Francisco; Federal Reserve Bank of Boston; Federal Reserve Bank of Cleveland; Federal Reserve Bank of Richmond; Federal Reserve Bank of New York; Federal Reserve Bank of St. Louis; Federal Reserve Bank of Atlanta; Federal Reserve Bank of Philadelphia; Federal Reserve Bank of Chicago;  Federal Reserve Bank of Kansas City; Federal Reserve

Bank of Dallas; Federal Reserve Bank of Minneapolis; and Board of Governors of the Federal Reserve System.

26.     Attached hereto as Exhibit 21 is a true and correct copy of the response from the Federal Reserve Bank of Richmond to the subpoena, dated March 30, 2018.

27.     Attached hereto as Exhibit 22 is a true and correct copy of the response from the Federal Reserve Bank of Dallas to the subpoena, dated March 30, 2018.

28.     Attached hereto as Exhibit 23 are true and correct copies of the responses to the subpoenas from each of the remaining Federal Reserve entities.

**TBIS's Announcement of a "Malicious Act"**

29.     On or about February 21, 2018, TBIS announced on the social media site www.medium.com that it was the subject of "a malicious act."  Attached hereto as Exhibit 24 is a true and correct copy of TBIS's announcement, which was downloaded at my direction on February 22, 2018.

**Los Angeles Police Department Records**

30.     I submitted requests to the Los Angeles Police Department ("LAPD"), Records and Identification Division, Report Services Section, Retrieval and Dissemination, for copies of police reports filed in 2018 by or under the names Michael Alan Stollery, Michael Stollaire, TBIS, and EHI.  Attached hereto as Exhibit 25 are true and correct copies of the LAPD's responses, dated April 2, 2018.

**TBIS's, EHI's, and Stollaire's Bank Accounts**

31.     An officer of the Commission acting pursuant to the Formal Order issued one or more subpoenas duces tecum to JP Morgan Chase Bank for copies of, among other things, account opening documents for accounts held in the same of TBIS and EHI.  JP Morgan Chase Bank responded to the subpoena and produced, among other things, account opening documents for TBIS accounts and a spreadsheet of transactions in April 2018, along with an affidavit from its custodian of records, true and correct copies of which are attached hereto as Exhibit 26.

32.     JP Morgan Chase Bank responded to the subpoena and produced, among other things, account opening documents for an EHI account along with an affidavit from its custodian of records and the monthly statement for December 30, 2017 through January 31, 2018, true and correct copies of which are attached hereto as Exhibit 27.

33.     JP Morgan Chase Bank responded to the subpoena and produced lists of accounts maintained at the bank for TBIS and EHI as well as for Stollaire and for his wife, Oxana, true and correct copies of which are attached hereto as Exhibit 28.

34.     An officer of the Commission acting pursuant to the Formal Order issued a subpoena duces tecum to U.S. Bank for copies of, among other things, account opening documents for accounts held in the same of TBIS.  U.S. Bank responded to the subpoena and produced, among other things, account opening documents for TBIS and a list of accounts for TBIS maintained at the bank, along with an affidavit from its custodian of records, true and correct copies of which are attached hereto as Exhibit 29.

35.     An officer of the Commission acting pursuant to the Formal Order issued one or more subpoenas duces tecum to Wells Fargo Bank for identification of accounts held in Stollaire's name.  Wells Fargo Bank produced a business records declaration in response to the Commission's subpoena that identified accounts held in Stollaire's name, a true and correct copy of which is attached hereto as Exhibit 30.

**TBIS's and Stollaire's PayPal and Venmo Accounts**

36.     As an officer of the Commission acting pursuant to the Formal Order, I issued a subpoena duces tecum to PayPal Holdings, Inc. for copies of, among other things, PayPal and Venmo account opening and transaction information for accounts held by TBIS, EHI, and Stollaire.  Attached hereto as Exhibits 31 and 32 are true and correct copies of Venmo account opening documents for accounts held by TBIS and Stollaire, respectively.  Attached hereto as Exhibits 33 are true and correct copies of PayPal account opening documents and the transaction log for the account held by

7

TBIS.  Attached hereto as Exhibits 34 and 35 are true and correct copies of PayPal account opening documents for the accounts held by Stollaire and EHI, respectively.

**TBIS's Minimum Viable Product Release March 1, 2018**

37.    On or about March 1, 2018, TBIS posted on the social media site www.medium.com a document captioned "Be Titanium.  We ARE the revolution." Attached hereto as Exhibit 36 is a true and correct copy of TBIS's post, which was downloaded at my direction on March 22, 2018.

**Online Interview with TBIS's Chief Technology Officer Christopher Snook**

38.    Attached hereto as Exhibit 37 are true and correct copies of excerpts of an interview of TBIS's chief technology officer, Christopher Snook, which was posted by the uCrypto Madness Show (hosted by Pierre Werner and Bob Walker) on Facebook on March 13, 2018, and which was downloaded and transcribed at my direction.

**TBIS Fired Snook**

39.    On or about April 3, 2018, TBIS posted on a TBIS page on the social media site www.reddit.com an announcement that it had fired its chief technology officer, Christopher Snook.  Attached hereto as Exhibit 38 is a true and correct copy of TBIS's announcement, which was downloaded at my direction on March 28, 2018.

**Online Interview with TBIS's Chief Operating Officer Richard Silver**

40.    Attached hereto as Exhibit 39 is a true and correct copy of an interview of TBIS's chief operating officer, Richard Silver, that was posted on a TBIS page on www.reddit.com in or about February 2018, and which was downloaded at my direction on April 20, 2018.

**U.S. Patent and Trademark Office Records**

41.    As an officer of the Commission acting pursuant to the Formal Order, I requested information from the United States Patent and Trademark Office ("PTO") about TBIS, EHI, and Stollaire.  In response, I received a certification from a

certifying officer of the PTO dated March 12, 2018, a true and correct copy of which is attached hereto as Exhibit 40.

42.     On April 20, 2018, I searched the PTO Trademark Electronic Search System for information about "Vordex." Attached hereto as Exhibit 41is a true and correct copy my search results, which I downloaded and printed on April 20, 2018.

**Stollaire's Online Interviews Promoting the ICO and/or TBIS**

43.     Attached hereto as Exhibit 42 is a true and correct copy of "Q&A session with Titanium CEO Michael Stollaire" dated December 26, 2017, which was downloaded at my direction from the website www.thedigitaledger.com on February 23, 2018.

44.     Attached hereto as Exhibit 43 are true and correct copies of excerpts of an interview of Stollaire posted by P2P Cryptoz on YouTube on January 11, 2018 entitled "Electroneum Update – New Interview.  Good News Today or Tomorrow!  4 Big Exchanges!" that was downloaded and transcribed at my direction.

45.     Attached hereto as Exhibit 44 is a true and correct copy of an Internet page entitled "ICO Spotlight: Interview with Michael Stollaire, CEO of Titanium Blockchain" dated January 23, 2018 that was downloaded at my direction on May 10, 2018 from the website www.coinschedule.com.

46.     Attached hereto as Exhibit 45 is a true and correct copy of an Internet page entitled "On the table with Titanium Blockchain's CEO Michael Stollaire" dated February 12, 2018 that was downloaded at my direction from the website www.cryptocentral.io.

47.     Attached hereto as Exhibit 46 are true and correct copies of excerpts of an interview of Stollaire posted by P2P Cryptoz on YouTube on February 22, 2018 entitled "Titanium's Michael Stollaire Interview About Titanium Theft.  TBAR Much Stronger Than Ever!!" that was downloaded and transcribed at my direction on March 14, 2018.

48.     Attached hereto as Exhibit 47 are true and correct copies of excerpts of an interview of Stollaire posted by P2P Cryptoz on YouTube on March 11, 2018 entitled "Titanium Big Deals in Asian (Thailand).  3 to 5 Client Deals in Works." that was downloaded and transcribed at my direction.

49.     Attached hereto as Exhibit 48 are true and correct copies of excerpts of an interview of Stollaire posted by Altcoin Buzz Podcast on YouTube on March 12, 2018 entitled "Altcoin Buzz Interviews-Titanium Crypto Review-Best Blockchain Infrastructure? BBB of Blockchain?" that was downloaded and transcribed at my direction on March 14, 2018.

50.     Attached hereto as Exhibit 49 are true and correct copies of excerpts of an interview of Stollaire posted on YouTube by The Larry and Joe Show on March 17, 2018 entitled "Live with the CEO of Titanium showing his new office for the first time EVER!" that was downloaded and transcribed at my direction on March 22, 2018..

51.     Attached hereto as Exhibit 50 are true and correct copies of excerpts of an interview of Stollaire posted by P2P Cryptoz on YouTube on April 27, 2018 entitled "Titanium Blockchain TBAR & Project POMA Target E-Commerce With Groundbreaking Collaboration!" that was downloaded and transcribed at my direction.

**Defendants' Use of YouTube to Promote the ICO and/or TBIS**

52.     Attached hereto as Exhibit 51 are true and correct copies of screenshots of TBIS's YouTube channel that were downloaded at my direction on May 2, 2018.

53.     Attached hereto as Exhibit 52 is a true and correct copy of excerpts of TBIS's video entitled "Titanium This Week (TTW) – Episode One" that was posted on YouTube on December 23, 2017, and which was downloaded and transcribed at my direction.

54.     Attached hereto as Exhibit 53 is a true and correct copy of excerpts of TBIS's video entitled "Titanium This Week (TTW) – Episode Two" that was posted

10

on YouTube on January 6, 2018, and which was downloaded and transcribed at my direction.

55.    Attached hereto as Exhibit 54 is a true and correct copy of excerpts of TBIS's video entitled "Titanium This Week (TTW) – Episode Three" that was posted on YouTube on January 16, 2018, and which was downloaded and transcribed at my direction.

56.    Attached hereto as Exhibit 55 is a true and correct copy of excerpts of TBIS's video entitled "Titanium This Week (TTW) – Episode Four" that was posted on YouTube on January 22, 2018, and which was downloaded and transcribed at my direction.

**Defendants' Use of Other Social Media to Promote the ICO and/or TBIS**

57.    On or about October 26, 2017, TBIS published an article entitled "Titanium Blockchain Infrastructure Services Inc.: Blockchain and Cryptocurrency 101 – Mr. Stollaire – Currency Transition – Accelerants of a Financial Revolution" attributed to Stollaire that appeared on the TBIS page on the social media site www.medium.com and was reposted on www.cointrends.top.  Attached hereto as Exhibit 56 is a true and correct copy of TBIS's October 26, 2017 article, which was downloaded at my direction on May 10, 2018.

58.    On or about October 31, 2017, TBIS published an article entitled "Titanium Blockchain Infrastructure Services Inc.: The Argument Against Proof of Stake (PoS)" attributed to Stollaire that appeared on the TBIS page on the social media site www.medium.com and was reposted on www.cointrends.top.  Attached hereto as Exhibit 57 is a true and correct copy of TBIS's October 31, 2017 article, which was downloaded at my direction on May 10, 2018.

59.    On or about November 4, 2017, TBIS published an article entitled "Titanium Blockchain Infrastructure Services Inc.: TITANIUM: The EHI Advantage" that appeared on the TBIS page on the social media site www.medium.com and was reposted on www.cointrends.top.  Attached hereto as

Exhibit 58 is a true and correct copy of TBIS's November 4, 2017 article, which was downloaded at my direction on May 10, 2018.

60.     On or about November 8, 2017, TBIS published an article entitled "Titanium Blockchain Infrastructure Services Inc.: Financial System v4.0 – The Evolution of Money" attributed to Jitendra Rathod that appeared on the TBIS page on the social media site www.medium.com and was reposted on www.cointrends.top. Attached hereto as Exhibit 59 is a true and correct copy of TBIS's November 8, 2017 article, which was downloaded at my direction on May 10, 2018.

61.     On or about November 18, 2017, TBIS published an article entitled "Titanium Blockchain Infrastructure Services Inc.: What is TBIS?" that appeared on the TBIS page on the social media site www.medium.com and was reposted on www.cointrends.top.  Attached hereto as Exhibit 60 is a true and correct copy of TBIS's article, which was downloaded at my direction on May 10, 2018.

62.     Attached hereto as Exhibit 61 is a true and correct copy of excerpts of TBIS's pages from Facebook.com, downloaded at my direction on May 8, 2018.

63.     Attached hereto as Exhibit 62 is a true and correct copy of excerpts of TBIS's pages from Instagram.com downloaded on May 4, 2018.

64.     Attached hereto as Exhibit 63 is a true and correct copy of excerpts of TBIS's pages from Reddit.com downloaded on May 2, 2018.

65.     Attached hereto as Exhibit 64 is a true and correct copy of Stollaire's LinkedIn profiled downloaded at my direction on February 15, 2018.

66.     Attached hereto as Exhibit 65 is a true and correct copy of excerpts of TBIS's Twitter feed downloaded at my direction on May 2, 2018.

67.     Attached hereto as Exhibit 66 is a true and correct copy of excerpts of Stollaire's Instagram feed downloaded at my direction on April 6 and 9, 2018.

68.     Attached hereto as Exhibit 67 is a true and correct copy of excerpts of the TBAR Twitter feed downloaded at my direction on April 9, 2018.

69.     Attached hereto as Exhibit 68 is a true and correct copy of excerpts of Stollaire's Twitter feed, downloaded at my direction on April 9, 2018.

**TBIS Most Recent Updates**

70.     Attached hereto as Exhibit 69 is a true and correct copy of excerpts of "TBIS Weekly: T-Shirts, Whitepaper, and …. VODEX!" published steemit.com on or about April 20, 2018, which was downloaded and printed at my direction on May 18, 2018.

71.     Attached hereto as Exhibit 70 is a true and correct copy of excerpts of "TBIS Weekly Anniversary Edition: IaaS Alpha, TBAR Targets E-Commerce, and Michael Stollaire!" published steemit.com on or about April 27, 2018, which was downloaded and printed at my direction on May 18, 2018.

72.     Attached hereto as Exhibit 71 is a true and correct copy of excerpts of "TBIS Weekly: #BlockchainUnited, Bitcoin Token, and a Mystery Listing!" published steemit.com on or about May 4, 2018, which was downloaded and printed at my direction on May 18, 2018.

73.     Attached hereto as Exhibit 72 is a true and correct copy of excerpts of the "TBIS Weekly Episode Six: Consensus 2018, AirDrops, and Partner Appreciation!" published on steemit.com on or about May 14, 2018, which was downloaded and printed at my direction on May 18, 2018.

**This Ex Parte Application Should Be Heard Without Notice To Defendants**

74.     The Commission requests, pursuant to Federal Rule of Civil Procedure 65(b) and Rule 7-19.2 of the Local Rules of the U.S. District Court for the Central District of California, that the Court consider this Ex Parte Application without prior notice to the Defendants.  This action alleges that the Defendants have violated and continue to violate the antifraud provisions of the federal securities laws by, among other things representing: the existence of business relationships with approximately thirty entities by using their names, logos, and purported employee testimonials, but these entities are not currently doing business with TBIS or EHI or Stollaire; and that

13

the Defendants have and will use trademark-protected products and services, however, all but one of the trademarked products and services the Defendants claim as theirs do not belong to TBIS or EHI or Stollaire.  The action also alleges that the Defendants have also violated and continue to violate the securities registration provisions by offering and selling digital tokens, a form of investment contract, under the securities laws without a registration statement on file with the Commission or in effect.

75.    I am informed that the Federal Bureau of Investigation is conducting a parallel and separate investigation into this matter, and that it intends to undertake affirmative actions including obtain search and execute warrants for property and/or devices belonging to one or more of the Defendants and conduct interviews of the individual Defendant and associated persons.  I have been informed that the FBI intends to take such actions on Thursday, May 24, 2018.

76.    In order to preserve investor funds and assets from dissipation, and to preserve documents and evidence, the interests of justice require that this Ex Parte Application be heard without prior notice to the Defendants.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of May, 2018 at Los Angeles, California.

David S. Brown

14

# THIS PAGE LEFT INTENTIONALLY BLANK

# EXHIBIT 1

EXHIBIT 1    PAGE    16

**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**

**Release No. 81207 / July 25, 2017**

**Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO**

## I.    Introduction and Summary

The United States Securities and Exchange Commission's ("Commission") Division of Enforcement ("Division") has investigated whether The DAO, an unincorporated organization; Slock.it UG ("Slock.it"), a German corporation; Slock.it's co-founders; and intermediaries may have violated the federal securities laws.  The Commission has determined not to pursue an enforcement action in this matter based on the conduct and activities known to the Commission at this time.

As described more fully below, The DAO is one example of a Decentralized Autonomous Organization, which is a term used to describe a "virtual" organization embodied in computer code and executed on a distributed ledger or blockchain.  The DAO was created by Slock.it and Slock.it's co-founders, with the objective of operating as a for-profit entity that would create and hold a corpus of assets through the sale of DAO Tokens to investors, which assets would then be used to fund "projects."  The holders of DAO Tokens stood to share in the anticipated earnings from these projects as a return on their investment in DAO Tokens.  In addition, DAO Token holders could monetize their investments in DAO Tokens by re-selling DAO Tokens on a number of web-based platforms ("Platforms") that supported secondary trading in the DAO Tokens.

After DAO Tokens were sold, but before The DAO was able to commence funding projects, an attacker used a flaw in The DAO's code to steal approximately one-third of The DAO's assets.  Slock.it's co-founders and others responded by creating a work-around whereby DAO Token holders could opt to have their investment returned to them, as described in more detail below.

The investigation raised questions regarding the application of the U.S. federal securities laws to the offer and sale of DAO Tokens, including the threshold question whether DAO Tokens are securities.  Based on the investigation, and under the facts presented, the Commission has determined that DAO Tokens are securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").[1]  The Commission deems it appropriate and in the public interest to issue this report of investigation ("Report") pursuant to

---

[1]  This Report does not analyze the question whether The DAO was an "investment company," as defined under Section 3(a) of the Investment Company Act of 1940 ("Investment Company Act"), in part, because The DAO never commenced its business operations funding projects.  Those who would use virtual organizations should consider their obligations under the Investment Company Act.

**EXHIBIT 1    PAGE    17**

Section 21(a) of the Exchange Act[2] to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws.  All securities offered and sold in the United States must be registered with the Commission or must qualify for an exemption from the registration requirements.  In addition, any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration.

This Report reiterates these fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm—virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities.  The automation of certain functions through this technology, "smart contracts,"[3] or computer code, does not remove conduct from the purview of the U.S. federal securities laws.[4]  This Report also serves to stress the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces.

## II.   Facts

### A.   Background

From April 30, 2016 through May 28, 2016, The DAO offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH"), a

---

[2]  Section 21(a) of the Exchange Act authorizes the Commission to investigate violations of the federal securities laws and, in its discretion, to "publish information concerning any such violations."  This Report does not constitute an adjudication of any fact or issue addressed herein, nor does it make any findings of violations by any individual or entity.  The facts discussed in Section II, *infra*, are matters of public record or based on documentary records.  We are publishing this Report on the Commission's website to ensure that all market participants have concurrent and equal access to the information contained herein.

[3] Computer scientist Nick Szabo described a "smart contract" as:

> a computerized transaction protocol that executes terms of a contract.  The general objectives of smart contract design are to satisfy common contractual conditions (such as payment terms, liens, confidentiality, and even enforcement), minimize exceptions both malicious and accidental, and minimize the need for trusted intermediaries.  Related economic goals include lowering fraud loss, arbitrations and enforcement costs, and other transaction costs.

*See* Nick Szabo, *Smart Contracts*, 1994, http://www.virtualschool.edu/mon/Economics/SmartContracts.html.

[4]  *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("[T]he reach of the [Securities] Act does not stop with the obvious and commonplace.  Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security'."); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.").

**EXHIBIT 1   PAGE   18**

virtual currency[5] used on the Ethereum Blockchain.[6]  As of the time the offering closed, the total ETH raised by The DAO was valued in U.S. Dollars ("USD") at approximately $150 million.

The concept of a DAO Entity is memorialized in a document (the "White Paper"), authored by Christoph Jentzsch, the Chief Technology Officer of Slock.it, a "Blockchain and IoT [(internet-of-things)] solution company," incorporated in Germany and co-founded by Christoph Jentzsch, Simon Jentzsch (Christoph Jentzsch's brother), and Stephan Tual ("Tual").[7]  The White Paper purports to describe "the first implementation of a [DAO Entity] code to automate organizational governance and decision making."[8]  The White Paper posits that a DAO Entity "can be used by individuals working together collaboratively outside of a traditional corporate form.  It can also be used by a registered corporate entity to automate formal governance rules contained in corporate bylaws or imposed by law."  The White Paper proposes an entity—a DAO Entity—that would use smart contracts to attempt to solve governance issues it described as inherent in traditional corporations.[9]  As described, a DAO Entity purportedly would supplant traditional mechanisms of corporate governance and management with a blockchain such that contractual terms are "formalized, automated and enforced using software."[10]

---

[5]  The Financial Action Task Force defines "virtual currency" as:

> a digital representation of value that can be digitally traded and functions as:  (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. It is not issued or guaranteed by any jurisdiction, and fulfils the above functions only by agreement within the community of users of the virtual currency. Virtual currency is distinguished from fiat currency (a.k.a. "real currency," "real money," or "national currency"), which is the coin and paper money of a country that is designated as its legal tender; circulates; and is customarily used and accepted as a medium of exchange in the issuing country.  It is distinct from e-money, which is a digital representation of fiat currency used to electronically transfer value denominated in fiat currency.

*FATF Report, Virtual Currencies, Key Definitions and Potential AML/CFT Risks*, FINANCIAL ACTION TASK FORCE (June 2014), http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf.

[6]  Ethereum, developed by the Ethereum Foundation, a Swiss nonprofit organization, is a decentralized platform that runs smart contracts on a blockchain known as the Ethereum Blockchain.

[7]  Christoph Jentzsch released the final draft of the White Paper on or around March 23, 2016.  He introduced his concept of a DAO Entity as early as November 2015 at an Ethereum Developer Conference in London, as a medium to raise funds for Slock.it, a German start-up he co-founded in September 2015.  Slock.it purports to create technology that embeds smart contracts that run on the Ethereum Blockchain into real-world devices and, as a result, for example, permits anyone to rent, sell or share physical objects in a decentralized way.  *See* SLOCK.IT, https://slock.it/.

[8]  Christoph Jentzsch, *Decentralized Autonomous Organization to Automate Governance Final Draft – Under Review*, https://download.slock.it/public/DAO/WhitePaper.pdf.

[9]  *Id.*

[10]  *Id.*  The White Paper contained the following statement:

> A word of caution, at the outset:  the legal status of [DAO Entities] remains the subject of active and vigorous debate and discussion.  Not everyone shares the same definition.  Some have said that [DAO Entities] are autonomous code and can operate independently of legal systems; others

**EXHIBIT 1    PAGE    19**

B.   The DAO

"The DAO" is the "first generation" implementation of the White Paper concept of a DAO Entity, and it began as an effort to create a "crowdfunding contract" to raise "funds to grow [a] company in the crypto space."[11]  In November 2015, at an Ethereum Developer Conference in London, Christoph Jentzsch described his proposal for The DAO as a "for-profit DAO [Entity]," where participants would send ETH (a virtual currency) to The DAO to purchase DAO Tokens, which would permit the participant to vote and entitle the participant to "rewards."[12]  Christoph Jentzsch likened this to "buying shares in a company and getting … dividends."[13]  The DAO was to be "decentralized" in that it would allow for voting by investors holding DAO Tokens.[14]  All funds raised were to be held at an Ethereum Blockchain "address" associated with The DAO and DAO Token holders were to vote on contract proposals, including proposals to The DAO to fund projects and distribute The DAO's anticipated earnings from the projects it funded.[15]  The DAO was intended to be "autonomous" in that project proposals were in the form of smart contracts that exist on the Ethereum Blockchain and the votes were administered by the code of The DAO.[16]

have said that [DAO Entities] must be owned or operate[d] by humans or human created entities. There will be many use cases, and the DAO [Entity] code will develop over time.  Ultimately, how a DAO [Entity] functions and its legal status will depend on many factors, including how DAO [Entity] code is used, where it is used, and who uses it.  This paper does not speculate about the legal status of [DAO Entities] worldwide.  This paper is not intended to offer legal advice or conclusions.  Anyone who uses DAO [Entity] code will do so at their own risk.

*Id.*

[11] Christoph Jentzsch, *The History of the DAO and Lessons Learned*, SLOCK.IT BLOG (Aug. 24, 2016), https://blog.slock.it/the-history-of-the-dao-and-lessons-learned-d06740f8cfa5#.5o62zo8uv.  Although The DAO has been described as a "crowdfunding contract," The DAO would not have met the requirements of Regulation Crowdfunding, adopted under Title III of the Jumpstart Our Business Startups (JOBS) Act of 2012 (providing an exemption from registration for certain crowdfunding), because, among other things, it was not a broker-dealer or a funding portal registered with the SEC and the Financial Industry Regulatory Authority ("FINRA").  *See Regulation Crowdfunding: A Small Entity Compliance Guide for Issuers*, SEC (Apr. 5, 2017), https://www.sec.gov/info/smallbus/secg/rccomplianceguide-051316.htm; *Updated Investor Bulletin: Crowdfunding for Investors*, SEC (May 10, 2017), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_crowdfunding-.html.

[12]  *See* Slockit, *Slock.it DAO demo at Devcon1: IoT + Blockchain*, YOUTUBE (Nov. 13, 2015), https://www.youtube.com/watch?v=49wHQoJxYPo.

[13]  *Id.*

[14]  *See* Jentzsch, *supra* note 8.

[15]  *Id.*  In theory, there was no limitation on the type of project that could be proposed.  For example, proposed "projects" could include, among other things, projects that would culminate in the creation of products or services that DAO Token holders could use or charge others for using.

[16]  *Id.*

**EXHIBIT 1    PAGE    20**

On or about April 29, 2016, Slock.it deployed The DAO code on the Ethereum Blockchain, as a set of pre-programmed instructions.[17]  This code was to govern how The DAO was to operate.

To promote The DAO, Slock.it's co-founders launched a website ("The DAO Website"). The DAO Website included a description of The DAO's intended purpose:  "To blaze a new path in business for the betterment of its members, existing simultaneously nowhere and everywhere and operating solely with the steadfast iron will of unstoppable code."[18]  The DAO Website also described how The DAO operated, and included a link through which DAO Tokens could be purchased.  The DAO Website also included a link to the White Paper, which provided detailed information about a DAO Entity's structure and its source code and, together with The DAO Website, served as the primary source of promotional materials for The DAO.  On DAO Website and elsewhere, Slock.it represented that The DAO's source code had been reviewed by "one of the world's leading security audit companies" and "no stone was left unturned during those five whole days of security analysis."[19]

Slock.it's co-founders also promoted The DAO by soliciting media attention and by posting almost daily updates on The DAO's status on The DAO and Slock.it websites and numerous online forums relating to blockchain technology.  Slock.it's co-founders used these posts to communicate to the public information about how to participate in The DAO, including how to create and acquire DAO Tokens; the framework for submitting proposals for projects; and how to vote on proposals.  Slock.it also created an online forum on The DAO Website, as well as administered "The DAO Slack" channel, an online messaging platform in which over 5,000 invited "team members" could discuss and exchange ideas about The DAO in real time.

*1.*     *DAO Tokens*

In exchange for ETH, The DAO created DAO Tokens (proportional to the amount of ETH paid) that were then assigned to the Ethereum Blockchain address of the person or entity remitting the ETH.  A DAO Token granted the DAO Token holder certain voting and ownership rights.  According to promotional materials, The DAO would earn profits by funding projects

---

[17]  According to the White Paper, a DAO Entity is "activated by deployment on the Ethereum [B]lockchain.  Once deployed, a [DAO Entity's] code requires 'ether' [ETH] to engage in transactions on Ethereum.  Ether is the digital fuel that powers the Ethereum Network."  The only way to update or alter The DAO's code is to submit a new proposal for voting and achieve a majority consensus on that proposal.  *See* Jentzsch, *supra* note 8.  According to Slock.it's website, Slock.it gave The DAO code to the Ethereum community, noting that:

> The DAO framework is [a] side project of Slock.it UG and a gift to the Ethereum community.  It consisted of a definitive whitepaper, smart contract code audited by one of the best security companies in the world and soon, a complete frontend interface.  All free and open source for anyone to re-use, it is our way to say 'thank you' to the community.

SLOCK.IT, https://slock.it. The DAO code is publicly-available on GitHub, a host of source code. *See The Standard DAO Framework, Inc., Whitepaper*, GITHUB, https://github.com/slockit/DAO.

[18]  The DAO Website was available at https://daohub.org.

[19]  Stephen Tual, *Deja Vu DAO Smart Contracts Audit Results*, SLOCK.IT BLOG (Apr. 5, 2016), https://blog.slock.it/deja-vu-dai-smart-contracts-audit-results-d26bc088e32e.

**EXHIBIT 1   PAGE   21**

that would provide DAO Token holders a return on investment. The various promotional materials disseminated by Slock.it's co-founders touted that DAO Token holders would receive "rewards," which the White Paper defined as, "any [ETH] received by a DAO [Entity] generated from projects the DAO [Entity] funded." DAO Token holders would then vote to either use the rewards to fund new projects or to distribute the ETH to DAO Token holders.

From April 30, 2016 through May 28, 2016 (the "Offering Period"), The DAO offered and sold DAO Tokens. Investments in The DAO were made "pseudonymously" (i.e., an individual's or entity's pseudonym was their Ethereum Blockchain address). To purchase a DAO Token offered for sale by The DAO, an individual or entity sent ETH from their Ethereum Blockchain address to an Ethereum Blockchain address associated with The DAO. All of the ETH raised in the offering as well as any future profits earned by The DAO were to be pooled and held in The DAO's Ethereum Blockchain address. The token price fluctuated in a range of approximately 1 to 1.5 ETH per 100 DAO Tokens, depending on when the tokens were purchased during the Offering Period. Anyone was eligible to purchase DAO Tokens (as long as they paid ETH). There were no limitations placed on the number of DAO Tokens offered for sale, the number of purchasers of DAO Tokens, or the level of sophistication of such purchasers.

DAO Token holders were not restricted from re-selling DAO Tokens acquired in the offering, and DAO Token holders could sell their DAO Tokens in a variety of ways in the secondary market and thereby monetize their investment as discussed below. Prior to the Offering Period, Slock.it solicited at least one U.S. web-based platform to trade DAO Tokens on its system and, at the time of the offering, The DAO Website and other promotional materials disseminated by Slock.it included representations that DAO Tokens would be available for secondary market trading after the Offering Period via several platforms. During the Offering Period and afterwards, the Platforms posted notices on their own websites and on social media that each planned to support secondary market trading of DAO Tokens.[20]

In addition to secondary market trading on the Platforms, after the Offering Period, DAO Tokens were to be freely transferable on the Ethereum Blockchain. DAO Token holders would also be permitted to redeem their DAO Tokens for ETH through a complicated, multi-week (approximately 46-day) process referred to as a DAO Entity "split."[21]

## 2.    Participants in The DAO

According to the White Paper, in order for a project to be considered for funding with "a DAO [Entity]'s [ETH]," a "Contractor" first must submit a proposal to the DAO Entity. Specifically, DAO Token holders expected Contractors to submit proposals for projects that could provide DAO Token holders returns on their investments. Submitting a proposal to The DAO involved:  (1) writing a smart contract, and then deploying and publishing it on the

---

[20]  The Platforms are registered with FinCEN as "Money Services Businesses" and provide systems whereby customers may exchange virtual currencies for other virtual currencies or fiat currencies.

[21]  According to the White Paper, the primary purpose of a split is to protect minority shareholders and prevent what is commonly referred to as a "51% Attack," whereby an attacker holding 51% of a DAO Entity's Tokens could create a proposal to send all of the DAO Entity's funds to himself or herself.

**EXHIBIT 1   PAGE   22**

Ethereum Blockchain; and (2) posting details about the proposal on The DAO Website, including the Ethereum Blockchain address of the deployed contract and a link to its source code.  Proposals could be viewed on The DAO Website as well as other publicly-accessible websites.  Per the White Paper, there were two prerequisites for submitting a proposal.  An individual or entity must:  (1) own at least one DAO Token; and (2) pay a deposit in the form of ETH that would be forfeited to the DAO Entity if the proposal was put up for a vote and failed to achieve a quorum of DAO Token holders.  It was publicized that Slock.it would be the first to submit a proposal for funding.[22]

ETH raised by The DAO was to be distributed to a Contractor to fund a proposal only on a majority vote of DAO Token holders.[23]  DAO Token holders were to cast votes, which would be weighted by the number of tokens they controlled, for or against the funding of a specific proposal.  The voting process, however, was publicly criticized in that it could incentivize distorted voting behavior and, as a result, would not accurately reflect the consensus of the majority of DAO Token holders.  Specifically, as noted in a May 27, 2016 blog post by a group of computer security researchers, The DAO's structure included a "strong positive bias to vote YES on proposals and to suppress NO votes as a side effect of the way in which it restricts users' range of options following the casting of a vote."[24]

Before any proposal was put to a vote by DAO Token holders, it was required to be reviewed by one or more of The DAO's "Curators."  At the time of the formation of The DAO, the Curators were a group of individuals chosen by Slock.it.[25]  According to the White Paper, the Curators of a DAO Entity had "considerable power."  The Curators performed crucial security functions and maintained ultimate control over which proposals could be submitted to, voted on, and funded by The DAO.  As stated on The DAO Website during the Offering Period, The DAO relied on its Curators for "failsafe protection" and for protecting The DAO from "malicous [sic] actors."  Specifically, per The DAO Website, a Curator was responsible for:  (1) confirming that any proposal for funding originated from an identifiable person or organization; and (2)

---

[22]  It was stated on The DAO Website and elsewhere that Slock.it anticipated that it would be the first to submit a proposal for funding.  In fact, a draft of Slock.it's proposal for funding for an "Ethereum Computer and Universal Sharing Network" was publicly-available online during the Offering Period.

[23]  DAO Token holders could vote on proposals, either by direct interaction with the Ethereum Blockchain or by using an application that interfaces with the Ethereum Blockchain.  It was generally acknowledged that DAO Token holders needed some technical knowledge in order to submit a vote, and The DAO Website included a link to a step-by-step tutorial describing how to vote on proposals.

[24]  By voting on a proposal, DAO Token holders would "tie up" their tokens until the end of the voting cycle.  *See* Jentzsch, *supra* note 8 at 8 ("The tokens used to vote will be blocked, meaning they can not  [sic] be transferred until the proposal is closed.").  If, however, a DAO Token holder abstained from voting, the DAO Token holder could avoid these restrictions; any DAO Tokens not submitted for a vote could be withdrawn or transferred at any time.  As a result, DAO Token holders were incentivized either to vote yes or to abstain from voting. *See* Dino Mark et al., *A Call for a Temporary Moratorium on The DAO*, HACKING, DISTRIBUTED (May 27, 2016, 1:35 PM), http://hackingdistributed.com/2016/05/27/dao-call-for-moratorium/.

[25]  At the time of The DAO's launch, The DAO Website identified eleven "high profile" individuals as holders of The DAO's Curator "Multisig" (or "private key").  These individuals all appear to live outside of the United States.  Many of them were associated with the Ethereum Foundation, and The DAO Website touted the qualifications and trustworthiness of these individuals.

**EXHIBIT 1    PAGE    23**

confirming that smart contracts associated with any such proposal properly reflected the code the Contractor claims to have deployed on the Ethereum Blockchain.  If a Curator determined that the proposal met these criteria, the Curator could add the proposal to the "whitelist," which was a list of Ethereum Blockchain addresses that could receive ETH from The DAO if the majority of DAO Token holders voted for the proposal.

Curators of The DAO had ultimate discretion as to whether or not to submit a proposal for voting by DAO Token holders.  Curators also determined the order and frequency of proposals, and could impose subjective criteria for whether the proposal should be whitelisted.  One member of the group chosen by Slock.it to serve collectively as the Curator stated publicly that the Curator had "complete control over the whitelist … the order in which things get whitelisted, the duration for which [proposals] get whitelisted, when things get unwhitelisted … [and] clear ability to control the order and frequency of proposals," noting that "curators have tremendous power."[26]  Another Curator publicly announced his subjective criteria for determining whether to whitelist a proposal, which included his personal ethics.[27]  Per the White Paper, a Curator also had the power to reduce the voting quorum requirement by 50% every other week.  Absent action by a Curator, the quorum could be reduced by 50% only if no proposal had reached the required quorum for 52 weeks.

### 3.   Secondary Market Trading on the Platforms

During the period from May 28, 2016 through early September 2016, the Platforms became the preferred vehicle for DAO Token holders to buy and sell DAO Tokens in the secondary market using virtual or fiat currencies.  Specifically, the Platforms used electronic systems that allowed their respective customers to post orders for DAO Tokens on an anonymous basis.  For example, customers of each Platform could buy or sell DAO Tokens by entering a market order on the Platform's system, which would then match with orders from other customers residing on the system.  Each Platform's system would automatically execute these orders based on pre-programmed order interaction protocols established by the Platform.

None of the Platforms received orders for DAO Tokens from non-Platform customers or routed its respective customers' orders to any other trading destinations.  The Platforms publicly displayed all their quotes, trades, and daily trading volume in DAO Tokens on their respective websites.  During the period from May 28, 2016 through September 6, 2016, one such Platform executed more than 557,378 buy and sell transactions in DAO Tokens by more than 15,000 of its U.S. and foreign customers.  During the period from May 28, 2016 through August 1, 2016, another such Platform executed more than 22,207 buy and sell transactions in DAO Tokens by more than 700 of its U.S. customers.

---

[26]  Epicenter, *EB134 – Emin Gün Sirer And Vlad Zamfir: On A Rocky DAO*, YOUTUBE (June 6, 2016), https://www.youtube.com/watch?v=ON5GhIQdFU8.

[27]  Andrew Quentson, *Are the DAO Curators Masters or Janitors?*, THE COIN TELEGRAPH (June 12, 2016), https://cointelegraph.com/news/are-the-dao-curators-masters-or-janitors.

**EXHIBIT 1   PAGE   24**

4.      *Security Concerns, The "Attack" on The DAO, and The Hard Fork*

In late May 2016, just prior to the expiration of the Offering Period, concerns about the safety and security of The DAO's funds began to surface due to vulnerabilities in The DAO's code.  On May 26, 2016, in response to these concerns, Slock.it submitted a "DAO Security Proposal" that called for the development of certain updates to The DAO's code and the appointment of a security expert.[28]  Further, on June 3, 2016, Christoph Jentzsch, on behalf of Slock.it, proposed a moratorium on all proposals until alterations to The DAO's code to fix vulnerabilities in The DAO's code had been implemented.[29]

On June 17, 2016, an unknown individual or group (the "Attacker") began rapidly diverting ETH from The DAO, causing approximately 3.6 million ETH—1/3 of the total ETH raised by The DAO offering—to move from The DAO's Ethereum Blockchain address to an Ethereum Blockchain address controlled by the Attacker (the "Attack").[30]  Although the diverted ETH was then held in an address controlled by the Attacker, the Attacker was prevented by The DAO's code from moving the ETH from that address for 27 days.[31]

In order to secure the diverted ETH and return it to DAO Token holders, Slock.it's co-founders and others endorsed a "Hard Fork" to the Ethereum Blockchain.  The "Hard Fork," called for a change in the Ethereum protocol on a going forward basis that would restore the DAO Token holders' investments as if the Attack had not occurred.  On July 20, 2016, after a majority of the Ethereum network adopted the necessary software updates, the new, forked Ethereum Blockchain became active.[32]  The Hard Fork had the effect of transferring all of the funds raised (including those held by the Attacker) from The DAO to a recovery address, where DAO Token holders could exchange their DAO Tokens for ETH.[33]  All DAO Token holders

---

[28] *See* Stephan Tual, *Proposal #1-DAO Security, Redux*, SLOCK.IT BLOG (May 26, 2016), https://blog.slock.it/both-our-proposals-are-now-out-voting-starts-saturday-morning-ba322d6d3aea.  The unnamed security expert would "act as the first point of contact for security disclosures, and continually monitor, pre-empt and avert any potential attack vectors The DAO may face, including social, technical and economic attacks."  *Id.*  Slock.it initially proposed a much broader security proposal that included the formation of a "DAO Security" group, the establishment of a "Bug Bounty Program," and routine external audits of The DAO's code.  However, the cost of the proposal (125,000 ETH), which would be paid from The DAO's funds, was immediately criticized as too high and Slock.it decided instead to submit the revised proposal described above.  *See* Stephan Tual, *DAO.Security, a Proposal to guarantee the integrity of The DAO*, SLOCK.IT BLOG (May 25, 2016), https://blog.slock.it/dao-security-a-proposal-to-guarantee-the-integrity-of-the-dao-3473899ace9d.

[29] *See TheDAO Proposal_ID 5*, ETHERSCAN, https://etherscan.io/token/thedao-proposal/5.

[30] *See* Stephan Tual, *DAO Security Advisory: live updates*, SLOCK.IT BLOG (June 17, 2016), https://blog.slock.it/dao-security-advisory-live-updates-2a0a42a2d07b.

[31] *Id.*

[32] A minority group, however, elected not to adopt the new Ethereum Blockchain created by the Hard Fork because to do so would run counter to the concept that a blockchain is immutable.  Instead they continued to use the former version of the blockchain, which is now known as "Ethereum Classic."

[33] *See* Christoph Jentzsch, *What the 'Fork' Really Means*, SLOCK.IT BLOG (July 18, 2016), https://blog.slock.it/what-the-fork-really-means-6fe573ac31dd.

**EXHIBIT 1    PAGE    25**

who adopted the Hard Fork could exchange their DAO Tokens for ETH, and avoid any loss of the ETH they had invested.[34]

## III.    Discussion

The Commission is aware that virtual organizations and associated individuals and entities increasingly are using distributed ledger technology to offer and sell instruments such as DAO Tokens to raise capital.  These offers and sales have been referred to, among other things, as "Initial Coin Offerings" or "Token Sales."   Accordingly, the Commission deems it appropriate and in the public interest to issue this Report in order to stress that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale.  In this Report, the Commission considers the particular facts and circumstances of the offer and sale of DAO Tokens to demonstrate the application of existing U.S. federal securities laws to this new paradigm.

### A.    Section 5 of the Securities Act

The registration provisions of the Securities Act contemplate that the offer or sale of securities to the public must be accompanied by the "full and fair disclosure" afforded by registration with the Commission and delivery of a statutory prospectus containing information necessary to enable prospective purchasers to make an informed investment decision.  Registration entails disclosure of detailed "information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered … ."  *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998).  "The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors."  *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124 (1953)), *vacated on other grounds*, 446 U.S. 680 (1980).  Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce.  Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed.  Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce.  15 U.S.C. § 77e(a) and (c).  Violations of Section 5 do not require scienter.  *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

---

[34] *Id.*

**EXHIBIT 1    PAGE    26**

B.     DAO Tokens Are Securities

    1.     *Foundational Principles of the Securities Laws Apply to Virtual Organizations or Capital Raising Entities Making Use of Distributed Ledger Technology*

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract."  *See* 15 U.S.C. §§ 77b-77c.  An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946); *see also United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").  This definition embodies a "*flexible rather than a static principle*, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299 (emphasis added).  The test "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'"  *Id.*  In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto."  *United Housing Found.*, 421 U.S. at 849.

    2.     *Investors in The DAO Invested Money*

In determining whether an investment contract exists, the investment of "money" need not take the form of cash.  *See, e.g.*, *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) ("[I]n spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract.").

Investors in The DAO used ETH to make their investments, and DAO Tokens were received in exchange for ETH.  Such investment is the type of contribution of value that can create an investment contract under *Howey*.  *See SEC v. Shavers*, No. 4:13-CV-416, 2014 WL 4652121, at *1 (E.D. Tex. Sept. 18, 2014) (holding that an investment of Bitcoin, a virtual currency, meets the first prong of *Howey*); *Uselton*, 940 F.2d at 574 ("[T]he 'investment' may take the form of 'goods and services,' or some other 'exchange of value'.") (citations omitted).

    3.     *With a Reasonable Expectation of Profits*

Investors who purchased DAO Tokens were investing in a common enterprise and reasonably expected to earn profits through that enterprise when they sent ETH to The DAO's Ethereum Blockchain address in exchange for DAO Tokens.  "[P]rofits" include "dividends, other periodic payments, or the increased value of the investment."  *Edwards*, 540 U.S. at 394.  As described above, the various promotional materials disseminated by Slock.it and its co-founders informed investors that The DAO was a for-profit entity whose objective was to fund

**EXHIBIT 1    PAGE    27**

projects in exchange for a return on investment.[35]  The ETH was pooled and available to The DAO to fund projects.  The projects (or "contracts") would be proposed by Contractors.  If the proposed contracts were whitelisted by Curators, DAO Token holders could vote on whether The DAO should fund the proposed contracts.  Depending on the terms of each particular contract, DAO Token holders stood to share in potential profits from the contracts.  Thus, a reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment of ETH in The DAO.

>    *4.    Derived from the Managerial Efforts of Others*

>>    a.    The Efforts of Slock.it, Slock.it's Co-Founders, and The DAO's Curators Were Essential to the Enterprise

Investors' profits were to be derived from the managerial efforts of others—specifically, Slock.it and its co-founders, and The DAO's Curators.  The central issue is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).  The DAO's investors relied on the managerial and entrepreneurial efforts of Slock.it and its co-founders, and The DAO's Curators, to manage The DAO and put forth project proposals that could generate profits for The DAO's investors.

Investors' expectations were primed by the marketing of The DAO and active engagement between Slock.it and its co-founders with The DAO and DAO Token holders.  To market The DAO and DAO Tokens, Slock.it created The DAO Website on which it published the White Paper explaining how a DAO Entity would work and describing their vision for a DAO Entity.  Slock.it also created and maintained other online forums that it used to provide information to DAO Token holders about how to vote and perform other tasks related to their investment.  Slock.it appears to have closely monitored these forums, answering questions from DAO Token holders about a variety of topics, including the future of The DAO, security concerns, ground rules for how The DAO would work, and the anticipated role of DAO Token holders.  The creators of The DAO held themselves out to investors as experts in Ethereum, the blockchain protocol on which The DAO operated, and told investors that they had selected persons to serve as Curators based on their expertise and credentials.  Additionally, Slock.it told investors that it expected to put forth the first substantive profit-making contract proposal—a blockchain venture in its area of expertise.  Through their conduct and marketing materials, Slock.it and its co-founders led investors to believe that they could be relied on to provide the significant managerial efforts required to make The DAO a success.

Investors in The DAO reasonably expected Slock.it and its co-founders, and The DAO's Curators, to provide significant managerial efforts after The DAO's launch.  The expertise of The DAO's creators and Curators was critical in monitoring the operation of The DAO, safeguarding investor funds, and determining whether proposed contracts should be put for a

---

[35]  That the "projects" could encompass services and the creation of goods for use by DAO Token holders does not change the core analysis that investors purchased DAO Tokens with the expectation of earning profits from the efforts of others.

EXHIBIT 1   PAGE   28

vote.  Investors had little choice but to rely on their expertise.  At the time of the offering, The DAO's protocols had already been pre-determined by Slock.it and its co-founders, including the control that could be exercised by the Curators.  Slock.it and its co-founders chose the Curators, whose function it was to:  (1) vet Contractors; (2) determine whether and when to submit proposals for votes; (3) determine the order and frequency of proposals that were submitted for a vote; and (4) determine whether to halve the default quorum necessary for a successful vote on certain proposals.  Thus, the Curators exercised significant control over the order and frequency of proposals, and could impose their own subjective criteria for whether the proposal should be whitelisted for a vote by DAO Token holders.  DAO Token holders' votes were limited to proposals whitelisted by the Curators, and, although any DAO Token holder could put forth a proposal, each proposal would follow the same protocol, which included vetting and control by the current Curators.  While DAO Token holders could put forth proposals to replace a Curator, such proposals were subject to control by the current Curators, including whitelisting and approval of the new address to which the tokens would be directed for such a proposal.  In essence, Curators had the power to determine whether a proposal to remove a Curator was put to a vote.[36]

And, Slock.it and its co-founders did, in fact, actively oversee The DAO.  They monitored The DAO closely and addressed issues as they arose, proposing a moratorium on all proposals until vulnerabilities in The DAO's code had been addressed and a security expert to monitor potential attacks on The DAO had been appointed.  When the Attacker exploited a weakness in the code and removed investor funds, Slock.it and its co-founders stepped in to help resolve the situation.

> b.      DAO Token Holders' Voting Rights Were Limited

Although DAO Token holders were afforded voting rights, these voting rights were limited.  DAO Token holders were substantially reliant on the managerial efforts of Slock.it, its co-founders, and the Curators.[37]  Even if an investor's efforts help to make an enterprise profitable, those efforts do not necessarily equate with a promoter's significant managerial efforts or control over the enterprise.  *See, e.g.*, *Glenn W. Turner*, 474 F.2d at 482 (finding that a multi-level marketing scheme was an investment contract and that investors relied on the promoter's managerial efforts, despite the fact that investors put forth the majority of the labor that made the enterprise profitable, because the promoter dictated the terms and controlled the scheme itself); *Long v. Shultz*, 881 F.2d 129, 137 (5th Cir. 1989) ("An investor may authorize the assumption of particular risks that would create the possibility of greater profits or losses but still depend on a third party for all of the essential managerial efforts without which the risk could not

---

[36]  DAO Token holders could put forth a proposal to split from The DAO, which would result in the creation of a new DAO Entity with a new Curator.  Other DAO Token holders would be allowed to join the new DAO Entity as long as they voted yes to the original "split" proposal.  Unlike all other contract proposals, a proposal to split did not require a deposit or a quorum, and it required a seven-day debating period instead of the minimum two-week debating period required for other proposals.

[37]  Because, as described above, DAO Token holders were incentivized either to vote yes or to abstain from voting, the results of DAO Token holder voting would not necessarily reflect the actual view of a majority of DAO Token holders.

**EXHIBIT 1    PAGE    29**

pay off.").  *See also generally SEC v. Merchant Capital, LLC,* 483 F.3d 747 (11th Cir. 2007) (finding an investment contract even where voting rights were provided to purported general partners, noting that the voting process provided limited information for investors to make informed decisions, and the purported general partners lacked control over the information in the ballots).

The voting rights afforded DAO Token holders did not provide them with meaningful control over the enterprise, because (1) DAO Token holders' ability to vote for contracts was a largely perfunctory one; and (2) DAO Token holders were widely dispersed and limited in their ability to communicate with one another.

First, as discussed above, DAO Token holders could only vote on proposals that had been cleared by the Curators.[38]  And that clearance process did not include any mechanism to provide DAO Token holders with sufficient information to permit them to make informed voting decisions.  Indeed, based on the particular facts concerning The DAO and the few draft proposals discussed in online forums, there are indications that contract proposals would not have necessarily provide enough information for investors to make an informed voting decision, affording them less meaningful control.  For example, the sample contract proposal attached to the White Paper included little information concerning the terms of the contract.  Also, the Slock.it co-founders put forth a draft of their own contract proposal and, in response to questions and requests to negotiate the terms of the proposal (posted to a DAO forum), a Slock.it founder explained that the proposal was intentionally vague and that it was, in essence, a take it or leave it proposition not subject to negotiation or feedback.  *See, e.g., SEC v. Shields,* 744 F.3d 633, 643-45 (10th Cir. 2014) (in assessing whether agreements were investment contracts, court looked to whether "the investors actually had the type of control reserved under the agreements to obtain access to information necessary to protect, manage, and control their investments at the time they purchased their interests.").

Second, the pseudonymity and dispersion of the DAO Token holders made it difficult for them to join together to effect change or to exercise meaningful control.  Investments in The DAO were made pseudonymously (such that the real-world identities of investors are not apparent), and there was great dispersion among those individuals and/or entities who were invested in The DAO and thousands of individuals and/or entities that traded DAO Tokens in the secondary market—an arrangement that bears little resemblance to that of a genuine general partnership.  *Cf. Williamson v. Tucker,* 645 F.2d 404, 422-24 (5th Cir. 1981) ("[O]ne would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many [limited] partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder in a corporation.").[39]  Slock.it did create and maintain online forums on which

---

[38]  Because, in part, The DAO never commenced its business operations funding projects, this Report does not analyze the question whether anyone associated with The DAO was an "[i]nvestment adviser" under Section 202(a)(11) of the Investment Advisers Act of 1940 ("Advisers Act").  *See* 15 U.S.C. § 80b-2(a)(11).  Those who would use virtual organizations should consider their obligations under the Advisers Act.

[39]  The Fifth Circuit in *Williamson* stated that:

**EXHIBIT 1   PAGE   30**

investors could submit posts regarding contract proposals, which were not limited to use by DAO Token holders (anyone was permitted to post).  However, DAO Token holders were pseudonymous, as were their posts to the forums.  Those facts, combined with the sheer number of DAO Token holders, potentially made the forums of limited use if investors hoped to consolidate their votes into blocs powerful enough to assert actual control.  This was later demonstrated through the fact that DAO Token holders were unable to effectively address the Attack without the assistance of Slock.it and others.  The DAO Token holders' pseudonymity and dispersion diluted their control over The DAO.  *See Merchant Capital*, 483 F.3d at 758 (finding geographic dispersion of investors weighing against investor control).

These facts diminished the ability of DAO Token holders to exercise meaningful control over the enterprise through the voting process, rendering the voting rights of DAO Token holders akin to those of a corporate shareholder.  *Steinhardt Group, Inc. v. Citicorp.*, 126 F.3d 144, 152 (3d Cir. 1997) ("It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negate the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action … a security may be found to exist … .  [The] emphasis must be placed on economic reality.") (citing *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 n. 14 (5th Cir. 1974)).

By contract and in reality, DAO Token holders relied on the significant managerial efforts provided by Slock.it and its co-founders, and The DAO's Curators, as described above. Their efforts, not those of DAO Token holders, were the "undeniably significant" ones, essential to the overall success and profitability of any investment into The DAO.  *See Glenn W. Turner*, 474 F.2d at 482.

C.    Issuers Must Register Offers and Sales of Securities Unless a Valid Exemption Applies

The definition of "issuer" is broadly defined to include "every person who issues or proposes to issue any security" and "person" includes "any unincorporated organization."  15 U.S.C. § 77b(a)(4).  The term "issuer" is flexibly construed in the Section 5 context "as issuers devise new ways to issue their securities and the definition of a security itself expands."  *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 909 (5th Cir. 1977); *accord SEC v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980) ("[W]hen a person [or entity] organizes or sponsors the organization of

---

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venture that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 424 & n.15 (court also noting that, "this is not to say that other factors could not also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded.").

**EXHIBIT 1    PAGE    31**

limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer … .").

The DAO, an unincorporated organization, was an issuer of securities, and information about The DAO was "crucial" to the DAO Token holders' investment decision.  *See Murphy*, 626 F.2d at 643 ("Here there is no company issuing stock, but instead, a group of individuals investing funds in an enterprise for profit, and receiving in return an entitlement to a percentage of the proceeds of the enterprise.") (citation omitted).  The DAO was "responsible for the success or failure of the enterprise," and accordingly was the entity about which the investors needed information material to their investment decision.  *Id.* at 643-44.

During the Offering Period, The DAO offered and sold DAO Tokens in exchange for ETH through The DAO Website, which was publicly-accessible, including to individuals in the United States.  During the Offering Period, The DAO sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million ETH, which was valued in USD, at the time, at approximately $150 million.  Because DAO Tokens were securities, The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied.

Moreover, those who participate in an unregistered offer and sale of securities not subject to a valid exemption are liable for violating Section 5.  *See, e.g.*, *Murphy*, 626 F.2d at 650-51 ("[T]hose who ha[ve] a necessary role in the transaction are held liable as participants.") (citing *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959); *SEC v. International Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna & Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969)); *SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5 … sweep[] broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security."); *SEC v. Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738, 740-41 (2d Cir. 1941) (defendant violated Section 5(a) "because it engaged in selling unregistered securities" issued by a third party "when it solicited offers to buy the securities 'for value'").

> D.   A System that Meets the Definition of an Exchange Must Register as a National Securities Exchange or Operate Pursuant to an Exemption from Such Registration

Section 5 of the Exchange Act makes it unlawful for any broker, dealer, or exchange, directly or indirectly, to effect any transaction in a security, or to report any such transaction, in interstate commerce, unless the exchange is registered as a national securities exchange under Section 6 of the Exchange Act, or is exempted from such registration.  *See* 15 U.S.C. §78e. Section 3(a)(1) of the Exchange Act defines an "exchange" as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood … ." 15 U.S.C. § 78c(a)(1).

Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1).  Under Exchange Act Rule 3b-16(a), an

**EXHIBIT 1    PAGE   32**

organization, association, or group of persons shall be considered to constitute, maintain, or provide "a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange," if such organization, association, or group of persons:  (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[40]

A system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b-16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act[41] or operate pursuant to an appropriate exemption.  One frequently used exemption is for alternative trading systems ("ATS").[42]  Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an ATS that complies with Regulation ATS,[43] which includes, among other things, the requirement to register as a broker-dealer and file a Form ATS with the Commission to provide notice of the ATS's operations.  Therefore, an ATS that operates pursuant to the Rule 3a1-1(a)(2) exemption and complies with Regulation ATS would not be subject to the registration requirement of Section 5 of the Exchange Act.

The Platforms that traded DAO Tokens appear to have satisfied the criteria of Rule 3b-16(a) and do not appear to have been excluded from Rule 3b-16(b).  As described above, the Platforms provided users with an electronic system that matched orders from multiple parties to buy and sell DAO Tokens for execution based on non-discretionary methods.

## IV.   Conclusion and References for Additional Guidance

Whether or not a particular transaction involves the offer and sale of a security— regardless of the terminology used—will depend on the facts and circumstances, including the

---

[40]  *See* 17 C.F.R. § 240.3b-16(a).  The Commission adopted Rule 3b-16(b) to exclude explicitly certain systems that the Commission believed did not meet the exchange definition.  These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system.  *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems) ("Regulation ATS"), 70852.

[41]  15 U.S.C. § 78e.  A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act.  15 U.S.C. § 78f.

[42]  Rule 300(a) of Regulation ATS promulgated under the Exchange Act provides that an ATS is:

> any organization, association, person, group of persons, or system:  (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading.

Regulation ATS, *supra* note 40, Rule 300(a).

[43]  *See* 17 C.F.R. § 240.3a1-1(a)(2).  Rule 3a1-1 also provides two other exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS.  *See* 17 C.F.R. §§ 240.3a1-1(a)(1) and (3).

**EXHIBIT 1   PAGE   33**

economic realities of the transaction. Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws. The registration requirements are designed to provide investors with procedural protections and material information necessary to make informed investment decisions. These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology. In addition, any entity or person engaging in the activities of an exchange, such as bringing together the orders for securities of multiple buyers and sellers using established non-discretionary methods under which such orders interact with each other and buyers and sellers entering such orders agree upon the terms of the trade, must register as a national securities exchange or operate pursuant to an exemption from such registration.

To learn more about registration requirements under the Securities Act, please visit the Commission's website here. To learn more about the Commission's registration requirements for investment companies, please visit the Commission's website here. To learn more about the Commission's registration requirements for national securities exchanges, please visit the Commission's website here. To learn more about alternative trading systems, please see the Regulation ATS adopting release here.

For additional guidance, please see the following Commission enforcement actions involving virtual currencies:

- *SEC v. Trendon T. Shavers and Bitcoin Savings and Trust*, Civil Action No. 4:13-CV-416 (E.D. Tex., complaint filed July 23, 2013)

- *In re Erik T. Voorhees*, Rel. No. 33-9592 (June 3, 2014)

- *In re BTC Trading, Corp. and Ethan Burnside*, Rel. No. 33-9685 (Dec. 8, 2014)

- *SEC v. Homero Joshua Garza, Gaw Miners, LLC, and ZenMiner, LLC (d/b/a Zen Cloud)*, Civil Action No. 3:15-CV-01760 (D. Conn., complaint filed Dec. 1, 2015)

- *In re Bitcoin Investment Trust and SecondMarket, Inc.*, Rel. No. 34-78282 (July 11, 2016)

- *In re Sunshine Capital, Inc.*, File No. 500-1 (Apr. 11, 2017)

And please see the following investor alerts:

- *Bitcoin and Other Virtual Currency-Related Investments* (May 7, 2014)

- *Ponzi Schemes Using Virtual Currencies* (July 2013)

By the Commission.

**EXHIBIT 1   PAGE   34**

**EXHIBIT 2**

## Public Statement

# Statement by the Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO

## Divisions of Corporation Finance and Enforcement

**July 25, 2017**

## Emerging Technologies and the Federal Securities Laws

Distributed ledger and other emerging technologies have the potential to influence and improve the capital markets and the financial services industry. Interest in and funding for these technologies appears to be growing at a rapid pace.  We welcome and encourage the appropriate use of technology to facilitate capital formation and provide investors with new investment opportunities. We are particularly hopeful that innovation in this area will facilitate fair and efficient capital raisings for small businesses. We are also mindful of our obligation to protect investors and recognize that new technologies can offer opportunities for misconduct and abuse.

A fundamental tenet of our regulatory framework is that an offer or sale of securities in the United States must comply with the federal securities laws. This approach has been critical to maintaining market integrity and fostering investor protection for over 80 years, including through various changes in technology. In this regard, the issue of whether a particular investment opportunity involves the offer or sale of a security — regardless of the terminology or technology used in the transaction — depends on the facts and circumstances, including the economic realities and structure of the enterprise.

## Report of Investigation — DAO Tokens are Securities

Today, the Commission issued a Report of Investigation ("Report") relating to an offering by The DAO — a decentralized autonomous organization that used distributed ledger or blockchain technology to operate as a "virtual" entity. The DAO sold tokens representing interests in its enterprise to investors in exchange for payment with virtual currency. Investors could hold these tokens as an investment with certain voting and ownership rights or could sell them on web-based secondary market platforms. Based on the facts and circumstances of this offering, the Commission, as explained in the Report, determined that the DAO tokens are securities.

**EXHIBIT 2   PAGE   35**

Sponsors involved in an exchange of something of value for an interest in a digital or other novel form for storing value should carefully consider whether they are creating an investment arrangement that constitutes a security. The definition of a security under the federal securities laws is broad, covering traditional notions of a security, such as a stock or bond, as well as novel products or instruments where value may be represented and transferred in digital form. A hallmark of a security is an investment of money or value in a business or operation where the investor has a reasonable expectation of profits based on the efforts of others.

A market participant engaged in offering an investment opportunity that constitutes a security must either register the offer and sale of the security with the Commission or structure it so that it qualifies for an exemption from registration. Market participants in this area must also consider other aspects of the securities laws, such as whether a platform facilitating transactions in its securities is operating as an exchange, whether the entity offering and selling the security could be an investment company, and whether anyone providing advice about an investment in the security could be an investment adviser. Structuring an offering so that it involves digital instruments of value or operates using a distributed ledger or blockchain does not remove that activity from the requirements of the federal securities laws.

## Consultation with Securities Counsel and the Staff

Although some of the detailed aspects of the federal securities laws and regulations embody more traditional forms of offerings or corporate organizations, these laws have a principles-based framework that can readily adapt to new types of technologies for creating and distributing securities. We encourage market participants who are employing new technologies to form investment vehicles or distribute investment opportunities to consult with securities counsel to aid in their analysis of these issues and to contact our staff, as needed, for assistance in analyzing the application of the federal securities laws.

In particular, staff providing assistance on these matters can be reached at FinTech@sec.gov .

## Investors Should Be Mindful of Risks Associated with New Technologies, Including Risks of Fraud

Finally, we recognize that new technologies also present new opportunities for bad actors to engage in fraudulent schemes, including old schemes under new names and using new terminology. We urge the investing public to be mindful of traditional "red flags" when making any investment decision, including: deals that sound too good to be true; promises of high returns with little or no risk; high-pressure sales tactics; and working with unregistered or unlicensed sellers. In that regard, the SEC's website for individual investors, Investor.gov, has a number of relevant resources — including an Investor Bulletin that the SEC's Office of Investor Education and Advocacy issued today regarding Initial Coin Offerings.

**EXHIBIT  2   PAGE   36**

**EXHIBIT  2   PAGE   37**

# EXHIBIT 3



**Investor.gov**

**U.S. SECURITIES AND
EXCHANGE COMMISSION**

# INVESTOR BULLETIN: INITIAL COIN OFFERINGS

**07/25/2017**

*Developers, businesses, and individuals increasingly are using initial coin offerings, also called ICOs or token sales, to raise capital. These activities may provide fair and lawful investment opportunities. However, new technologies and financial products, such as those associated with ICOs, can be used improperly to entice investors with the promise of high returns in a new investment space. The SEC's Office of Investor Education and Advocacy is issuing this Investor Bulletin to make investors aware of potential risks of participating in ICOs.*

**Background – Initial Coin Offerings**

Virtual coins or tokens are created and disseminated using distributed ledger or blockchain technology. Recently promoters have been selling virtual coins or tokens in ICOs. Purchasers may use fiat currency (e.g., U.S. dollars) or virtual currencies to buy these virtual coins or tokens. Promoters may tell purchasers that the capital raised from the sales will be used to fund development of a digital platform, software, or other projects and that the virtual tokens or coins may be used to access the platform, use the software, or otherwise participate in the project. Some promoters and initial sellers may lead buyers of the virtual coins or tokens to expect a return on their investment or to participate in a share of the returns provided by the project. After they are issued, the virtual coins or tokens may be resold to others in a secondary market on virtual currency exchanges or other platforms.

Depending on the facts and circumstances of each individual ICO, the virtual coins or tokens that are offered or sold may be securities. If they are securities, the offer and sale of these virtual coins or tokens in an ICO are subject to the federal securities laws.

> On July 25, 2017, the SEC issued a [Report of Investigation under Section 21(a)](https://www.sec.gov/litigation/investreport/34-81207.pdf) of the Securities Exchange Act of 1934 describing an SEC investigation of The DAO, a virtual organization, and its use of distributed ledger or blockchain technology to facilitate the offer and sale of DAO Tokens to raise capital. The Commission applied existing U.S. federal securities laws to this new paradigm, determining that DAO Tokens were securities. The Commission stressed that those who offer and sell securities in the U.S. are required to comply with federal securities laws, regardless of whether those securities are purchased with virtual currencies or distributed with blockchain technology.

To facilitate understanding of this new and complex area, here are some basic concepts that you should understand before investing in virtual coins or tokens:

**What is a blockchain?**

A blockchain is an electronic distributed ledger or list of entries – much like a stock ledger – that is maintained by various participants in a network of computers. Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure. Some examples

of blockchain are the Bitcoin and Ethereum blockchains, which are used to create and track transactions in bitcoin and ether, respectively.

**What is a virtual currency or virtual token or coin?**

A virtual currency is a digital representation of value that can be digitally traded and functions as a medium of exchange, unit of account, or store of value.  Virtual tokens or coins may represent other rights as well.  Accordingly, in certain cases, the tokens or coins will be securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration.

**What is a virtual currency exchange?**

A virtual currency exchange is a person or entity that exchanges virtual currency for fiat currency, funds, or other forms of virtual currency.  Virtual currency exchanges typically charge fees for these services.  Secondary market trading of virtual tokens or coins may also occur on an exchange.  These exchanges may not be registered securities exchanges or alternative trading systems regulated under the federal securities laws.  Accordingly, in purchasing and selling virtual coins and tokens, you may not have the same protections that would apply in the case of stocks listed on an exchange.

**Who issues virtual tokens or coins?**

Virtual tokens or coins may be issued by a virtual organization or other capital raising entity.  A virtual organization is an organization embodied in computer code and executed on a distributed ledger or blockchain.  The code, often called a "smart contract," serves to automate certain functions of the organization, which may include the issuance of certain virtual coins or tokens.  The DAO, which was a decentralized autonomous organization, is an example of a virtual organization.

**Some Key Points to Consider When Determining Whether to Participate in an ICO**

If you are thinking about participating in an ICO, here are some things you should consider.

▸ Depending on the facts and circumstances, the offering may involve the offer and sale of securities.  If that is the case, the offer and sale of virtual coins or tokens must itself be registered with the SEC, or be performed pursuant to an exemption from registration.  Before investing in an ICO, ask whether the virtual tokens or coins are securities and whether the persons selling them registered the offering with the SEC.  A few things to keep in mind about registration:

   • If an offering is registered, you can find information (such as a registration statement or "Form S-1") on SEC.gov (https://www.sec.gov/) through EDGAR (https://investor.gov/research-before-you-invest/research/researching-investments/using-edgar-researching-public-companies).

   • If a promoter states that an offering is exempt from registration, and you are not an accredited investor (https://investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-accredited-investors), you should be very careful – most exemptions have net worth or income requirements.

   • Although ICOs are sometimes described as crowdfunding (https://investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-crowdfunding-investors) contracts, it is possible that they are not being offered and sold in compliance with the requirements of Regulation Crowdfunding or with the federal securities laws generally.

▸ Ask what your money will be used for and what rights the virtual coin or token provides to you.  The promoter should have a clear business plan that you can read and that you understand.  The rights the token or coin entitles you to should be clearly laid out, often in a white paper or development roadmap.  You should specifically ask about how and when you can get your money back in the event you wish to do so.  For example, do you have a right to give the token or coin back to the company or to receive a refund? Or can you resell the coin or token? Are there any limitations on your ability to resell the coin or token?

▸ If the virtual token or coin is a security, federal and state securities laws require investment professionals and their firms who offer, transact in, or advise on investments to be licensed or registered.  You can visit

**EXHIBIT  3    PAGE    39**

Investor.gov (https://www.investor.gov/) to check the registration status and background of these investment professionals.

▸ Ask whether the blockchain is open and public, whether the code has been published, and whether there has been an independent cybersecurity audit.

▸ Fraudsters often use innovations and new technologies to perpetrate fraudulent investment schemes. Fraudsters may entice investors by touting an ICO investment "opportunity" as a way to get into this cutting-edge space, promising or guaranteeing high investment returns. Investors should always be suspicious of jargon-laden pitches, hard sells, and promises of outsized returns. Also, it is relatively easy for anyone to use blockchain technology to create an ICO that looks impressive, even though it might actually be a scam.

▸ Virtual currency exchanges and other entities holding virtual currencies, virtual tokens or coins may be susceptible to fraud, technical glitches, hacks, or malware. Virtual tokens or virtual currency may be stolen by hackers.

**Investing in an ICO may limit your recovery in the event of fraud or theft. While you may have rights under the federal securities laws, your ability to recover may be significantly limited.**

If fraud or theft results in you or the organization that issued the virtual tokens or coins losing virtual tokens, virtual currency, or fiat currency, you may have limited recovery options. Third-party wallet services, payment processors, and virtual currency exchanges that play important roles in the use of virtual currencies may be located overseas or be operating unlawfully.

Law enforcement officials may face particular challenges when investigating ICOs and, as a result, investor remedies may be limited. These challenges include:

▸ Tracing money. Traditional financial institutions (such as banks) often are not involved with ICOs or virtual currency transactions, making it more difficult to follow the flow of money.

▸ International scope. ICOs and virtual currency transactions and users span the globe. Although the SEC regularly obtains information from abroad (such as through cross-border agreements), there may be restrictions on how the SEC can use the information and it may take more time to get the information. In some cases, the SEC may be unable to obtain information from persons or entities located overseas.

▸ No central authority. As there is no central authority that collects virtual currency user information, the SEC generally must rely on other sources for this type of information.

▸ Freezing or securing virtual currency. Law enforcement officials may have difficulty freezing or securing investor funds that are held in a virtual currency. Virtual currency wallets are encrypted and unlike money held in a bank or brokerage account, virtual currencies may not be held by a third-party custodian.

**Be careful if you spot any of these potential warning signs of investment fraud.**

▸ "Guaranteed" high investment returns. There is no such thing as guaranteed high investment returns. Be wary of anyone who promises that you will receive a high rate of return on your investment, with little or no risk.

▸ Unsolicited offers. An unsolicited sales pitch may be part of a fraudulent investment scheme. Exercise extreme caution if you receive an unsolicited communication—meaning you didn't ask for it and don't know the sender—about an investment opportunity.

▸ Sounds too good to be true. If the investment sounds too good to be true, it probably is. Remember that investments providing higher returns typically involve more risk.

▸ Pressure to buy RIGHT NOW. Fraudsters may try to create a false sense of urgency to get in on the investment. Take your time researching an investment opportunity before handing over your money.

▸ Unlicensed sellers. Many fraudulent investment schemes involve unlicensed individuals or unregistered firms. Check license and registration status on Investor.gov (https://investor.gov/).

▸

**EXHIBIT  3    PAGE    40**

No net worth or income requirements.  The federal securities laws require securities offerings to be registered with the SEC unless an exemption from registration applies. Many registration exemptions require that investors are accredited investors (http://www.sec.gov/answers/accred.htm); some others have investment limits.  Be highly suspicious of private (*i.e.,* unregistered) investment opportunities that do not ask about your net worth or income or whether investment limits apply.

<p style="text-align:center">***</p>

Before making any investment, carefully read any materials you are given and verify the truth of every statement you are told about the investment. For more information about how to research an investment, read our publication Ask Questions (http://www.sec.gov/investor/pubs/sec-questions-investors-should-ask.pdf).  Investigate the individuals and firms offering the investment, and check out their backgrounds on Investor.gov (https://investor.gov/) and by contacting your state securities regulator (http://www.nasaa.org/about-us/contact-us/contact-your-regulator/).  Many fraudulent investment schemes involve unlicensed individuals or unregistered firms.

**Additional Resources**

SEC Investor Alert: Bitcoin and Other Virtual Currency-Related Investments (https://investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-bitcoin-other-virtual-currency)

SEC Investor Alert: Ponzi Schemes Using Virtual Currencies (http://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf)

SEC Investor Alert: Social Media and Investing – Avoiding Fraud (http://www.sec.gov/investor/alerts/socialmediaandfraud.pdf)

---

The Office of Investor Education and Advocacy has provided this information as a service to investors.  It is neither a legal interpretation nor a statement of SEC policy.  If you have questions concerning the meaning or application of a particular law or rule, please consult with an attorney who specializes in securities law.



IN LESS TIME THAN IT TAKES TO READ THIS WEB PAGE . . .

You can check out the background of an investment professional by using Investor.gov.  It's a great first step toward protecting your money.  Learn about an investment professional's background, registration status, and more.

Search Now ▶(http

**EXHIBIT  3    PAGE    41**

# EXHIBIT 4



# UNITED STATES OF AMERICA
### SECURITIES AND EXCHANGE COMMISSION

## ATTESTATION

I HEREBY ATTEST

*that:*

*A diligent search has this day been made of the records and files of this Commission, and the records and files do not disclose that any filings have been received in this Commission under the name of Titanium Blockchain Infrastructure Services, Inc., pursuant to the provisions of any of the Acts administered by the Commission.*

on file in this Commission

04/02/2018
Date

ALICIA HOEFKE

Digitally signed by
ALICIA HOEFKE
Date: 2018.04.02
15:51:52 -04'00'

Alicia Hoefke, Records & Information Mgmt Specialist

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is the official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, Records and Information Management Specialist, and the Program Analyst for the Records Officer, or any one of them, is authorized to execute the above attestation.

For the Commission

Secretary

SEC 334 (12/15)

**EXHIBIT 4    PAGE    42**



# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

# ATTESTATION

**I HEREBY ATTEST**

*that:*

*A diligent search has this day been made of the records and files of this Commission, and the records and files do not disclose that any filings have been received in this Commission under the name of EHI Internetwork and Systems Management, Inc., pursuant to the provisions of any of the Acts administered by the Commission.*

on file in this Commission

04/02/2018
Date

ALICIA
HOEFKE

Digitally signed by
ALICIA HOEFKE
Date: 2018.04.02
15:53:21 -04'00'

Alicia Hoefke, Records & Information Mgmt Specialist

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is the official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, Records and Information Management Specialist, and the Program Analyst for the Records Officer, or any one of them, is authorized to execute the above attestation.

For the Commission

Brent J. Fields
Secretary

SEC 334 (12/15)

**EXHIBIT 4   PAGE   43**



# UNITED STATES OF AMERICA
### SECURITIES AND EXCHANGE COMMISSION

## ATTESTATION

**I HEREBY ATTEST**

*that:*

*A diligent search has this day been made of the records and files of this Commission, and the records and files do not disclose that any filings have been received in this Commission under the name of Michael Alan Stollery, pursuant to the provisions of any of the Acts administered by the Commission.*

on file in this Commission

04/02/2018
Date

ALICIA HOEFKE

Digitally signed by
ALICIA HOEFKE
Date: 2018.04.02
15:52:21 -04'00'

Alicia Hoefke, Records & Information Mgmt Specialist

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is the official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, Records and Information Management Specialist, and the Program Analyst for the Records Officer, or any one of them, is authorized to execute the above attestation.

For the Commission

Secretary

SEC 334 (12/15)

**EXHIBIT 4    PAGE    44**



# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

# ATTESTATION

I HEREBY ATTEST

*that:*

*A diligent search has this day been made of the records and files of this Commission, and the records and files do not disclose that any filings have been received in this Commission under the name of Michael Stollaire, pursuant to the provisions of any of the Acts administered by the Commission.*

on file in this Commission

04/02/2018

Date

**ALICIA HOEFKE**

Digitally signed by
ALICIA HOEFKE
Date: 2018.04.02
15:52:40 -04'00'

Alicia Hoefke, Records & Information Mgmt Specialist

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is the official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, Records and Information Management Specialist, and the Program Analyst for the Records Officer, or any one of them, is authorized to execute the above attestation.

For the Commission

Secretary

SEC 334 (12/15)

**EXHIBIT 4    PAGE   45**



# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

## ATTESTATION

I HEREBY ATTEST

that:

*A diligent search has this day been made of the records and files of this Commission, and the records and files do not disclose that any filings have been received in this Commission under the name of Michael Stoller, pursuant to the provisions of any of the Acts administered by the Commission.*

on file in this Commission

04/02/2018
Date

**ALICIA HOEFKE**

Digitally signed by
ALICIA HOEFKE
Date: 2018.04.02
15:53:02 -04'00'

Alicia Hoefke, Records & Information Mgmt Specialist

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is the official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, Records and Information Management Specialist, and the Program Analyst for the Records Officer, or any one of them, is authorized to execute the above attestation.

For the Commission

Secretary

SEC 334 (12/15)

**EXHIBIT 4   PAGE   46**

# EXHIBIT 5

4073241

**Secretary of State**

**Articles of Incorporation of a General Stock Corporation**

| ARTS-GS |

FILED
Secretary of State
State of California

OCT 10 2017

IPC

**IMPORTANT — Read Instructions before completing this form.**

Filing Fee  –  $100.00

Copy Fees  –  First page $1.00; each attachment page $0.50;
Certification Fee - $5.00

*Note:* Corporations may have to pay minimum $800 tax to the California Franchise Tax Board each year. For more information, go to https://www.ftb.ca.gov.

**This Space For Office Use Only**

**1. Corporate Name** (Go to www.sos.ca.gov/business/be/name-availability for general corporate name requirements and restrictions.)

The name of the corporation is  Titanium Blockchain Infrastructure Services Inc.

**2. Business Addresses** (Enter the complete business addresses.)

| a. Initial Street Address of Corporation - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 15027 Dickens Street, Apt. 4 | Sherman Oaks | CA | 91403 |
| b. Initial Mailing Address of Corporation, if different than Item 2a | City (no abbreviations) | State | Zip Code |
| | | | |

**3. Agent for Service of Process**

Item 3a and 3b: If naming an individual, the agent must reside in California and Items 3a and 3b must be completed with the agent's name and complete California street address.

Item 3c: If naming a California Registered Corporate Agent, a current agent registration certificate must be on file with the California Secretary of State and Item 3c must be completed (leave Item 3a-3b blank).

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| | | | | |
| b. Street Address (if agent is not a corporation) - Do not list a P.O. Box | City (no abbreviations) | | State | Zip Code |
| | | | CA | |

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 3a or 3b

LegalZoom.com, Inc.

**4. Shares** (Enter the number of shares the corporation is authorized to issue. Do not leave blank or enter zero (0).)

This corporation is authorized to issue only one class of shares of stock.

The total number of shares which this corporation is authorized to issue is _____ 1,000,000 _____.

**5. Purpose Statement** (Do not alter the Purpose Statement.)

The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**6. Read and Sign Below** (This form must be signed by each incorporator. See Instructions for signature requirements.)

_____
Signature

LegalZoom.com, Inc. by Cheyenne Moseley, Assistant Secretary
Type or Print Name

ARTS-GS (REV 12/2016)

2016 California Secretary of State
www.sos.ca.gov/business/be

**EXHIBIT 5   PAGE   46**

4073241

Attachment to the
Articles of Incorporation
of

Titanium Blockchain Infrastructure Services Inc.

7.     The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

8.     This corporation is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code with respect to actions for breach of duty to the corporation and its shareholders.

9.     Any repeal or modification of the foregoing provisions of Sections 7 and 8 by the shareholders of this corporation shall not adversely affect any right or protection of an agent of this corporation existing at the time of such repeal or modification.

**EXHIBIT  5   PAGE    47**



## State of California
### Secretary of State

**Statement of Information**
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| S |

**FS38714**

# FILED

In the office of the Secretary of State
of the State of California

**NOV-16 2017**

1. **CORPORATE NAME**
TITANIUM BLOCKCHAIN INFRASTRUCTURE SERVICES INC.

2. **CALIFORNIA CORPORATE NUMBER**
C4073241

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.
☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 17.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | | |
| 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | | |
| 5. STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | CITY | STATE | ZIP CODE |
| 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | | |
| 6. MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7. CHIEF EXECUTIVE OFFICER/ | | | | |
| MICHAEL ALAN STOLLERY | 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | |
| 8. SECRETARY | ADDRESS | CITY | STATE | ZIP CODE |
| MICHAEL ALAN STOLLERY | 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | |
| 9. CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| MICHAEL ALAN STOLLERY | 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10. NAME | | | | |
| MICHAEL ALAN STOLLERY | 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | |
| 11. NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12. NAME | ADDRESS | CITY | STATE | ZIP CODE |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS
MICHAEL ALAN STOLLERY

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 15027 DICKENS ST APT 4, SHERMAN OAKS, CA 91403 | | | |

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION
TECH INFRASTRUCTURE SERVICES

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 11/16/2017 | MICHAEL ALAN STOLLERY | CEO | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |

**EXHIBIT 5   PAGE   48**

# EXHIBIT 6



**Secretary of State**

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

For Office Use Only

**Karen Wheeler, WY Dep Sec of State**
**FILED: Feb 20 2018 12:28PM**
**Original ID: 2018-000790061**

## Profit Corporation
## Articles of Incorporation

**I. The name of the corporation is:**

Titanium Blockchain Infrastructure Services Inc.

**II. The name and physical address of the registered agent of the corporation is:**

Wyoming Registered Agent
1621 Central Ave
Cheyenne, WY 82001

**III. The mailing address of the corporation is:**

1621 Central Avenue
Cheyenne, WY 82001

**IV. The principal office address of the corporation is:**

1621 Central Avenue
Cheyenne, WY 82001

**V. The number, par value, and class of shares the corporation will have the authority to issue are:**

Number of Common Shares:   50,000          Common Par Value:   $1.0000
Number of Preferred Shares:   0              Preferred Par Value:   $0.0000

**VI. The name and address of each incorporator is as follows:**

Wyoming Registered Agent
1621 Central Avenue Cheyenne, WY 82001

Signature:   *Rose Garcia*                               Date:   **02/20/2018**

Print Name:   **Rose Garcia**

Title:   **Assistant Secretary**

Email:   **info@wyomingregisteredagent.com**

Daytime Phone #:   **(307) 637-5151**

**EXHIBIT  6 PAGE    49**



Secretary of State

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

---

☑ I am the person whose signature appears on the filing; that I am authorized to file these documents on behalf of the business entity to which they pertain; and that the information I am submitting is true and correct to the best of my knowledge.

☑ I am filing in accordance with the provisions of the Wyoming Business Corporation Act, (W.S. 17-16-101 through 17-16-1804) and Registered Offices and Agents Act (W.S. 17-28-101 through 17-28-111).

☑ I understand that the information submitted electronically by me will be used to generate Articles of Incorporation that will be filed with the Wyoming Secretary of State.

☑ I intend and agree that the electronic submission of the information set forth herein constitutes my signature for this filing.

☑ I have conducted the appropriate name searches to ensure compliance with W.S. 17-16-401.

☑ I affirm, under penalty of perjury, that I have received actual, express permission from each of the following incorporators to add them to this business filing: Wyoming Registered Agent

**Notice Regarding False Filings: Filing a false document could result in criminal penalty and prosecution pursuant to W.S. 6-5-308.**

> **W.S. 6-5-308. Penalty for filing false document.**
>
> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he files with the secretary of state and willfully or knowingly:
>
> (i) Falsifies, conceals or covers up by any trick, scheme or device a material fact;
>
> (ii) Makes any materially false, fictitious or fraudulent statement or representation; or
>
> (iii) Makes or uses any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry.

☑ I acknowledge having read W.S. 6-5-308.

**Filer is:**  ☐ An Individual    ☑ An Organization

The Wyoming Secretary of State requires a natural person to sign on behalf of a business entity acting as an incorporator or organizer. The following individual is signing on behalf of all Organizers or Incorporators.

**Filer Information:**
**By submitting this form I agree and accept this electronic filing as legal submission of my Articles of Incorporation.**

| | |
|---|---|
| Signature: | *Rose Garcia*    Date: **02/20/2018** |
| Print Name: | **Rose Garcia** |
| Title: | **Assistant Secretary** |
| Email: | **info@wyomingregisteredagent.com** |
| Daytime Phone #: | **(307) 637-5151** |

Page 2 of 4

**EXHIBIT  6 PAGE   50**



Secretary of State

**Wyoming Secretary of State**

2020 Carey Avenue
Suite 700
Cheyenne, WY 82002-0020
Ph. 307-777-7311

## Consent to Appointment by Registered Agent

**Wyoming Registered Agent**, whose registered office is located at **1621 Central Ave, Cheyenne, WY 82001**, voluntarily consented to serve as the registered agent for **Titanium Blockchain Infrastructure Services Inc.** and has certified they are in compliance with the requirements of W.S. 17-28-101 through W.S. 17-28-111.

I have obtained a signed and dated statement by the registered agent in which they voluntarily consent to appointment for this entity.

Signature:   *Rose Garcia*                    Date:  **02/20/2018**

Print Name:   **Rose Garcia**

Title:   **Assistant Secretary**

Email:   **info@wyomingregisteredagent.com**

Daytime Phone #:   **(307) 637-5151**

Page 3 of 4

**EXHIBIT  6 PAGE   51**

## STATE OF WYOMING
## Office of the Secretary of State

I, KAREN L. WHEELER, Acting Secretary of State of the State of Wyoming, do hereby certify that the filing requirements for the issuance of this certificate have been fulfilled.

CERTIFICATE OF INCORPORATION

**Titanium Blockchain Infrastructure Services Inc.**

I have affixed hereto the Great Seal of the State of Wyoming and duly executed this official certificate at Cheyenne, Wyoming on this **20th** day of **February**, **2018** at **12:28 PM.**

Remainder intentionally left blank.

*Karen L. Wheeler*

Acting Secretary of State

Filed Date: 02/20/2018

Filed Online By:

Rose Garcia

on 02/20/2018

**EXHIBIT  6 PAGE    52**

# EXHIBIT 7

## Business Registry Business Name Search

### Business Entity Data

New Search

04-19-2018
11:18

| Registry Nbr | Entity Type | Entity Status | Jurisdiction | Registry Date | Next Renewal Date | Renewal Due? |
|---|---|---|---|---|---|---|
| 1411276-96 | FBC | ACT | CALIFORNIA | 03-05-2018 | 03-05-2019 | |
| **Entity Name** | TITANIUM BLOCKCHAIN INFRASTRUCTURE SERVICES, INC. | | | | | |
| **Foreign Name** | | | | | | |

### Associated Names

New Search

| Type | PPB | PRINCIPAL PLACE OF BUSINESS | | | |
|---|---|---|---|---|---|
| **Addr 1** | 5250 HIGHBANKS RD STE 250 | | | | |
| **Addr 2** | | | | | |
| **CSZ** | SPRINGFIELD | OR | 97478 | **Country** | UNITED STATES OF AMERICA |

*Please click here for general information about registered agents and service of process.*

| Type | AGT | REGISTERED AGENT | | **Start Date** | 03-05-2018 | **Resign Date** | |
|---|---|---|---|---|---|---|---|
| **Name** | RICHARD | | SILVER | | | | |
| **Addr 1** | 5250 HIGHBANKS RD STE 250 | | | | | | |
| **Addr 2** | | | | | | | |
| **CSZ** | SPRINGFIELD | OR | 97478 | **Country** | UNITED STATES OF AMERICA | | |

| Type | MAL | MAILING ADDRESS | | | |
|---|---|---|---|---|---|
| **Addr 1** | 5250 HIGHBANKS RD STE 250 | | | | |
| **Addr 2** | | | | | |
| **CSZ** | SPRINGFIELD | OR | 97478 | **Country** | UNITED STATES OF AMERICA |

| Type | PRE | PRESIDENT | | **Resign Date** | |
|---|---|---|---|---|---|
| **Name** | MICHAEL | | STOLLERY | | |
| **Addr 1** | 15027 DICKENS ST APT 4 | | | | |
| **Addr 2** | | | | | |
| **CSZ** | SHERMAN OAKS | CA | 91403 | **Country** | UNITED STATES OF AMERICA |

| Type | SEC | SECRETARY | | **Resign Date** | |
|---|---|---|---|---|---|
| **Name** | RICHARD | | SILVER | | |
| **Addr 1** | 5250 HIGHBANKS RD STE 250 | | | | |
| **Addr 2** | | | | | |
| **CSZ** | SPRINGFIELD | OR | 97478 | **Country** | UNITED STATES OF AMERICA |

### Name History

New Search

| Business Entity Name | Name Type | Name Status | Start Date | End Date |
|---|---|---|---|---|

**EXHIBIT 7  PAGE   53**

Business Registry Business Name Search                                                Page 2 of 2

| TITANIUM BLOCKCHAIN INFRASTRUCTURE SERVICES, INC. | EN | CUR | 03-05-2018 | |

Please read before ordering Copies.

New Search                          Summary History

| Image Available | Action | Transaction Date | Effective Date | Status | Name/Agent Change | Dissolved By |
|---|---|---|---|---|---|---|
| 🖹 | APPLICATION FOR AUTHORITY | 03-05-2018 | | FI | Agent | |

© 2018  Oregon Secretary of State.  All Rights Reserved.

**EXHIBIT 7  PAGE   54**

# EXHIBIT 8

2340630

**FILED**
In the office of the Secretary of State
of the State of California

MAR 2 7 2001

*Bill Jones*
BILL JONES, Secretary of State

# STATE OF CALIFORNIA
## ARTICLES OF INCORPORATION
### OF
## EHI INTERNETWORK AND SYSTEMS MANAGEMENT, INC.

**ARTICLE I:**  The name of the corporation is

**EHI INTERNETWORK AND SYSTEMS MANAGEMENT, INC.**

**ARTICLE II:**  The purpose of the corporation is to engage in any lawful act or activity for which a corporation may be organized under the **GENERAL CORPORATION LAW** of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**.ARTICLE III:**  The name and address in the State of California of this corporation's initial agent for service of process is:

MICHAEL STOLLER
19143 VICTORY BLVD, STE 127
RESEDA CA 91335

**ARTICLE IV:** This corporation is authorized to issue only one class of shares of stock; and the total number of shares which this corporation is authorized to issue is 2,000 shares at $.01 par value.

*Kerry Walsh*

Kerry Walsh, Incorporator 3/21/01
Incorporatetime.com, Inc.
35-37 Carleton Avenue, Suite 200
Islip Terrace, New York 11752

**EXHIBIT 8   PAGE 55**

## State of California
## Secretary of State

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| S |
|---|

FC12769

# FILED

In the office of the Secretary of State
of the State of California

**FEB-23 2016**

1.  CORPORATE NAME

EHI INTERNETWORK AND SYSTEMS MANAGEMENT, INC.

2.  CALIFORNIA CORPORATE NUMBER

C2340630

*This Space for Filing Use Only*

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3.  **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☐  If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4.  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |
| 5.  STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |
| 6.  MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7.  CHIEF EXECUTIVE OFFICER/ MICHAEL STOLLERY | 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |
| 8.  SECRETARY MICHAEL STOLLERY | 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |
| 9.  CHIEF FINANCIAL OFFICER/ MICHAEL STOLLERY | 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 10.  NAME MICHAEL STOLLERY | 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |
| 11.  NAME | ADDRESS | CITY | STATE | ZIP CODE |
| 12.  NAME | ADDRESS | CITY | STATE | ZIP CODE |

13.  NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14.  NAME OF AGENT FOR SERVICE OF PROCESS

MICHAEL STOLLERY

| 15.  STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 15027 DICKENS STREET, SUITE 4, SHERMAN OAKS, CA 91403 | | | |

**Type of Business**

16.  DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

INFO TECHNOLOGY CONSULTANCY

17.  BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 02/23/2016 | MICHAEL STOLLERY | CEO | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

| SI-200 (REV 01/2013) | Page 1 of 1 | APPROVED BY SECRETARY OF STATE |
|---|---|---|

**EXHIBIT 8   PAGE 56**

## State of California
### Secretary of State

**S**

### Statement of Information
(Domestic Stock and Agricultural Cooperative Corporations)
FEES (Filing and Disclosure): $25.00.
If this is an amendment, see instructions.
IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM

**FS74019**

# FILED

In the office of the Secretary of State
of the State of California

**DEC-07 2017**

1. **CORPORATE NAME**

EHI INTERNETWORK AND SYSTEMS MANAGEMENT, INC.

2. **CALIFORNIA CORPORATE NUMBER**

C2340630

This Space for Filing Use Only

**No Change Statement** (Not applicable if agent address of record is a P.O. Box address. See instructions.)

3. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.

[✓] If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to **Item 17.**

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 4 and 5 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 4. | STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5. | STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6. | MAILING ADDRESS OF CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers** (The corporation must list these three officers. A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 7. | CHIEF EXECUTIVE OFFICER/ | | | | |
| 8. | SECRETARY | | | | |
| 9. | CHIEF FINANCIAL OFFICER/ | | | | |

**Names and Complete Addresses of All Directors, Including Directors Who are Also Officers** (The corporation must have at least one director. Attach additional pages, if necessary.)

| | | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|
| 10. | NAME | | | | |
| 11. | NAME | | | | |
| 12. | NAME | | | | |

13. NUMBER OF VACANCIES ON THE BOARD OF DIRECTORS, IF ANY:

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 15 must be completed with a California street address, a P.O. Box address is not acceptable. If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 15 must be left blank.

14. NAME OF AGENT FOR SERVICE OF PROCESS

| 15. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | CITY | STATE | ZIP CODE |
|---|---|---|---|

**Type of Business**

16. DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

17. BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 12/07/2017 | MICHAEL ALAN STOLLERY | CEO | |
|---|---|---|---|
| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |

SI-200 (REV 01/2013)    APPROVED BY SECRETARY OF STATE

**EXHIBIT 8   PAGE 57**

# EXHIBIT 9

NIC.IO - The Indian Ocean .IO Domain Registry and Network Information Centre - .IO WhoisIs Search          Page 1 of 2

 Sign In ∨          

☰



×

**nic.io**
home

**domain names**
purchase domain
whois search
services

**support**
support center

**legal**
terms & conditions
allocation rules
policies

## whois search

Enter your domain name with us

☐ I'm not a robot

reCAPTCHA
Privacy - Terms

search whois

## Your WHOIS information

```
Domain Name: TBIS.IO
Registry Domain ID: D503300000045300548-LRMS
Registrar WHOIS Server:
Registrar URL: http://registrar.1and1.info
Updated Date: 2017-11-06T20:32:44Z
Creation Date: 2017-09-07T19:08:35Z
Registry Expiry Date: 2018-09-07T19:08:35Z
Registrar Registration Expiration Date:
Registrar: 1&1 Internet SE
Registrar IANA ID: 83
Registrar Abuse Contact Email:
Registrar Abuse Contact Phone:
Reseller:
```

https://www.nic.io/whois-search.htm                                    1/30/2018

**EXHIBIT  9  PAGE  58**

```
Domain Status: clientTransferProhibited
https://icann.org/epp#clientTransferProhibited
Registrant Name: Michael Stollery
Registrant Organization: EHI-INSM Inc.
Name Server: NS1022.UI-DNS.ORG
Name Server: NS1025.UI-DNS.BIZ
Name Server: NS1083.UI-DNS.COM
Name Server: NS1038.UI-DNS.DE
DNSSEC: unsigned
URL of the ICANN Whois Inaccuracy Complaint Form:
https://www.icann.org/wicf/
>>> Last update of WHOIS database: 2018-01-30T19:23:28Z <<<
For more information on Whois status codes, please visit
https://icann.org/epp
Access to WHOIS information provided by Internet Computer Bureau
Ltd. ("ICB") is provided to assist persons in determining the
contents of a domain name registration record in the ICB registry
database. The data in this record is provided by ICB for
informational purposes only, and ICB does not guarantee its
accuracy. This service is intended only for query-based access.
You agree that you will use this data only for lawful purposes and
that, under no circumstances will you use this data to(i) allow,
enable, or otherwise support the transmission by e-mail,
telephone, facsimile or other electronic means of mass,
unsolicited, commercial advertising or solicitations to entities
other than the data recipient's own existing customers; or (ii)
enable high volume, automated, electronic processes that send
queries or data to the systems of Registry Operator, a Registrar,
or ICB or its services providers except as reasonably necessary to
register domain names or modify existing registrations. UK privacy
laws limit the scope of information permitted for certain public
access. Therefore, concerns regarding abusive use of domain
registrations in the ICB registry should be directed to either (a)
the Registrar of Record as indicated in the WHOIS output, or (b)
the ICB anti-abuse department at abuse@icbregistry.info.
All rights reserved. ICB reserves the right to modify these terms
at any time. By submitting this query, you agree to abide by these
policies.
```

## .IO Domains are issued on a first come, first served basis.

Obtain your own .IO domain today!

**sitemap | contact**

Copyright © 1997-2017 NIC.IO. All Rights Reserved.

**EXHIBIT  9  PAGE  59**

Whois ehiinsm.com

Page 1 of 4



DOMAINS    HOSTING    CLOUD ^NEW    WEBSITES    EMAIL    SECURITY    WHOIS    SUPPORT

## ehiinsm.com

Updated 1 second ago

### DOMAIN INFORMATION

| | |
|---|---|
| Domain: | ehiinsm.com |
| Registrar: | Brandon Gray Internet Services, Inc. dba NameJuice.com |
| Registration Date: | 2001-04-23 |
| Expiration Date: | 2018-04-23 |
| Updated Date: | 2018-03-21 |
| Status: | clientTransferProhibited |
| Name Servers: | dns1.stabletransit.com |
| | dns2.stabletransit.com |

### REGISTRANT CONTACT

| | |
|---|---|
| Name: | Michael Stollaire |
| Organization: | Private Registration |
| Street: | 2316 Delaware Ave Suite #266 |
| | Suite 102 |
| City: | Buffalo |
| State: | NY |
| Postal Code: | 14216-2687 |
| Country: | US |
| Phone: | +1.8664340212 |
| Fax: | +1.8664340211 |
| Email: | fpvgqkfwla2k8ozu@private-contact.com |

### ADMINISTRATIVE CONTACT

| | |
|---|---|
| Name: | Michael Stollaire |
| Organization: | Private Registration |
| Street: | 2316 Delaware Ave Suite #266 |
| | Suite 102 |
| City: | Buffalo |
| State: | NY |
| Postal Code: | 14216-2687 |
| Country: | US |
| Phone: | +1.8664340212 |
| Fax: | +1.8664340211 |
| Email: | a0iiaswmc0fuvkqo@private-contact.com |





**EXHIBIT  9  PAGE  60**

Whois ehiinsm.com

## TECHNICAL CONTACT

| | |
|---|---|
| Name: | Michael Stollaire |
| Organization: | Private Registration |
| Street: | 2316 Delaware Ave Suite #266 Suite 102 |
| City: | Buffalo |
| State: | NY |
| Postal Code: | 14216-2687 |
| Country: | US |
| Phone: | +1.8664340212 |
| Fax: | +1.8664340211 |
| Email: | **5vfhn5lgddokoquq**@private-contact.com |

## RAW WHOIS DATA

```
Domain name: EHIINSM.COM
Registry Domain ID: 69832129_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.namejuice.com
Registrar URL: http://www.namejuice.com
Updated Date: 2018-04-05T00:38:46Z
Creation Date: 2003-12-14T01:49:08Z
Registrar Registration Expiration Date: 2018-04-23T04:00:00Z
Registrar: BRANDON GRAY INTERNET SERVICES, INC. DBA NAMEJUICE.COM
Registrar IANA ID: 636
Registrar Abuse Contact Email: abuse@namejuice.com
Registrar Abuse Contact Phone: +1.9054152681
Reseller: Domain Registry of America
Domain Status: clientTransferProhibited
https://www.icann.org/epp#clientTransferProhibited
Registry Registrant ID:
Registrant Name: Michael Stollaire
Registrant Organization: Private Registration
Registrant Street: 2316 Delaware Ave Suite #266
Registrant Street: Suite 102
Registrant City: Buffalo
Registrant State/Province: NY
Registrant Postal Code: 14216-2687
Registrant Country: US
Registrant Phone: +1.8664340212
Registrant Phone Ext:
Registrant Fax: +1.8664340211
Registrant Fax Ext:
Registrant Email: fpvgqkfwla2k8ozu@private-contact.com
Registry Admin ID:
Admin Name: Michael Stollaire
Admin Organization: Private Registration
Admin Street: 2316 Delaware Ave Suite #266
Admin Street: Suite 102
Admin City: Buffalo
Admin State/Province: NY
Admin Postal Code: 14216-2687
Admin Country: US
Admin Phone: +1.8664340212
Admin Phone Ext:
Admin Fax: +1.8664340211
Admin Fax Ext:
Admin Email: a0iiaswnc0fuvkqo@private-contact.com
Registry Tech ID:
Tech Name: Michael Stollaire
Tech Organization: Private Registration
Tech Street: 2316 Delaware Ave Suite #266
Tech Street: Suite 102
```

**EXHIBIT 9 PAGE 61**

Whois ehiinsm.com

```
Tech City: Buffalo
Tech State/Province: NY
Tech Postal Code: 14216-2687
Tech Country: US
Tech Phone: +1.8664340212
Tech Phone Ext:
Tech Fax: +1.8664340211
Tech Fax Ext:
Tech Email: 5vfhn5lgddokoquq@private-contact.com
Name Server: DNS1.STABLETRANSIT.COM
Name Server: DNS2.STABLETRANSIT.COM
DNSSEC: Unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
Last update of WHOIS database: 2018-04-05T00:38:46Z

For more information on Whois status codes, please visit
https://www.icann.org/resources/pages/epp-status-codes-2014-06-16-en.

Registration Service Provided By: Domain Registry of America
support@droa.com +1.8664340212
http://www.droa.com


The data in this whois database is provided to you for information
purposes only, that is, to assist you in obtaining information about or
related to a domain name registration record. We make this information
available "as is," and do not guarantee its accuracy. By submitting a
whois query, you agree that you will use this data only for lawful
purposes and that, under no circumstances will you use this data to: (1)
enable high volume, automated, electronic processes that stress or load
this whois database system providing you this information; or (2) allow,
enable, or otherwise support the transmission of mass unsolicited,
commercial advertising or solicitations via direct mail, electronic
mail, or by telephone. The compilation, repackaging, dissemination or
other use of this data is expressly prohibited without prior written
consent from us.

We reserve the right to modify these terms at any time. By submitting
this query, you agree to abide by these terms!
```

## related domain names

namejuice.com    icann.org    nameresolvers.com

## Domains

Register Domain Name

Transfer Domain Name

View Domain Pricing

Bulk Domain Register

Whois Lookup

Name Suggestion Tool

Free with Every Domain

## Hosting & Products

Linux Hosting

Windows Hosting

Wordpress Hosting

Linux Reseller Hosting

Windows Reseller Hosting

Virtual Private Servers

Dedicated Servers

Follow us 

Enter a Domain Name

LOGIN    OR    Cl

https://www.whois.com/whois/ehiinsm.com

4/5/2018

**EXHIBIT  9  PAGE  62**

Whois ehiinsm.com

Domain Offers

**Infrastructure**

Datacenter Details

Hosting Security

24 x 7 Servers Monitoring

Backup and Recovery

Managed Servers

Cloud Hosting

Website Builder

Business Email

Enterprise Email

SSL Certificates

Sitelock

CodeGuard

**Support**

View Knowledge Base

Contact Support

Report Abuse

About Whois

Page 4 of 4



Copyright © Whois.com. All rights reser

Privacy Policy | Legal Agreement

**EXHIBIT 9 PAGE 63**

# EXHIBIT 10

Titanium Blockchain
INFRASTRUCTURE SERVICES

# About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

**The EHI Advantage**

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:

Honeywell | Hewlett Packard Enterprise | hp | IBM

EXHIBIT 10 PAGE **65**

2/2

About Us - Titanium Blockchain Infrastructure Services | TBIS

© Copyright 2017 - Titanium Blockchain Infrastructure Services



# Titanium Blockchain
INFRASTRUCTURE SERVICES

Home | About Us | Our Team | Services | White Paper | Media | Roadmap | Token Sale | Insights | Contact | Sign In

## About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

### The EHI Advantage

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:









*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger.*

Titanium Blockchain Infrastructure Services Inc.
15027 Dickens Street, Suite 4, North Hollywood, CA, 91403, USA
info@tbis.io – TEL: 1.833.DIAL.TITANIUM

EXHIBIT 10 PAGE 66

# Titanium Blockchain
INFRASTRUCTURE SERVICES

Home | About Us | Our Team | Services | White Paper | Media | Roadmap | Token Sale | Insights | Contact | Sign In

## About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:

### The EHI Advantage











*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger.*

Titanium Blockchain Infrastructure Services Inc.
15027 Dickens Street, Suite 4, North Hollywood, CA, 91403, USA
info@tbis.io ~ TEL: 1.833.DIAL.TITANIUM

EXHIBIT 10 PAGE 67



# Titanium Blockchain
## INFRASTRUCTURE SERVICES

Home | About Us | Our Team | Services | White Paper | Media | Roadmap | Token Sale | Insights | Contact | Sign In

## About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

### The EHI Advantage

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:











*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger.*

Titanium Blockchain Infrastructure Services Inc.
15027 Dickens Street, Suite 4, North Hollywood, CA, 91403, USA
info@tbis.io ~ TEL: 1.833.DIAL.TITANIUM

EXHIBIT 10 PAGE 68

# Titanium Blockchain
INFRASTRUCTURE SERVICES

Home | About Us | Our Team | Services | White Paper | Media | Roadmap | Token Sale | Insights | Contact | Sign In

## About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

### The EHI Advantage

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:







*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger.*

Titanium Blockchain Infrastructure Services Inc.
15027 Dickens Street, Suite 4, North Hollywood, CA, 91403, USA
info@tbis.io ~ TEL: 1.833.DIAL.TITANIUM

EXHIBIT 10 PAGE   69

# Titanium Blockchain
## INFRASTRUCTURE SERVICES

Home | About Us | Our Team | Services | White Paper | Media | Roadmap | Token Sale | Insights | Contact | Sign In

## About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

### The EHI Advantage

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:











*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger.*

Titanium Blockchain Infrastructure Services Inc.
15027 Dickens Street, Suite 4, North Hollywood, CA, 91403, USA
info@tbis.io ~ TEL: 1.833.DIAL.TITANIUM

EXHIBIT 10 PAGE  70



**Titanium Blockchain**
INFRASTRUCTURE SERVICES

Home | About Us | Our Team | Services | White Paper | Media | Roadmap | Token Sale | Insights | Contact | Sign In

## About Us

Today, the largest transportation company in the world owns no cars (Uber), the largest hospitality company on the face of the planet owns no hotels (AirBnB), the largest retailer carries no stock (Alibaba), and the world's most popular media network creates no content (Facebook). Clearly, we are living in a time of radical change. Why should internet infrastructure be any different?

### The EHI Advantage

Unlike 99.99% of Blockchain start-ups and Initial Coin Offerings (ICOs), the Titanium Core Team is not composed of relative newcomers to technology. In stark contrast, the Titanium Core Team has over two-hundred (200) years of combined experience. This is also not the first technology company that Titanium's Founder and CEO, Michael Stollaire, has ever formed. In 1999, Mr. Stollaire founded EHI, a technology consultancy specializing in enterprise infrastructure management.

EHI and its consultants are known in the industry as top-tier, elite personnel, as shown by their impressive Client List and Testimonials.

Most Blockchain start-ups and ICOs face a very serious problem after they develop a viable product and or service: finding companies and people that will actually purchase them and use them.

Titanium will not have this problem. As EHI's sister company, Titanium will simply inherit EHI's clientele, and since EHI is considered a trusted source of excellent customer service and personnel, Titanium will also be held in high regard.

What follows is a short excerpt of some of EHI's customers, which Titanium will leverage immediately:



 





*As you can see, the Titanium project had a huge advantage over other Blockchain start-ups and ICOs, before anyone on the Titanium Team ever lifted a finger.*

Titanium Blockchain Infrastructure Services Inc.
15027 Dickens Street, Suite 4, North Hollywood, CA, 91403, USA
info@tbis.io — TEL: 1.833.DIAL.TITANIUM

EXHIBIT 10 PAGE   71

# Titanium Blockchain
## INFRASTRUCTURE SERVICES

Welcome to the new world brought to you
by Titanium Blockchain Infrastructure
Services (TBIS)

▲

We Are The Revolution.

# 35,000,000

Limited to only 35 million BAR during token sale with a 60M total supply (NOTE: The Soft Cap Has Been Shattered!)

Bars Sold

What if an entire IT enterprise could be virtualized, including data centers, firewalls, load-balancers, routers, switches, network appliances and servers? Imagine being able to set up an enterprise level infrastructure for a global company from a tablet in your living room, without spending any time installing rack servers, routers, load balancers, or any other network component beyond what is needed to access the network.

With TBIS' proprietary Company as a Service™ (CaaS) and Infrastructure as a Service (IaaS), every device, from enterprise level on down, can be virtualized; routers, firewalls, and specialized equipment such as cryptocurrency miners, can exist in an entirely cloud-based environment based on the decentralized Ethereum blockchain.

# In The Media

Forbes





"ICOs raise money without middlemen, such as venture capitalists and angel investors, which, even if they give you money, they also take a percentage of equity of the company, require a certain number of seats on the board of directors, and so forth. In fact, ICOs are now raising more money for start-ups than early stage venture capital," says Mike Stollaire, President and CEO of Titanium.

Read more...

Inc.

New IaaS technology is making it so data can be managed on demand as well. Computer technology corporation Oracle has created an IaaS platform that combines the benefits of cloud services with the benefits usually associated with physical on-site infrastructure.

Read more...

HUFF POST

Titanium is a company that is planning on changing the internet as we know it and make it much more efficient, while also creating an infrastructure that cannot be controlled or manipulated by anyone. The Titanium infrastructure will exist on the Ethereum blockchain (which has over 200,000 nodes) and will be completely decentralized.

Read more...

COINPOST



the future of the internet is decentralized and one company that is looking to be at the forefront of this new world on the internet is Titanium Blockchain Infrastructure Services (TBIS). Titanium is a company that is looking to revolutionize the internet and make it more efficient than ever before, while also creating an internet infrastructure that can't be controlled or destroyed by anyone, and is completely open for everyone.

Read more...

## NEWS

The Titanium Blockchain Infrastructure Services (TBIS) strives to create a robust decentralized network infrastructure that will encompass data centers, firewalls, routers, switches and other network components. Using the power of blockchain technology, an enterprise level network infrastructure module can be condensed into a smartphone or a tablet.

Read more...

EXHIBIT 10 PAGE   76



Best Cryptocurrency Company | Blockchain Infrastructure | TBIS

1/29/2018

https://tbis.io/

Just as steel changed the building industry forever, Titanium will usher in a new era of network construction. With TBIS' proprietary Company as a Service™ (CaaS) and Infrastructure as a Service (IaaS), every device, from enterprise level on down, can be virtualized; routers, firewalls, and specialized equipment such as cryptocurrency miners, can exist in an entirely cloud-based environment based on the decentralized Ethereum blockchain. Paired with cutting-edge enterprise management and monitoring technology, this will create a shock-proof internet infrastructure that will be both lightweight and completely revolutionary in scope. Imagine being able to set up an enterprise level infrastructure for a global company from a tablet in your living room, without spending any time installing rack servers, routers, load balancers, or any other network component beyond what is needed to access the network.

The distributed TBIS system will monitor the health of the network and everything attached to it, and execute autonomous "healing" actions when specific weaknesses are detected. With Titanium Hydra Fault Tolerance, if a device falters, TBIS will have already shifted load away and onto another network of redundant nodes. If a potential security problem arises, the TBIS system will work automatically to limit the potential impact of attacks such as DDoS or other address-specific attacks; it is impossible to overwhelm a piece of equipment that exists only on the ether.

Accredited *&* Trusted By

dun & bradstreet
GROWING RELATIONSHIPS THROUGH DATA

ACCREDITED BUSINESS
BBB

EXHIBIT 10 PAGE   78



EXHIBIT 10 PAGE   79

EXHIBIT 10 PAGE 80

Best Cryptocurrency Company | Blockchain Infrastructure | TBIS

**1. Titanium Blockchain Infrastructure Services Inc. (TBIS)** incorporated and and registered in Los Angeles and registered office at 15027 Dickens Street, Suite 4, North Hollywood, CA 91403 USA (**the Company, we, us, our**); and

**2.** The person accepting this agreement by ticking the "I accept these terms and conditions" box, located at the second step within the Public Crowdsale

widget (**the Participant, you, your**).

**1.1** The Token Issuing Entity intends to conduct a sale of Tokens, which will be made available to the public (i.e Token Sale). The terms of the Token offer (when and if applicable) in accordance with the Token Sale is specified below.

**1.2** By purchasing Tokens during the Token Sale and indicating your acceptance of these Terms on the Website, you will be bound by

Open terms in a new window.

☐ I ACCEPT THESE TERMS AND CONDITIONS

Next

ACCREDITED
BUSINESS
BBB

Business ID:

© Copyright 2017 - Titanium Blockchain Infrastructure Services

1/29/2018

https://tbis.io/

9/9



1/29/2018

Career Applications - Titanium Blockchain Infrastructure Services

# Titanium Blockchain
INFRASTRUCTURE SERVICES

## Career Applications Form

### Join Team Titanium!

EXHIBIT 10 PAGE 82

Career Applications - Titanium Blockchain Infrastructure Services

1/29/2018

Attachment
Choose File   No file chosen

Send

© Copyright 2017 - Titanium Blockchain Infrastructure Services



EXHIBIT 10 PAGE   83



Contact - Titanium Blockchain Infrastructure Services | TBIS

© Copyright 2017 - Titanium Blockchain Infrastructure Services

EXHIBIT 10 PAGE 85

EXHIBIT 10 PAGE  86

2/2

Meet Our Team | Careers | TBIS

© Copyright 2017 - Titanium Blockchain Infrastructure Services

1/29/2018

https://tbis.io/our-team/

EXHIBIT 10 PAGE   87



# Our Team

Titanium Blockchain
INFRASTRUCTURE SERVICES

Meet Our Team | Careers | TBIS

© Copyright 2017 · Titanium Blockchain Infrastructure Services

**EXHIBIT 10 PAGE 88**

EXHIBIT 10 PAGE 89

# Our Team

ALL STAFF    Leadership    Development    Design & Marketing

## Titanium Blockchain
INFRASTRUCTURE SERVICES

**EXHIBIT 10 PAGE   90**

Meet Our Team | Careers | TBIS

© Copyright 2017 - Titanium Blockchain Infrastructure Services

EXHIBIT 10 PAGE   91

Meet Our Team | Careers | TBIS

© Copyright 2017 - Titanium Blockchain Infrastructure Services

**EXHIBIT 10 PAGE   92**

EXHIBIT 10 PAGE   93

# Our Team

ALL STAFF   Leadership   Development   Design & Marketing

## Titanium Blockchain
### INFRASTRUCTURE SERVICES

EXHIBIT 10 PAGE   **94**

1/29/2018

Meet Our Team | Careers | TBIS

© Copyright 2017 - Titanium Blockchain Infrastructure Services

EXHIBIT 10 PAGE   95



Titanium & Phore Partnership

Titanium Enters Into New Partnership With Phore

Our Latest Blog - Titanium Blockchain Infrastructure Services | TBIS

Titanium Blockchain
INFRASTRUCTURE SERVICES

https://tbis.io/blog/

EXHIBIT 10 PAGE   96

Our Latest Blog - Titanium Blockchain Infrastructure Services | TBIS
1/29/2018
https://tbis.io/blog/
EXHIBIT 10 PAGE   97
3/6

community, whilst simultaneously forcing mass adoption of blockchain technology to occur" said Stollaire.

Mr. Stollaire's experience in network infrastructure services and blockchain technologies brings value to each project and collectively as the decentralized systems are deployed. While there are currently many great infrastructure services capabilities across both traditional cloud and decentralised services, these partnerships serve to increase the ability to offer a real and extremely competitive alternative to the current enterprise strength cloud/virtualization world.

## TBIS NEWS

JANUARY 19, 2018   BY  EHI FANG

Titanium completes ICO 41 Days Ahead of Schedule!



We have reached our hard cap of 35,000,000 BAR in just 18 days! Due to extremely high demand, we have sold out of BAR tokens more than 1 month ahead of schedule!

Our Latest Blog - Titanium Blockchain Infrastructure Services | TBIS

We would like express our tremendous thanks to the Titanium community for their amazing support. This process has exceeded our highest expectations and serves as an incredible validation of our project.

Now that the ICO has been fully funded, our hard-working team will begin taking the next steps toward building a world-class company.

We will be rapidly moving forward to add more staff, setup new headquarters, and deliver our core product, Infrastructure as a Service (IaaS).

We will continue to develop our recently announced partnerships with ETN, HTMLCoin and Bounty0X, as well as seeking new partnerships, with the goal of helping unite the blockchain community.

We will also be doing a Q&A in Telegram over the next week. Please join our Telegram group (https://t.me/TbisOfficial) to keep up to date with the latest developments.

## FAQ

**Q: I still haven't received my BARs, when will I get them?**

Right now, our team is processing thousands of transactions. If you have sent us your payment then please, just wait! We are working hard to send out all of the BARs as soon as possible.

**Q: When do I get my referral tokens?**

Now that the ICO has concluded, our team will begin calculating referrals. It may take a few weeks to send out the referral payments.

**Q: I didn't get my bonus! When are you sending it?**

Bonuses were included in the price of your purchase request, and were sent in the same transaction as the BARs you ordered. There is no separate transaction for bonuses.

4/6

EXHIBIT 10 PAGE   98

Our Latest Blog - Titanium Blockchain Infrastructure Services | TBIS

**Q: When will I receive my T-Shirt / Gear Box / Deluxe Gear Box?**

Our top priority is processing transactions and making sure everyone who participated in the token sale received their BARs. For those of you who qualified for a gear box – we haven't forgotten about you! We will be contacting you to confirm your shipping addresses, so please watch for that email.

**Q: What is the final market cap of BARs in circulation?**

While the total number BAR in existence will be 60 million, the BARs in circulation will be significantly less than that. Even though the ICO has officially ended, we have a lot of work ahead of us. Once all transactions have been processed, we will be able to more accurately estimate the BAR circulation, and will announce this information publibly.

**Q: How do I buy tokens?**

The ICO has concluded. In the future you will be able to purchase tokens on the secondary market.

**Q: When will tokens be listed on exchanges?**

We cannot legally comment on exchanges at this time. Rest assured that we will use our knowledge and experience to do the best for our community. We will make an official announcement sometime in the coming weeks.

Many thanks and much love from the Titanium Team!

Join our community:

Twitter [https://twitter.com/TBISINC] – Facebook [https://www.facebook.com/TBISICO/] – Telegram [https://t.me/TBisOfficial] – Discord [https://discordapp.com/invite/xtra4Fb] – LinkedIn [https://www.linkedin.com/company/18271882/] – Reddit [https://www.reddit.com/r/TBIS] – Medium [https://medium.com/@TBIS] – GitHub [https://github.com/this-inc/TBIS]

**EXHIBIT 10 PAGE   99**

Our Latest Blog - Titanium Blockchain Infrastructure Services | TBIS

JANUARY 19, 2018    BY MICHAEL STOLLAIRE

© Copyright 2017 - Titanium Blockchain Infrastructure Services

1/29/2018

https://tbis.io/blog/

66

EXHIBIT 10 PAGE  100

Titanium Blockchain
INFRASTRUCTURE SERVICES

Just as steel changed the building industry forever, Titanium will usher in a new era of network construction. With TBIS' proprietary Company as a Service™ (CaaS) and Infrastructure as a Service (IaaS), every device, from enterprise level on down, can be virtualized; routers, firewalls, and specialized equipment such as cryptocurrency miners, can exist in an entirely cloud-based environment based on the decentralized Ethereum blockchain. Paired with cutting-edge enterprise management and monitoring technology, this will create a shock-proof internet infrastructure that will be both lightweight and completely revolutionary in scope. Imagine being able to set up an enterprise level infrastructure for a global company from a tablet in your living room, without spending any time installing rack servers, routers, load balancers, or any other network component beyond what is needed to access the network.

## The Future Is Now!

Unlike typical infrastructure services, where a company's technology may exist on up to several hundred devices, the Titanium infrastructure will reside on the decentralized Ethereum blockchain, which is composed of over 20,000 nodes, with each node potentially being composed of several hundred discreet systems. Even if several thousand nodes experienced a system failure, there would still be zero outage time, and perhaps, only a performance degradation of the Titanium services being delivered.

Titanium is at the forefront of the utilization of Blockchain technology across personal and enterprise networking systems. Read our whitepaper to see how you can take advantage of this new technology today!

© Copyright 2017 - Titanium Blockchain Infrastructure Services

EXHIBIT 10 PAGE   102

The Official Roadmap - Titanium Blockchain Infrastructure Services | TBIS

Titanium Blockchain
INFRASTRUCTURE SERVICES

1/29/2018

https://tbis.io/the-official-titanium-roadmap/

1/3

EXHIBIT 10 PAGE   103

EXHIBIT 10 PAGE   104

EXHIBIT 10 PAGE   105

1/17

Titanium Blockchain Infrastructure | Media | TBIS

Titanium Blockchain
INFRASTRUCTURE SERVICES

1/29/2018

https://tbis.io/media/

EXHIBIT 10 PAGE 106

Titanium Blockchain
INFRASTRUCTURE SERVICES

Read the full article NOW on

THE COINTELEGRAPH

dun & bradstreet
GROWING RELATIONSHIPS THROUGH DATA

ACCREDITED BUSINESS
BBB

„Titanium Blockchain Infrastructure Services (TBIS) is running IaaS on their own dedicated Ethereum Blockchain, leveraging Raiden technology to achieve Visa-like speeds, offering a safe, flexible and decentralized service. This solution is not only effective, as there is no outage, but it is also cheaper than most alternatives."

Titanium Blockchain Infrastructure | Media | TBIS

1/29/2018

https://tbis.io/media/

2/17

EXHIBIT 10 PAGE   107



EXHIBIT 10 PAGE   108

T  tbis.io

*Michael Stollaire, CEO*

We Are the Revolution.

[https://www.forbes.com/sites/jaywest/2017/12/02/icos-new-startup-likelihood/#1fbcb2bb3d3b]

EXHIBIT 10 PAGE  109



EXHIBIT 10 PAGE 110

world, at an affordable price."

We Are the Revolution.

tbis.io

EXHIBIT 10 PAGE   111

EXHIBIT 10 PAGE 112

Titanium Blockchain
INFRASTRUCTURE SERVICES

Read the full article NOW on

**HUFFPOST**

„Well one company that is trying to take the power out of the hands of huge corporations and return it to you is Titanium Blockchain Infrastructure Services. Titanium is a company that is planning on changing the internet as we know it and make it much more efficient, while also creating an infrastructure that cannot be controlled or manipulated by anyone."

dun&bradstreet
GROWING RELATIONSHIPS THROUGH DATA

ACCREDITED BUSINESS
BBB

Titanium Blockchain Infrastructure | Media | TBIS

1/29/2018

https://tbis.io/media/

8/17

EXHIBIT 10 PAGE 113

EXHIBIT 10 PAGE 114

Tuesday, November 28, 2017

Titanium Blockchain Infrastructure | Media | TBIS

(®) RSS

# Titanium Blockchain Named a BBB Accredited Business

**Company Builds on a Foundation of Integrity and Trust**

**LOS ANGELES, CA. (PRWEB) NOVEMBER 27, 2017**

Titanium Blockchain, a leading provider of infrastructure-based enterprise management, has earned accreditation from the Better Business Bureau of Los Angeles, signaling a commitment to ethical behavior and marketplace trust.

"We put open and honest relationships first and seek to mutually encourage innovation and growth with our customers," says Michael Stollaire, Founder and CEO of Titanium Blockchain. "Having the BBB seal tells the world that we operate with integrity and follow through on our commitments.

Accredited Businesses like Titanium Blockchain meet the standards embodied in the BBB Code of Business Practices: build trust, advertise honestly, tell the truth, be transparent, honor promises, be responsive, safeguard privacy and embody integrity.

"Michael and his associates have advanced an IT infrastructure solution based on principles of security and reliability so they are eminently qualified to display the BBB seal," says Steve McFarland, President and CEO of the Better Business Bureau of Los Angeles & Silicon Valley. "We count numerous tech companies among our members and are pleased to welcome Titanium Blockchain to the fold."

Titanium Blockchain is fueling everything from startup growth to large enterprise efficiency, helping organizations virtualize their entire IT enterprise and create a private cloud environment with native monitoring of mission-critical devices, applications and services.

"Almost everything can be virtualized these days and that includes creating an entire company with IT infrastructure, from the privacy of one's home," says Stollaire. "After decades of basically doing things the same way, this will be the new normal for business and it will be more efficient, more secure and less expensive."

Stollaire continues: "Technologies change, but trust endures. We understand that the way to earn and keep the public's trust is to consistently deliver on our promises."

> Having the BBB seal tells the world that we operate with integrity and follow through on our commitments.

[https://www.prweb.com/releases/2017/11/prweb14854618.htm]

1/29/2018

https://tbis.io/media/

10/17

EXHIBIT 10 PAGE   115

**We Are the Revolution.**

tbis.io

Titanium Blockchain Infrastructure | Media | TBIS

EXHIBIT 10 PAGE   117

Titanium Blockchain
INFRASTRUCTURE SERVICES

dun & bradstreet

ACCREDITED BUSINESS
BBB

Read the full article NOW on

The Bitcoin News

„The Titanium Blockchain Infrastructure Services (TBIS) strives to create a robust decentralized network infrastructure that will encompass data centers, firewalls, routers, switches and other network components. Using the power of blockchain technology, an enterprise level network infrastructure module can be condensed into a smartphone or a tablet. "

Titanium Blockchain Infrastructure | Media | TBIS

1/29/2018

https://tbis.io/media/

13/17



EXHIBIT 10 PAGE   118

EXHIBIT 10 PAGE   119

#CryptoAMA

I AM NOT ONLY AGREEABLE
WITH THE IDEA OF
REPLACING MONEY WITH
$ CURRENCY, BUT
CONSIDER MYSELF TO BE A
BLOCKCHAIN/CRYPTOCUR
RENCY/FINTECH
EVANGELIST. MY GOAL IS
TO EDUCATE OTHERS, SO
THAT MASS ADOPTION
OCCURS AS FAST AS
POSSIBLE. REPLACEMENT
OF FIAT MONEY WITH
CRYPTOCURRENCY IS A
MATTER OF TIME, I AM 100%
SUPPORTING

Michael Hoddler, AMA: How a Successful Transition from Cloud Computing to
Blockchain

Michael Stollaire, CEO of EHI and the
Titanium Blockchain ICO
LIVE on AMAFeed on the 8th Nov 2017

Titanium Blockchain Infrastructure | Media | TBIS

1/29/2018

https://tbis.io/media/



EXHIBIT 10 PAGE   120

1/29/2018

Titanium Blockchain Infrastructure | Media | TBIS

Market Sighs: Investment in the Levers and Income Meme. November 11, 2017

© Copyright 2017 - Titanium Blockchain Infrastructure Services

Login to Titanium

Email Address:

Password:

Log in

Titanium Blockchain
INFRASTRUCTURE SERVICES

Token Sale Home | TBIS Home | About Us | Services | Our Team | White Paper | Contact | Sign In

EXHIBIT 10 PAGE   122

EXHIBIT 10 PAGE  123

2/2

Titanium Login

© Copyright 2018 - Titanium Blockchain Infrastructure Services

1/29/2018

https://ico.tbis.io/login/



Titanium Blockchain
INFRASTRUCTURE SERVICES

# Token Mechanics and Sale Details

Great news! We have just reached the hard cap of **35 Million BAR** tokens more than 1 month ahead of schedule. We thank you for your incredible support and trust in our project. **YOU** have made it all possible! Now the work really starts. Our team is ready for the challenge, and as always, we will keep you up to date on the latest developments.

35,000,000

HARDCAP REACHED!

Limited to only 35 million BAR during token sale with a 60M total supply (NOTE: The Soft Cap Has Been Shattered!)

Bars Sold

Token Mechanics | Titanium Bars for Sale | TBIS

# What People Are Saying

"Team Titanium brings the rare combination of uncompromising customer service and ruthless innovation. Their service specialist g0ldn0vey10 was fast and effective in answering all of my questions, even in a time of tremendous growth for the company. Put your trust in Titanium."^

Name: Gabriel Garza

"You're the man Michael! I was at a block chain event and they talked all about the issues with centralized servers... and all I could think about is Titanium will fix all of these issues!"

Matt Skaggell

"Just have to give a shout out to Martha and Richard and the entire support team. Unbelievable customer support on something that was all my fault. Fixed and ready to move on"

Thanks to the whole TBIS crew for:
1) Being awesomely responsive, both when it comes to purchase of tokens and just answering questions.
2) Bringing about a product that's new in the game, and long sought!
3) Leading a community with an openness seldom seen.

Really looking forward to the next level!

Telegram ID @Dolfin24

"Just wanna say thanks to the admins for being so responsive. This ICO is running so smoothly. Paid with ETH sent from MEW and got my tokens near instantly."

Rob Mayne

"I've been scared to enter ICOs due to so many horror stories regarding scams - Not only did Michael and goldn0vey help me with my payment issue, they went above and beyond"

"Not many CEO's interact with their shareholders the way @Michael Stollaire does. One of the many ways which sets this company apart from competitors."

Liam Rottkov

"Of all of the ICO's that I have been a part of, Titanium stands second to none. The methods for investing are simple, refined and smooth. The support team is on point and extremely responsive. I'd be very proud to be part of this team. Way to go, Titanium!"

Tyler Durden

"I just want to say thank you to the Telegram Admins and Victoria D and Richard for helping me with my wrong transaction details that was stressful and I only just made it but I have my

EXHIBIT 10 PAGE 125



in less than 12 hours. These guys are amazing! Super excited for this and if the customer support is indicative of the success of this company, we are all about to see something truly one of a kind!!!!

**Dave DeRemer**

to make sure it was done correctly. Thank you gentlemen

**Shawn Ray**

BAR confirmed 😊 please be very careful everyone with ether address details I nearly lost 1000 BAR .

**Heidi Ohlsen**

# Behind Our Technology

**Infrastructure as a Service (IaaS)**

With our proprietary IaaS structure, Titanium can create any piece of networked hardware on the blockchain through distributed computing.



EXHIBIT 10 PAGE  127



Titanium Instant ICO Incubator™ will take the guesswork out your token launch through providing end-to-end launch services.

### Bring Your Own Cloud™ (BYOC)

The Titanium Bring Your Own Cloud will allow you to create a truly private computing environment by leveraging a cryptographically secure device-based context to provide total privacy.

### DEXchange™

Trade cryptocurrencies on an entirely decentralized exchange (DEX). The top two-hundred (200) cryptocurrencies will be listed initially, along with the top twenty (20) fiat currency pairs globally. Also, DEXchange will guarantee the lowest transaction fees, period.

EmployeeDirect

Cut the costs associated with expensive recruiting companies. We have pre-screened the best resources on the planet, so you are ensured to find the finest employees, consultants and contractors for your business in mere minutes.

CryptoEscrow™

Leveraging the power of Ethereum smart contracts to facilitate Peer-to-Peer sales on the blockchain using any of the top-100 cryptocurrencies using Titanium Atomic Swaps.

© Copyright 2017 - Titanium Blockchain Infrastructure Services

# EXHIBIT 11

2017

# EHI

*Recommendations and Testimonials*

EHI Stollaire

EXHIBIT 11   PAGE  130

EHI Stollaire



*Recommendations and Testimonials*

"I worked with EHI at Santa Barbara Bank and Trust. EHI was the lead on some major projects. His professionalism and technical skills were far above what we were used to. I really enjoyed working with EHI and thought I should try harder to be more like Mike. He was the Project Manager for our HP OpenView Project. Needless to say it was a huge project on many platforms, including AIX, Windows and Linux. He was able to implement and troubleshoot issues far better than anyone I've ever worked with. He would stay cool when the pressure was on and I really respected his work ethic."

**~ Eran Jenkins, Senior Linux/UNIX/Windows Systems Administrator, Santa Barbara Bank and Trust (SBBT)**

"EHI was originally asked to perform (and did indeed perform) administration tasks with HP OpenView Operations and HP Performance Manager.  Later, we took advantage of the fact that

1 •

**EXHIBIT 11   PAGE  131**

EHI Stollaire

he was familiar with SCOM and asked EHI to perform some SCOM admin tasks, too. Tools utilized: HP OpenView Operations (OVO), HP OpenView Performance Manager (OVPM), Microsoft System Center Operations Manager (SCOM) Microsoft System Center Orchestrator (SCOrch), as well as BMC Remedy. EHI met our technical expectations by far, and his ability to communicate and work with internal and external clients should not be underestimated."


**~ Mark Conty, Senior Enterprise Management Architect, Cargill**


"EHI joined our project to provide expertise for deploying our HP performance monitoring products - which was to be replacing several of our Boeing-developed tools.  Among a couple other contractors that were hired to support the project, EHI was the most productive. EHI guided us on tuning the NNMi, SHR, and Performance SPI products to scale to our large environment.  He became the key liaison between Boeing and HP in resolving many issues that we identified.  His relationship with HP support was very helpful.   He also gave us good direction on the overall architecture – I wish he had come on board earlier in the project before procuring the platforms."


**~ David Christianson, Network Management Product Manager, Boeing**

**EXHIBIT 11   PAGE  132**

"This award is presented to you in recognition of your outstanding performance and invaluable contributions to the Capacity Management Tool (HP Service Health Reporter {SHR}) Ready for Use deployment. Your skills and efforts have contributed immeasurably to our success. Thank you for your dedication."

**~ Laura Rasor, Project Manager, Boeing**

"I worked with Mike Stollaire on a major project to upgrade BSM to version 9.21. Mike took the lead role in designing, developing, implementing, and testing the BSM System Health application meeting the business requirements. He was always calm and completed his tasks on time. He is very helpful and works as a team with other colleagues. I strongly recommend EHI for any lead positions."

**~ Gopi Sadagopan, Senior Software Designer at Hewlett Packard**

"Thank you for all of your hard work and dedication over this past year. We and the client have been very happy and fortunate to have you with us since day one. Even if we do not have the opportunity to talk or meet regularly, we remain aware of and sincerely appreciate your significant contributions to our and our client's success. Thank you for that."

**~ Mark Cohen, President of Ntelicor, L.P.**

3

**EXHIBIT 11   PAGE  133**

"Best enterprise management company I have ever worked with. Talented, conscientious, hard worker, excellent communication skills. The entire package!"

**~ John Sharpe, Service Delivery Manager, HP Professional Services, The Federal Reserve Bank**

"While at The Walt Disney Company, EHI Stollaire was instrumental to help our server, storage, and monitoring teams to discover and manage critical IT assets across the enterprise.

Mike was affectionately known as 'OpenView Mike' for his mastery of HP's technology. The excellence in what Mike delivered was his ability to partner with and empower our Disney Cast Members allowing them to eventually own their environments with confidence. The output of the relevant data allowed for action-based decisions that quickly helped us reduce risk, compliance, and operational concerns.

I would highly recommend EHI Stollaire (EHI-INSM Inc.) to any organization with the desire to succeed!"

**~ Brian Tacoronte, Infrastructure Manager, The Walt Disney Company**

Top Qualities: Great Results, Personable, High Integrity

4 •

**EXHIBIT 11   PAGE  134**

"EHI's knowledge of the HP tools and in-depth technical know-how of the systems they monitor has been invaluable to our projects. It was a pleasure working with EHI and hope to have you contribute to our enterprise management projects in the future."

**~ Dan Hiris, Enterprise Management Architect, Honeywell International**

"Mike is a strong thinker in the Enterprise Monitoring space. He is capable and will run well with items when given direction. He is a good big picture thinker and is someone who I can strongly recommend as an Enterprise Architect in the fault and performance monitoring space."

**Philip Rogers, VP, Enterprise Monitoring and Reporting, Royal Bank of Scotland/Citizens Bank**

"EHI was contracted at eBay to upgrade, fix, configure and customize one of our monitoring environments responsible for the monitoring of thousands of network devices and servers. We continue to be impressed with his technical skills, communication, and ability to multitask between many tasks and projects, and get things done as committed. EHI is all about doing a quality job and delivering the results without delay. It has been a pleasure working with EHI."

**~ Jason Butler, Director of Network Engineering, eBay**

"I had the pleasure of working with EHI in 2010.  The infrastructure I was managing was beginning to show its age.  I needed better

**EXHIBIT 11   PAGE  135**

visibility into the health of the system in order for me to best manage the systems and focus on the areas that required the most attention.  EHI joined a team of senior system experts and created and implemented processes, and installed and managed a sophisticated set of tools: SiteScope, HP/OpenView (Operations Manager, Network Node Manager and Performance Manager), as well as maximized the effectiveness of the tools that were in place at the time.  The results were better visibility into the health of the systems, improved response time, faster and more complete alerting and reporting capabilities.  We were able to better manage and administer the complex system with the help of EHI's expertise."

~ EHI Gibson, Operations Manager, Zag.com/TrueCar.com

"EHI has always been a great resource when I needed Network Management advice. His knowledge of enterprise management and IT security products has been extremely useful. I'd recommend EHI for any project at the highest level."

~ Peter Benac, Senior Systems/Network Engineer, Emacolet Networking Services, Inc.

"EHI was highly praised and respected for the work that he did at several major Southern California organizations. His ability to understand technical detail, deliver as promised and also

6

EXHIBIT 11   PAGE  136

communicate at high levels of an organization set EHI apart from most consultants."

~ Ken Chism, Account Executive, BMC Software


"I have collaborated with EHI for well over a decade now. I enjoy his levity along with his wit in thinking on his feet in the Enterprise Management and IT Security space. He knows his stuff and works diligently to do the right thing, keep folks working, and take care of customers."

~ Douglas "Dougie" Stevenson, Senior Engineer, AOL and Cisco


"EHI was very helpful and provided great insight into our environment. He always stressed proper Change Management procedures and best practices. EHI has a wealth of knowledge of the Enterprise Management space and should definitely be considered when needing consulting work. EHI never complained about the tough and tight schedules we put on EHI and was always professional. EHI helped solve some of our very complex problems as well as provided creative solutions to help us with our customers."

Top qualities: **Great Results, Expert, Creative**

~ Robert Brant, Senior Enterprise Management Engineer, Acxiom

**EXHIBIT 11   PAGE  137**

EHI Stollaire

"If you are looking for an out of the box thinker and someone who knows his craft, you need look no further. EHI Stollaire is the best among a niche group of individuals at such a high-level skill-set. If you are looking for someone to clean up your architecture, hire Mike. You cannot go wrong"

Top qualities: **Great Results, Expert, Creative**

~ Craig White, Senior IT Recruiter, TEKsystems

"EHI has an exceptional understanding of how to implement applications on a large scale, globally across multiple data-centers. He is greatly energetic and shows genuine personal interest, in his customers and co-workers. EHI was a pleasure to work with at the Walt Disney Company, and I consider EHI a true LEADER."

~ Joseph Romero, Technical Analyst/ Engineering, The Walt Disney Company

"EHI was engaged to assist with implementation and development of a large-scale enterprise management and IT security implementation. His detailed knowledge of the software, and intricate concepts for large and diverse multinational organizations, made the entire program of work much more straightforward and achievable."

8 •

**EXHIBIT 11   PAGE  138**

EHI Stollaire

Top qualities: **Great Results, Expert, Creative**

~ Craig Forsberg, Senior IT Director, Canada Petroleum

"EHI is an exceptional technical talent and an invaluable resource for enterprise network management services. Mike is one of the most dedicated consultants because he cares about the work he produces and the reputation he leaves behind. When you hire Mike, you can rest assured that you have the very best in the business working for you."

Top qualities: **Great Results, Expert, High Integrity**

~ Janet Chung, Senior IT Executive, The County of Los Angeles

"EHI is one of the best people I've worked with in my entire IT career. He is the strongest Enterprise Management and IT Security expert I've ever worked with, and also has the business sense plus people skills to handle the most challenging projects. I would love to work with EHI again!"

~ David Rowley, Senior  Unix Systems Administrator, The Walt Disney Company and eBay

"I have found EHI to be very knowledgeable on HP OpenView products, helpful and hard working. EHI has a vast amount of

9 •

**EXHIBIT 11   PAGE  139**

**EHI Stollaire**

experience working with management software and has worked with many customers in this capacity."

~ John McDonagh, Software Consultant, HP

"I've had the pleasure of working with 'OpenView Mike' for almost a decade now… through a couple of different companies, through a couple of mergers and acquisitions and in a couple of different roles… and the fact that we are still working together, doing essentially the same thing, I think speaks volumes for the quality of Mike's work. Mike is truly an expert in every sense in the IT space – just Google 'OpenView Mike' and you'll quickly get a feel for his commitment to the community. My relationship with Mike has always been as an ISV/business partner – the companies I have worked for offered products that complimented or enhanced the solutions Mike was deploying. Mike is always on top of his game with me and his customers say the same thing when I have the opportunity to speak with them. Mike is one of those people that it is always a pleasure to work with and I know my colleagues would echo that same thought."

~ Mike Joy, Director of Sales, nWorks

"EHI was a pleasure to work with. He provided expert level assistance in getting our enterprise management and IT Security installation customized to our requirements. He was extremely knowledgeable of the solutions and how to tailor them for our exact environment. He was always on time and had a knack for getting along with all of the

10 •

**EXHIBIT 11   PAGE  140**

**EHI Stollaire**

personalities involved. I would definitely use his services again if I had the opportunity to."

~ Shawn Duex, Director of Enterprise Technology, Santa Barbara Bank and Trust

"EHI was the driving force behind the design and implementation of a revitalization effort for a previously neglected enterprise management and IT security messaging infrastructure at the Walt Disney Company worldwide. He was able to execute this mission in a complex environment with many unforeseen challenges. If you need the very best in the game, EHI should be your first call."

~ **Russell Brown**, *Technical Analyst, Walt Disney Company*

11 •

**EXHIBIT 11   PAGE  141**

# EXHIBIT 12



# Our Clients

Nothing says more than our clients experience with EHI.

---

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.

   

**EXHIBIT 12    PAGE  142**



"I worked with Mike Stollaire and the team at EHI at Santa Barbara Bank and Trust. He was the lead on some major projects. His professionalism and technical skills were far above what we were used to. I really enjoyed working with him and thought I should try harder to be more like Mike. He was the Project Manager for our HP OpenView Project. Needless to say it was a huge project on many platforms, including AIX, Windows and Linux. He was able to implement and troubleshoot issues far better than anyone I've ever worked with. He would stay cool when the pressure was on and I really respected his work ethic."

**Eran Jenkins**

Senior Systems Administrator, Santa Barbara Bank and Trust

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

EHI-INSM Inc. | Clients

---

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12     PAGE  144**



# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.





EXHIBIT 12     PAGE  145



"Best enterprise management team I have ever worked with. Talented, conscientious, hard working, excellent communication skills. The entire package!"

**John Sharpe**

Service Delivery Manager, The Federal Reserve Bank

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

**EXHIBIT 12    PAGE  146**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved



# Our Clients

Nothing says more than our clients experience with EHI.

---

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.

  

**EXHIBIT 12     PAGE  148**

EHI-INSM Inc. | Clients                                          Page 2 of 3



"Michael joined our project to provide expertise for deploying our HP performance monitoring products – which was to be replacing several of our Boeing-developed tools. Among a couple other contractors that were hired to support the project, Michael was the most productive. Michael guided us on tuning the NNMi, SHR, and Performance SPI products to scale to our large environment.  He became the key liaison between Boeing and HP in resolving many issues that we identified.  His relationship with HP support was very helpful.   He also gave us good direction on the overall architecture – I wish he had come on board earlier in the project before procuring the platforms."

**David Christianson**

Network Management Product Manager, Boeing

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

**EXHIBIT 12     PAGE  149**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12     PAGE  150**


We Eliminate Chaos

# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.





**EXHIBIT 12     PAGE  151**



"I cannot overstate how helpful Mike was over the past couple weeks in supporting the HP uCMDB Universal Discovery (UD) project, specifically for the scan testing that we needed to complete in a hurry for our test phase.  I had to ask a lot of his time over several test sessions.  He was very helpful, was available when needed and contributed the subject matter expertize in running and evaluating the HP Performance Manager reports as well.  Thanks for his support!!!"

**Jill Temple**

Project Manager, IT Infrastructure Synchrony Financial

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

EXHIBIT 12    PAGE  152

EHI-INSM Inc. | Clients

---

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12      PAGE  153**



# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.





**EXHIBIT 12     PAGE  154**



"Michael was originally asked to perform (and did indeed perform) routine administration tasks with HP OpenView Operations and HP OV Performance Manager. Later, we took advantage of the fact that he was familiar with SCOM and asked him to perform some SCOM admin tasks, too. Tools utilized: HP OpenView Operations (OVO), HP OpenView Performance Manager (OVPM), Microsoft System Center Operations Manager (SCOM) Microsoft System Center Orchestrator (SCOrch), as well as BMC Remedy. Michael met our technical expectations by far, and his ability to communicate and work with internal and external clients should not be underestimated."

**Mark Conty**

Senior Enterprise Management Architect, Cargill

---

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12     PAGE  156**



# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.

  

**EXHIBIT 12    PAGE  157**



"This award is presented to you in recognition of your outstanding performance and invaluable contributions to the Capacity Management Tool (HP Service Health Reporter {SHR}) Ready for Use deployment. Your skills and efforts have contributed immeasurably to our success. Thank you for your dedication."

**Laura Rasor**

Project Manager, Boeing

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

**EXHIBIT 12     PAGE  158**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12     PAGE  159**


We Eliminate Chaos

# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.





**EXHIBIT 12     PAGE  160**



"I worked with Mike Stollaire on a major project to upgrade BSM to version 9.21. Mike took the lead role in designing, developing, implementing, and testing the BSM System Health application meeting the business requirements. He was always calm and completed his tasks on time. He is very helpful and works as a team with other colleagues. I strongly recommend him for any lead positions."

**Gopi Sadagopan**
Senior Software Designer at Hewlett Packard

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

EXHIBIT 12      PAGE  161

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12     PAGE  162**

EHI-INSM Inc. | Clients                                                          Page 1 of 3


**We Eliminate Chaos**

# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.






**EXHIBIT 12     PAGE  163**



"Thank you for all of your hard work and dedication over this past year. We and the client have been very happy and fortunate to have you with us since day one. Even if we do not have the opportunity to talk or meet regularly, we remain aware of and sincerely appreciate your significant contributions to our and our client's success. Thank you for that."

**Mark Cohen**

President of Ntelicor, L.P.

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

**EXHIBIT 12    PAGE  164**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

**EXHIBIT 12     PAGE  165**



We Eliminate Chaos

# Our Clients

Nothing says more than our clients experience with EHI.

---

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.







**EXHIBIT 12    PAGE  166**

○○○○○○○

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

**EXHIBIT 12      PAGE   167**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

 We Eliminate Chaos

# Our Clients

Nothing says more than our clients experience with EHI.

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.

  

**EXHIBIT 12    PAGE  169**



"Thank you for all of your hard work and dedication over this past year. We and the client have been very happy and fortunate to have you with us since day one. Even if we do not have the opportunity to talk or meet regularly, we remain aware of and sincerely appreciate your significant contributions to our and our client's success. Thank you for that."

**Mark Cohen**
President of Ntelicor, L.P.

Don't just take our clients words for it, find out for yourself how EHI can help you today!

Schedule A Demo

**EXHIBIT 12      PAGE  170**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved



We Eliminate Chaos

# Our Clients

Nothing says more than our clients experience with EHI.

---

We have had the pleasure of working with global leaders in various industries. Our ITIL approach to solving business problems with IT solutions is unique, which has allowed us to help our clients to become more successful in their efforts. Don't take our word for it. Just take a look at what some of our clients have said.






**EXHIBIT 12     PAGE  172**



"I cannot overstate how helpful Mike was over the past couple weeks in supporting the HP uCMDB Universal Discovery (UD) project, specifically for the scan testing that we needed to complete in a hurry for our test phase.  I had to ask a lot of his time over several test sessions.  He was very helpful, was available when needed and contributed the subject matter expertize in running and evaluating the HP Performance Manager reports as well.  Thanks for his support!!!"

**Jill Temple**

Project Manager, IT Infrastructure Synchrony Financial

**Don't just take our clients words for it, find out for yourself how EHI can help you today!**

Schedule A Demo

**EXHIBIT 12      PAGE  173**

© Copyright 2017 EHI-INSM Inc. | All Rights Reserved

EXHIBIT 12      PAGE  174