HOLLAND & KNIGHT LLP
Kristina S. Azlin (SBN 235238)
Samuel J. Stone (SBN 317013)
kristina.azlin@hklaw.com
sam.stone@hklaw.com
400 South Hope Street, 8th Floor
Los Angeles, California 90071
Telephone: 213.896.2400
Facsimile: 213.896.2450

Jose A. Casal (*pro hac vice*)
jose.casal@hklaw.com
701 Brickell Avenue. Suite 3300
Miami, Florida 33131
Telephone: 305.789.7736

*Attorneys for Josias Dewey, Court-appointed
Receiver for Receivership Entities*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TITANIUM BLOCKCHAIN INFRASTRUCTURE SERVICES, INC.; EHI INTERNETWORK AND SYSTEMS MANAGEMENT, INC. aka EHI-INSM, INC.; and MICHAEL ALAN STOLLERY aka MICHAEL STOLLAIRE,<br><br>Defendants. | Case No. 18-4315 DSF (JPRx)<br><br>**NOTICE OF MOTION AND MOTION FOR ORDER APPROVING FINAL REPORT AND FINAL ACCOUNTING, DISCHARGING RECEIVER AND GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[FRCP 66; L.R. 66-7]**<br><br>Date:    December 18, 2023<br>Time:    1:30 pm<br>Ctrm:    7D<br>Judge:    Hon. Dale S. Fischer |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that on December 18, at 1:30 pm, or as soon thereafter as the matter may be heard before the Honorable Dale S. Fischer, in Courtroom 7D of the United States District Court, Central District of California, Western Division, 350 West 1st Street, 6th Floor, Los Angeles, California, 90012, Holland & Knight LLP ("Counsel" or "H&K"), counsel to Josias Dewey, as Court-appointed Receiver (the "Receiver") for the estates of Defendant Titanium Blockchain Infrastructure Services, Inc. and its subsidiaries and/or affiliates (collectively, the "Receivership Entities"), moves the Court for an Order for the following relief:

1.    Approving the Receiver's Final Report, provided herein, and approving the Receiver's Final Accounting, which is attached as **Exhibit 6** to the Declaration of Josias Dewey ("Decl."), served and filed concurrently herewith;

2.    Authorizing and approving the Receiver's wind up of the receivership estate;

3.    Approving and confirming all actions and activities taken by the Receiver and the Receivership Team[1], including but not limited to, all payments made in connection with the administration of the receivership estate;

4.    Authorizing the Receiver to destroy all records pertaining to the receivership estate in the Receiver's possession or custody within 30 days after the Receiver serves written notice on the Securities and Exchange Commission ("SEC") of the Receiver's intention to destroy such records;

5.    Providing that neither the Receiver nor any agent, employee, member, officer, independent contractor, attorney or representative of the

---

[1] The "Receivership Team" shall include acts taken by the Receiver himself and acts taken by his Released Professionals. As defined by the Distribution Plan, the "Released Professionals" mean "Holland & Knight LLP, and all other advisors and professionals retained by the Receiver after the Receivership Date" including without limitation, the Receiver's claims administrator, RCB Fund Services LLC ("RFS") (*see* Dkt. 107-1).

Final Report, Accounting, and Winding Up          Case No.:  18-4315 DSF (JPRx)

Receiver shall have any liability to any person or entity for any action taken in connection with carrying powers, duties and responsibilities in connection therewith, and directing that the Receiver, its agents, employees, members, officers, independent contractors, attorneys and representatives are: (i) discharged; (ii) released from all claims and liabilities arising out of and/or pertaining to the receivership; and (iii) relieved of all duties and responsibilities pertaining to the receivership; and

6.    Granting such additional relief in connection with the wind up and closing of the receivership estate as the Court may determine to be just and proper under the circumstances.

PLEASE TAKE FURTHER NOTICE that this motion is made pursuant to Local Civil Rules 7 and 66-7, and is based upon this notice of motion and motion, the Final Report which is set forth herein, the memorandum of points and authorities, Declaration of Receiver Josias Dewey served and filed concurrently herewith (including the Final Accounting attached thereto), upon the pleadings, records and files of this case and upon all other pleadings, oral and documentary evidence and argument of counsel as may be presented by the Receiver at or before the time of the hearing on this motion.

Dated: November 20, 2023          Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ *Kristina S. Azlin*

Kristina S. Azlin (SBN 235238)
Jose A. Casal (*pro hac* vice)
Samuel J. Stone (SBN 317013)

*Attorneys for Josias Dewey, Court-appointed Receiver for Receivership Entities*

Final Report, Accounting, and Winding Up          Case No.: 18-4315 DSF (JPRx)

# TABLE OF CONTENTS

I.    SUMMARY OF RECEIVER'S EFFORTS TO DATE ................................3

    A.    Summary of Claims Process ................................................3

    B.    Summary of Distributions to Allowed Claims....................4

        (i)    Allowed Claimants........................................................4

        (ii)    Sole Objecting Claimant ................................................7

II.   DISTRIBUTIONS AND REMAINING ASSETS....................................10

    A.    Results of Initial and Second Distributions........................10

    B.    Remaining Assets of the Receivership Entities .................11

        (i)    Non-Operational Expenses .......................................11

        (ii)    Outstanding Administrative Expenses.....................12

        (iii)    Future Administrative Expenses ...............................12

        (iv)    Reserve Fund Remaining Balance ............................13

III.  CLOSING THE CASE AND DISCHARGING THE RECEIVER............16

    A.    Applicable Law ................................................................16

    B.    Wind Up Activities............................................................17

    C.    Requested Relief...............................................................18

IV.   CONCLUSION.....................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*S.E.C. v. Garman*,
    No. 04-cv-00354-PAB-BNB, 2009 WL 1173328 (D. Colo. Apr. 29, 2009) 17

*SEC v. Durmaz*,
    210CV01689JLSAJW, 2018 WL 10798893 (C.D. Cal. Sept. 19, 2018)......15

*SEC v. Lincoln Thrift Association*,
    577 F.2d 600 (9th Cir. 1978) ............................................................16

*Securities and Exchange Commission v. Hardy*,
    803 F.2d 1034 (9th Cir. 1986) ..........................................................16

*Skirvin v. Mesta*,
    141 F.2d 668 (10th Cir. 1944) ..........................................................17

<u>Other Authorities</u>

Federal Rule of Civil Procedure, Rule 66............................................3, 16

Local Rule 66-7.........................................................................3, 16

*2 Clark on Receivers,* § 383.1 (3d ed. Rev. 1992).....................................12

*Moore's Federal Practice,* § 66.06[4][a] (Matthew Bender 3d ed. Rev. 2013)......12

## RECEIVER'S MOTION FOR ORDER APPROVING FINAL REPORT AND FINAL ACCOUNTING, DISCHARGING RECEIVER AND GRANTING RELATED RELIEF

Pursuant to paragraph 11 of this Court's Order Approving Distribution Plan entered May 9, 2022 (the "Order Approving Distribution Plan") (Dkt. 109), Rule 66 of the Federal Rules of Civil Procedure, and Local Rule 66-7, Holland & Knight LLP ("Counsel" or "H&K"), counsel to Josias Dewey, as Court-appointed Receiver (the "Receiver") for the estates of Defendant Titanium Blockchain Infrastructure Services, Inc. ("TBIS") and its subsidiaries and/or affiliates (collectively, the "Receivership Entities"), hereby submits the Receiver's Motion for Order Approving Final Report and Final Accounting, Discharging Receiver and Granting Related Relief (the "Motion").

In support of this Motion, Counsel respectfully states the following:

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. SUMMARY OF RECEIVER'S EFFORTS TO DATE

### A. Summary of Claims Process

On May 23, 2018, the Court entered a Temporary Restraining Order and Orders (1) Freezing Assets; (2) Prohibiting the Destruction or Alteration of Documents; (3) Granting Expedited Discovery; (4) Requiring Accountings; and (5) Appointing a Temporary Receiver (the "Temporary Receivership Order"), appointing Josias N. Dewey as temporary receiver for the Receivership Entity. (Dkt. 2.) On May 30, 2018, the Court entered the Permanent Receivership Order (Dkt. 48) (together with the Temporary Receivership Order, collectively, the "Receivership Order"). The Defendants consented to the entry of the Permanent Receivership Order. (*See* Dkt. 47.)

On July 28, 2020 the Receiver submitted a motion for the Court to approve his proposed Claims Process and Bar Date (Dkt. 94), which categorized a list of eligible claimants, provided for internet-based notice to victims of the fraud, and sought authorization for submitting and validating claims using a blockchain token confirmation system. The Court granted the motion in all respects (Dkt. 96). Given the complexities

of this claim validation system, on December 15, 2020, the Court granted a Joint Stipulation to Extend the Claims Bar Date (Dkt. 101). Pursuant to that Order, the Court established that the claims period for potential claimants of the Receivership Entities would run for 180 calendar days following publication of the Claims Process Notice. Any claims submitted after 11:59 p.m. Pacific Time on the date 180 calendar days following initial publication of the Notice would be barred. On February 12, 2021, the Receiver published the initial Notice of the Claims Process and Bar Date, thus establishing the claims "Bar Date" as August 11, 2021 (Dkt. 110).

Since the inception of the claims process, the Receiver and his Released Professionals reviewed more than 1,000 claim submissions—of which, 677 Claimants received Allowed Amounts and 63 Claimants submitted objections (Dkt. 122). Together with the cooperation of the Claimants, the Receiver successfully resolved 62 of the 63 objections. *Id.* The one Claimant who sought Court intervention emailed the Court's clerk arguing that his Allowed Amount was incorrectly calculated. *Id.* The Receiver subsequently filed a Motion with the Court providing a detailed explanation of the Receivership Team's loss calculation and requesting that the Court uphold the Claimant's Allowed Amount. *Id.* Upon review, the Court issued an Order granting the Receiver's motion and upholding the objecting Claimant's Allowed Amount (Dkt. 129). Accordingly, all Claims have been processed and objections resolved.

B.    Summary of Distributions to Allowed Claims

    (i) *Allowed Claimants*

On April 5, 2022, the Receiver's Counsel filed a motion to approve the proposed Distribution Plan: (i) defining a claims calculation methodology based on a net investment *pro rata* distribution; (ii) proposing an Initial Distribution to the Non-Investor Claimants and a Second Distribution to the Investor Claimants; (iii) distributing Receivership Assets in either United States Dollars ("USD") or the cryptocurrency Ether; and (iv) proposing a third *pro rata* distribution to the Investor Claimants if sufficient assets are available (Dkt. 107). The Receiver's substantive plan was attached

4

as Exhibit 1 to that motion (Dkt. 107-1 and hereinafter referred to as "<u>Distribution Plan</u>")[2].

On May 9, 2022, the Court granted the Distribution Plan in all respects and authorized the Receiver to make the Initial and Second Distributions pursuant to the terms and procedures stated therein (Dkt. 109). Notably, the Court's Order approved the Receiver's proposed methodology for calculating both Investor and Non-Investor Claims, including a *pro rata* distribution for Investor Allowed Amounts. *Id.* The Order further approved the form of distribution, in either Ether or USD. *Id.* Additionally, the Receiver was granted discretion in setting the Benchmark Date, Conversion Price, and Distribution Dates for the Initial and Second Distributions. *Id.*

On December 2, 2022, the Receiver sent all Allowed Claims a "<u>Distribution Election</u>" via email that included instructions on how to submit their Distribution preference between Ether or USD (Dkt. 116). Of the Allowed Claims, 642 of 677 successfully completed their Distribution Elections within the 14 day deadline (Dkt 121). Pursuant to the Distribution Plan, and the discretion extended therein, the Receiver assigned a USD preference to the remaining 35 Allowed Claims that failed to submit a timely Distribution Election. *Id.*

On December 29, 2022, the Receiver filed his "<u>Distribution Motion</u>" noticing the Court of the Initial and Second Distributions (Dkt. 116), and on January 4, 2023, the United States Securities and Exchange Commission filed a Non-Opposition to the Distribution Motion (Dkt. 117, hereinafter the "<u>SEC's Non-Opposition</u>"). Whenever a distribution motion is filed with the Court, the Distribution Plan requires that the Receiver deliver notice, via email and website posting, to all Allowed Claims and allow them 14 days to object ("<u>Distribution Notice</u>"). Accordingly, on January 9, 2023, the Distribution Notice was both emailed to all Allowed Claims and posted on the website

---

[2] Any capitalized terms not specifically defined herein, will take the meaning prescribed to them by the Distribution Plan.

Final Report, Accounting, and Winding Up          Case No.:  18-4315 DSF (JPRx)

that same week (*see* Dkt. 121). The Receiver did not receive any objections to the Distribution Motion. *See id.*

On January 25, 2023, the Court granted the Distribution Motion in all respects, including, *inter alia*, authorizing the Receiver to make the Initial and Second Distributions within 45 days of its Order (Dkt. 120). Pursuant to this Order, the Receiver set the "Distribution Date" as February 1, 2023 and executed the Initial and Second Distributions in accordance with the Court-approved procedures and further detailed in Section II below (*see* Dkt. 121).

Namely, as prescribed by the Distribution Plan, the Distribution to Non-Investor Claimants was allocated first, in full satisfaction of their Allowed Amounts. *Id.* Then, at approximately 10:00 a.m. Eastern Standard Time on the Distribution Date, the Receiver calculated the total value of the Available Cryptocurrency Assets. *Id.* Based on this value, less the Reserve Fund, the Receiver calculated that each Investor Claimant should receive approximately 91% of their Allowed Amounts ("*Pro Rata Share*"). *Id.* Throughout the Distribution Date, the Receiver and his undersigned counsel sent Ether to all Allowed Claims who selected this preference. *Id.* In total, 443 Allowed Claims received 2,316.44 units of Ether (representing approximately $3,651,893.49). *Id.* Then, on February 24, 2023, the Receiver's distribution agent (RFS) dispatched $1,319,401.67 worth of USD checks to the remaining 228 Allowed Claims. *Id.* Each Investor Claimant was allocated the same 91% *Pro Rata Share* irrespective of whether they received their distribution via Ether or USD check[3]. *Id.*

After satisfying all Distributions, the Receiver and his undersigned counsel liquidated the balance of the Available Cryptocurrency Assets in exchange for $1,061,841.83 (Dkt. 121). This amount was then transferred to the Receiver's bank

---

[3] Claim Number 1000785 is the only Allowed Claim that materially deviated from the 91% Pro Rata Share (*see* Dkt. 121). Specifically, the Allowed Amount was $0.22, but the Receiver's digital asset custodian restricted transactions of this size. *Id.* Accordingly, the Receiver sent the smallest possible amount of Ether, equivalent to approximately $1.58. *Id.*

6

1    account and served as the Reserve Fund—of which the Court authorized $1,051,909.63

2    be set aside for Outstanding and Future Administrative Expenses (Dkts. 120 and 121).

3                    (ii) <u>*Sole Objecting Claimant*</u>

4          On May 5, 2023, the Court granted the Receiver's Motion to uphold the single

5    Disputed Claim's Allowed Amount (*see* Dkt. 129). On May 10, 2023, the Receiver

6    emailed the objecting Claimant both providing notice of the Court's Order and

7    requesting bank information to execute a wire transfer for his Allowed Amount (Decl.

8    ¶13). The objecting Claimant responded for the first time on July 17, 2023, stating that

9    he has not received his Distribution payment, but failed to provide the requested wire

10   instructions (*id.* ¶14). The Receiver responded the same day, insisting that the objecting

11   Claimant (who resides in Asia) provide wire instructions because of several delays and

12   check cashing issues that the Receivership Team has experienced with mailing checks

13   to foreign jurisdictions (*id.*).

14         On July 18, 2023, the objecting Claimant asked the Receiver to execute his

15   Distribution via Ether (*id.* ¶15). Because all of the Cryptocurrency Assets had been

16   liquidated prior to this time (Dkt. 121), the Receiver explained to the objecting Claimant

17   that Ether would no longer be an option (Decl. ¶15). Nevertheless, in an effort to

18   accommodate the objecting Claimant's Distribution Election and efficiently complete

19   his Distribution, the Receiver offered two options: (1) USD Coin ("<u>USDC</u>") and (2)

20   USD check (*id.*). The Distribution Plan provided that for each Claimant who elected to

21   receive Ether, the Receiver could either send Ether or effect the Distribution by "***any***

22   ***other means of effecting the transfer of Ether to the Claimant***" (*see* Dkt. 107-1)

23   (emphasis added). Additionally, the Court's Order Granting the Distribution Plan also

24   "authorized [the Receiver] to take all steps necessary or appropriate to complete the

25   administration of the Receivership and its assets in accordance with the relief requested

26   in the Motion" (Dkt. 109).

27         USDC is an Ethereum ERC-20 token that is pegged 1:1 with the USD, and does

28   not charge transaction fees for converting fiat USD to USDC—unlike Ether (*id.* ¶17).

7

Therefore, utilizing this Court's authorized discretion, the Receiver determined that USDC: (i) qualified as an authorized alternative, Ethereum-based token for effecting the objecting Claimant's Distribution under the Distribution Plan; (ii) provided for a less costly solution than converting the Distribution to Ether; and (iii) eliminated risks associated with Ether's volatile pricing (*see id.*). The objecting Claimant chose the USDC option and executed a Declaration attesting that he understood, and accepted, the risks associated with the alternative form of payment (*id.* ¶18). The objecting Claimant further confirmed that the same Ethereum address that the objecting Claimant validated as part of the Court approved Claims Process procedures was capable of accepting USDC (*id.*). On August 29, 2023, the Receivership Team executed the objecting Claimant's Distribution via USDC, and the objecting Claimant acknowledged the transaction (*id.* ¶19). As a result, the Initial and Second Distributions are complete.

C.    <u>Asset Recovery Efforts and Liquidations</u>

As further detailed in the Receiver's Final Accounting, attached to his Declaration as **Exhibit 6**, the Receiver successfully recovered various digital assets on behalf of the Receivership Entities and custodied them throughout the receivership. These assets include Bitcoin, Bitcoin Cash, Ether, Litecoin, and Dash (*see* Ex. 6). All of these assets, other than Ether, were liquidated to cash for a total sum of $2,847,558.68—most of which was used to fund the USD Distribution and Reserve Fund (*see id.*). Then, 2307.366432 units of Ether[4] were disbursed to Allowed Claims in furtherance of the Ether Distribution, representing an approximate value of $3,651,893.49 on the Distribution Date. Lastly, the Receiver recovered $310,791.83 in fiat assets held in bank accounts controlled by Defendants (Decl. ¶23).

---

[4] On the Distribution Date, the Receiver had 2,151.37143643 units of Ether, which was insufficient to satisfy the Initial and Second Distributions in full (*see* Decl. ¶24). Accordingly, the Receivership Team traded 11.23876 Bitcoin for the shortfall in Ether, or 164.55 units (*id.*).

*(i) Unrecoverable Assets*

Although the Receiver and his team successfully recovered more than $6 million in assets for the benefit of harmed investors, certain digital assets were unrecoverable (*see* Ex. 6).

Most notably, as first introduced in the Second Interim Fee Application (Dkt. 103), the Receivership Team traced approximately 477.647 Ether and 38.75387 Bitcoin ("HitBTC Crypto") that were stolen (prior to the Receiver's appointment) from a wallet owned by the Receivership Entities and transferred to a wallet owned by a third-party and hosted by HitBTC (an offshore cryptocurrency exchange which, according to its website, was headquartered in Hong Kong but is now operating out of Chile and the Seychelles) (Decl. ¶26). The Receivership Team successfully negotiated with HitBTC to freeze the HitBTC Crypto, but despite repeated attempts to secure the transfer of the HitBTC Crypto to the Receivership Team (including filing suit through local counsel in Hong Kong to order HitBTC to transfer the HitBTC Crypto) HitBTC ceased communications with the Receivership Team (and its various local counsel) (*id.*). In October of 2023, the Receivership Team made a final attempt to recover the HitBTC Crypto—including, (i) sending several emails to HitBTC's legal department with reference to our prior correspondence, but receiving no response; (ii) meeting with local counsel from Chile, who visited HitBTC's purported office address, yet HitBTC was nowhere to be found; (iii) requesting company records from the British Virgin Islands and discovering that HitBTC's purported legal entity, HiTech Digital Business LTD, was administratively dissolved on April 7, 2023 due to resignation of its registered agent; (iv) emailing its prior registered agent for HitBTC contact information, but also receiving no response; and (v) drafting and serving a third-party subpoena to obtain alternative contact information for HitBTC (*id.*).

The Receivership Team's subpoena request is still pending, but will serve as its last attempt to establish contact with HitBTC (*id.* ¶27). If unsuccessful or otherwise unavailable, pursuant to the Receivership Team's extensive efforts to contact HitBTC,

9

but their unwillingness to cooperate, there does not appear to be a reasonable likelihood of success in recovering the HitBTC Crypto, and any further efforts seem like an unrecoverable cost to the estate (*id.*).

Further, the Bitcoin SV, Zcash, and OMG assets were written off considering they are either prohibited from trading in the United States or largely illiquid; moreover, the collective USD value of these digital assets ($294.07) did not justify the expense of engaging third party liquidators (*id.* ¶25). Additionally, despite extensive correspondence with Electroneum's support team, they would not grant the Receivership Team access to the assets, and therefore, were also written off (*id.*). Lastly, the Defendants previously reported to the Receiver that the Receivership Entities controlled a wallet with 35.59965546 units of DASH; however, upon further investigation, this wallet was encrypted with an unknown password and no recovery alternatives exist (*id.*). As a result, this too was written off.

## II.    DISTRIBUTIONS AND REMAINING ASSETS

### A.    Results of Initial and Second Distributions

A total of 677 Allowed Claims were sent Distributions as part of the Initial and Second Distributions (Decl. ¶12). Non-Investor Claims were satisfied in full, representing approximately $29,628.54 in USD value distributed (*id.* ¶11). Investor Claims received a *Pro Rata Share* equal to approximately 91% of their total Allowed Amounts, representing about $4,956,029.07 in USD value distributed (*id.*).

As provided by the Distribution Plan, Allowed Claimants had 180 days from the Distribution Date (or July 31, 2023, the "Forfeiture Date") to claim their Distributions, and failure to claim such Distributions prior to the stated deadline would result in forfeiture—at which point the Unclaimed Property would be added to the estate's Available Assets. Together with all Distributions, the Receivership Team provided a "Distribution Letter" reminding Allowed Claimants of this deadline and the consequences of failing to claim their Distributions by the Forfeiture Date (Decl. ¶5–6). Although under no obligation to do so by the Distribution Plan, on July 7, 2023, the

Receivership Team emailed a reminder to Allowed Claimants who had failed to claim their Distributions as of that date (*id.* ¶8). All but fourteen (14) Allowed Claimants claimed their Distributions by the Forfeiture Date (*id.* ¶11). Accordingly, fourteen (14) Allowed Claimants effectively forfeited their Distributions, representing a total sum of $4,850.71 (*id.*).

B.   Remaining Assets of the Receivership Entities

After completing the Initial and Second Distributions—distributing approximately $4,985,657.61 in USD value to Allowed Claims—the Reserve Fund was left with $1,076,204.29 as of the end of February 2023 (Decl. ¶28). Of this amount, the Court authorized $1,051,909.63 be set aside for Outstanding and Future Administrative Expenses (the "Fees Budget") (Dkts. 120 and 121)[5].

(i) *Non-Operational Expenses*

In March of 2023, the Receiver paid outstanding taxes to the Florida Department of Revenue for the years 2019 to 2022, in the total amount of $1,200 (*see* Decl., Ex. 6). Then, in September of 2023, the Receiver paid outstanding taxes to the Oregon Department of Revenue from 2018, in the total amount of $650 (*see id.*). Also in September of 2023, the Receiver paid Defendant Michael Alan Stollery aka Michael Stollaire's attorney $50,000 pursuant to the parties Stipulation (Dkt. 115) providing for payment of his attorney's legal fees associated with the DOJ's criminal investigation (Decl. ¶31). Lastly, in July of 2023, the Receiver transferred $14,362.46 worth of USDC in satisfaction of the sole Disputed Claimant's Allowed Amount (*id.* ¶19). As defined, these expenses do not count against the Fees Budget.

---

[5] "Outstanding Administrative Expenses" were defined as "operating expenses of the Receivership Entities and unpaid invoices from the Receiver's Professionals since the Third Interim Fee Application Period" (*see* Dkt. 116). "Future Administrative Expenses" were defined as "operating expenses of the Receivership Entities and invoices from the Receiver's Professionals occurring after the period covered by the Outstanding Administrative Expenses (*see* Dkt. 116).

11

| Receivership Non-Operational Expenses - January 1, 2023 to October 31, 2023 | |
|---|---|
| **Total Non-Operational Expenses** | **$ (66,212.46)** |
| Florida Department of Revenue Taxes (2019-2022) | (1,200.00) |
| Oregon Department of Revenue Taxes (2018) | (650.00) |
| Disputed Claim Distribution | (14,362.46) |
| Stipulation for Stollaire's Legal Fees | (50,000.00) |

### (ii) *Outstanding Administrative Expenses*

On April 14, 2023, the Receiver's Counsel filed its Fourth Interim Fee Application—spanning nearly one year and five months of services provided to the Receivership Entities—requesting an Order from the Court granting the Receiver authorization to settle the Outstanding Administrative Expenses balance in the amounts of $516,212.10 in legal fees and $59,607.42 in administrative expenses (*see* Dkt. 126). Notably, the requested application was 23% under the $750,000 Court-approved budget. *See id.* The SEC supported this request finding that "the work done was reasonable and necessary to the management of the receivership estate" (Dkt. 127). On May 8, 2023, the Court granted H&K's request, authorizing the Receiver to pay the fees and expenses in full, for a total sum of $575,819.52 (Dkt. 130). The following day, the Receiver executed payment to his Released Professionals.

### (iii)    *Future Administrative Expenses*

As defined above, Future Administrative expenses include both operating expenses of the Receivership Entities and invoices from the Receiver's Released Professionals from January 1, 2023 to the present.

With respect to the first category, the Receivership Entities incurred $3,843.90 in operational expenses from January 1, 2023 through October 31, 2023. This includes (1) monthly service charges for the Receivership Entities' website in the total amount of $3,538.90; (2) bank wire fees for $105.00; and (3) service charges for digital asset custody in the total amount of $200.00 (*see* Ex. 6). Until the website and domain are shut down, the only anticipated future operating expense is a reoccurring monthly charge for such services in the amount of approximately $388.80.

Final Report, Accounting, and Winding Up          Case No.:  18-4315 DSF (JPRx)

Then, with respect to the second category, H&K filed its Final Fee Application (Dkt. 131, "Final Fee Application") requesting payment for fees and expenses in the amount of $291,445.57. As further stated therein, H&K does not intend to make any additional fee applications; instead, it requests that the Court authorize the Receiver to disburse any remaining Reserve Fund balance to H&K at the conclusion of the receivership for prior discounts and write-offs (*see id.*).

If the Court grants H&K's request for fees, the remaining Fees Budget balance would be equal to $180,800.64.

| Fees Budget | $ 1,051,909.63 |
|---|---|
| **Outstanding Administrative Expenses** | |
| Budget | $   750,000.00 |
| Actual | $ (575,819.52) |
| *Professional Fees & Expenses* | *(575,819.52)* |
| Balance | $   174,180.48 |
| **Future Administrative Expenses** | |
| Budget | $   301,909.63 |
| Actual | *$ (295,289.47)* |
| Operating Expenses | *(3,843.90)* |
| Professional Fees & Expenses | *(291,445.57)* |
| Balance | $       6,620.16 |
| **Remaining Fees Budget** | **$   180,800.64** |

### (iv)     Reserve Fund Remaining Balance

If the Court grants H&K's request for fees in full, the remaining Reserve Fund balance would be equal to $150,633.74 (Decl. ¶32).

| Receivership Bank Account - ending October 2023 | $   442,079.31 |
|---|---|
| Final Fee Application Request | (291,445.57) |
| **Remaining Reserve Fund (if Final Fee Application is Granted)** | **$   150,633.74** |

## C.     Insufficient Assets for a Final Distribution

The Distribution Plan contemplates a Final Distribution to Investor Claimants "comprised of the Net Remaining Funds." "Net Remaining Funds" mean "any excess Available Cash and Available Cryptocurrency Assets ***after subtracting*** the Initial

13

Distribution, Second Distribution, **Reserve Fund**, and any other tax obligations as defined in Section 4.7 of this Plan" (*see* Distribution Plan) (emphasis added).

As further explained herein, the Receiver has either liquidated or distributed all of the Receivership Entities' Cryptocurrency Assets—leaving cash as the Receivership Entities' only asset. However, the Receivership Entities' remaining cash balance is entirely comprised of the Reserve Fund, which the Court authorized the Receiver to set aside as the Fees Budget for satisfying the Receivership Team's invoices and operational expenses of the Receivership Entities (*see* Dkts. 120 and 121).

Accordingly, pursuant to the Distribution Plan, there are insufficient Net Remaining Funds for the Final Distribution. Instead, as previously granted by this Court, the remaining Reserve Fund balance should be applied towards the Receivership Team's fees and the operational expenses for winding down the receivership.

Even assuming, *arguendo*, that the Distribution Plan required a Final Distribution to the Investor Claimants or that the Court wished to consider reallocating the Reserve Fund, the significant administrative costs associated with an additional distribution would outweigh the marginal benefit to the 673 Investor Claims. Namely, if the Court grants H&K's Final Fee Application, the remaining Reserve Fund balance would be approximately $150,633.74 (Decl. ¶32). Without accounting for any administrative costs, this hypothetical distribution would provide each Investor Claim with—at most— an additional 2.77% of their Allowed Amounts (*id.* ¶33). In dollar figures, an additional distribution would result in more than 32% of Investor Claims receiving less than $25 and more than 64% of Investor Claims receiving less than $100 (*id.*). Again, this hypothetical example assumes zero administrative expenses with respect to carrying out this large-scale distribution. For reference, in the months of February 2023 (when the Initial and Second Distributions were commenced) and January 2023 (the preceding month of preparations), the Receivership Team incurred more than $177,000 in administrative costs—or an amount of costs greater than this hypothetical distribution itself (*see* Final Fee Application, Exs. C-1 and E).

Final Report, Accounting, and Winding Up          Case No.:  18-4315 DSF (JPRx)

Notably, in an analogous context, this Court has explained that when, as here, "there are insufficient funds in a receivership estate to satisfy all claims, the costs and expenses of the receiver and his retained professionals are entitled to highest priority of distribution, as consistent with principles of bankruptcy law." *SEC v. Durmaz*, 210CV01689JLSAJW, 2018 WL 10798893, at *2 (C.D. Cal. Sept. 19, 2018) (internal citations omitted). There, because there were insufficient funds to satisfy the claims of investors and creditors of the estate, this Court held that they should receive no distribution, and instead, the remaining balance of the receivership estate should be distributed to the receiver and his professionals in partial satisfaction of their fees and complete reimbursement of their expense. *See id.* at *3.

Here, much like *Durmaz*, there are insufficient Net Remaining Funds for a Final Distribution, and therefore, pursuant to the terms of the Distribution Plan, no additional distribution is required. Moreover, the financial and practical considerations suggest that a Final Distribution would be engulfed by a greater amount of administrative expenses—providing a nominal benefit, if any, to the Investor Class. Lastly, unlike *Durmaz* where the receiver and his professionals requested, and received, the full balance of the estate at the expense of the claimants who received nothing, here, the Claimants received approximately $5 million in USD value—representing 100% of Non-Investor and 91% of Investor Allowed Amounts (*see* Ex. 4). In an effort to achieve such results, the Receivership Team implemented substantial cost reducing measures throughout the five and a half years since the Receiver's appointment, including without limitation the Receiver billing a total of $5,299.20 to the estate; H&K discounting its fees by $232,236.64, and utilizing the lowest cost providers wherever possible (*see* Final Fee Application).

Accordingly, as further described in the Final Fee Application, the remaining Reserve Fund balance should, *first*, be applied towards the following wind up activities and, *second*, once all such activities are complete, the remaining balance should be disbursed to H&K for prior discounts and write-offs. Assuming the Court grants H&K's

15

Final Fee Application, the remaining cash in the Receivership Entities bank account is $150,633.74—meaning, any amount disbursed to H&K would be less than its prior discounts in this matter ($232,236.64) and below the remaining Fees Budget previously set by the Court for third-party fees and expenses ($180,800.64). Such a result is not only consistent with the Distribution Plan and previous Orders of this Court, but also, it is the most economically feasible resolution given the remaining Reserve Fund balance.

## III.  CLOSING THE CASE AND DISCHARGING THE RECEIVER

### A.  Applicable Law

The Receiver's request to wind up the receivership estate and to obtain the receivership relief sought herein, including the provisions related to approval of the Final report and Final Accounting, the destruction of records, and discharge and release of both the Receiver and his Released Professionals are ordinary and customary in connection with the wind up of a federal equity receivership estate, and within the Court's broad supervisory authority over federal equity receiverships described in *Securities and Exchange Commission v. Hardy*, 803 F.2d 1034 (9th Cir. 1986):

> A district judge supervising an equity receivership faces a myriad of complicated problems in dealing with the various parties and issues involved in administering the receivership. Reasonable administrative procedures, crafted to deal with the complex circumstances of each case, will be upheld. A district judge simply cannot effectively and successfully supervise a receivership and protect the interests of its beneficiaries absent broad discretionary power. We would be remiss were we to interfere with a district court's supervision of an equity receivership absent a clear abuse of discretion.

*Id.* at 1038; *see also SEC v. Lincoln Thrift Association*, 577 F.2d 600, 606 (9th Cir. 1978). Furthermore, Court approval of the Receiver's actions and the relief sought herein is consistent with federal receivership practice as required by Federal Rule of Civil Procedure, Rule 66 and Local Rule 66-7. *See 2 Clark on Receivers,* § 383.1 (3d ed. Rev. 1992). The Court has wide latitude in supervising the Receiver and may provide

Final Report, Accounting, and Winding Up        Case No.:  18-4315 DSF (JPRx)

for the administration of the receivership as it deems appropriate. *Moore's Federal Practice*, § 66.06[4][a] (Matthew Bender 3d ed. Rev. 2013). Moreover, the discharge of a receiver is a matter within the discretion of the trial court. *See, e.g., Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1944) (noting that "[t]he power to … terminate a receivership no longer needed is a necessary incident to the power to appoint in the first instance").  A court should "not continue a receiver if the receiver's services are no longer needed." *S.E.C. v. Garman*, No. 04-cv-00354-PAB-BNB, 2009 WL 1173328, at *2 (D. Colo. Apr. 29, 2009) (adopting report and recommendation of magistrate judge) (granting motion to discharge receiver because the receiver had taken control of the assets, paid all fees and expenses, completed distributions to investors pursuant to orders of the court, and accounted for all matters under his control).

The protections afforded the Receiver pursuant to such a wind up order is reasonable and necessary in light of the history of this matter; the complex, novel and protracted nature of the proceedings; and the excellent results achieved by the Receivership Team—satisfying 100% of Non-Investor and 91% of Investor Allowed Amounts.

B.  <u>Wind Up Activities</u>

The Receiver identifies the following exhaustive list of actions that will be taken by him and the Receivership Team prior to the conclusion of the receivership:

- If the Receivership Team successfully obtains alternative contact information for HitBTC pursuant to its third-party subpoena, make one final attempt to establish contact with HitBTC and request turnover of the HitBTC Crypto, but if no response or cooperation is received, then forgo any further recovery efforts;

- The Receiver's tax advisor, Grobstein Teeple LLP ("<u>Teeple</u>"), will prepare the Receivership Entities' final tax return, and the Receiver will file the return;

- The Receiver will pay Teeple's invoice for its services rendered in

17

furtherance of the final tax return, an amount which shall not exceed $4,000 (*see* Final Fee Application);

- The Receiver will pay any Administrative Expenses approved by the Court, including those requested in the Final Fee Application;

- Shut down the Receivership Team's website (https://tbis.io/), terminate the domain subscription, and pay any outstanding operational expenses to close out such accounts;

- Shut down the Receivership Team's email accounts; and

- The SEC will file a Consent to Final Judgment against Defendants together with the good faith cooperation of the Receivership Team, where required.

Upon completion of the above activities, the Receiver will file a "Final Notice" confirming that the aforementioned wind up activities have been completed; immediately thereafter, the Receiver respectfully requests that the Court terminate the receivership, discharge the Receiver, and release both the Receiver and his Released Professionals from any and all liability relating thereto.

C.     Requested Relief

Books & records. The Receiver is currently in possession of books and records for the Receivership Entities—both in physical and digital form. The Receiver seeks authority to destroy all books and records of the Receivership Entities. The Receiver will continue to maintain his work product files for a period of seven years following conclusion of the receivership.

Taxes. The Receiver created a Qualified Settlement Fund ("QSF") for the receivership estate. All assets of the receivership entities were transferred to the QSF at their then current market value and taxable gains and losses were calculated accordingly and reflected in the QSF tax returns. The Receiver has filed tax returns beginning in 2018 (the year of his appointment) and for each subsequent year up through and including 2022. Additionally, the Receiver will file a final QSF return for 2023 as required, to which the Receiver's tax professionals do not anticipate any tax liability.

Final Report, Accounting, and Winding Up          Case No.:  18-4315 DSF (JPRx)

<u>Claims & Distributions</u>. The Receiver successfully distributed approximately $4,985,657.61 in USD value to Allowed Claimants—representing 100% of Non-Investor and 91% of Investor Allowed Amounts. **Exhibit 4** to the Receiver's Declaration provides a list of Claimants, the amount of their total Allowed Amount and corresponding Distribution, form of payment (*e.g.*, USD, Ether, and USDC), and type of Claimant (*e.g.*, Investor, Non-Investor, or both).

Because both the Initial and Second Distributions are complete (including resolution of all Disputed Claims) and the estate has insufficient Net Remaining Funds for a Final Distribution, the Receiver seeks Court confirmation that the Claim and Distribution amounts are deemed final and fully satisfied.

<u>Forfeited Property</u>. Pursuant to Sections 4.8 and 4.9 of the Distribution Plan, Claimants had until July 31, 2023 to claim their Distributions; otherwise, the Distributions are forfeited. Only fourteen (14) Allowed Claimants failed to claim their Distribution by the stated deadline, and thereby, forfeited any legal claim or interest in their Distributions, representing a total sum of $4,850.71 (Decl. ¶11). The Receiver seeks Court authorization that this Forfeited Property be disbursed in the same manner as the remaining Reserve Fund.

<u>Future recoveries</u>. In the event that that Receiver is successful in recovering the HitBTC Crypto, the Receiver's Final Notice will provide an accounting of the recovered assets and proposed procedures for proceeding with a Final Distribution. If such efforts are unsuccessful, the receivership will terminate as directed by the Court's Order on this Motion.

<u>Approval of Final Report and Accounting</u>. The Receiver requests that the Court approve his Final Report, described herein, and his Final Accounting (attached to the Declaration of Josias Dewey, as **Exhibit 6**), and find that the Receiver's actions during his administration are ratified, confirmed and approved as being right and proper in the best interest of the receivership estate and parties to this action.

<u>Discharge of the Receiver</u>. The Receiver requests the Court discharge the

Final Report, Accounting, and Winding Up         Case No.:  18-4315 DSF (JPRx)

Receiver and his Released Professionals from all further duties, liabilities and responsibilities, including those that may be imposed by state, municipal or local tax or corporate authorities, pursuant to his Declaration (attached hereto as **Exhibit A**) affirming the faithful completion of his duties (Decl. ¶35).

Court Jurisdiction. The Receiver requests the Court to retain jurisdiction over receivership matters following conclusion of the receivership.

## IV.    CONCLUSION

For the reasons set forth in this Motion and the papers filed in support, it is respectfully requested that the Court enter an Order, in substantially similar form to that attached hereto as **Exhibit B**, including the following:

1.    Approving the Receiver's Final Report, described herein, and approving the Receiver's Final Accounting, which is attached as **Exhibit 6** to the Declaration of Josias Dewey, served and filed concurrently herewith;

2.    Authorizing and approving the Receiver's wind up of the receivership estate upon the Receiver' Final Notice confirming completion of the wind up activities identified herein;

3.    Approving and confirming all actions and activities taken by the Receiver and the Receivership Team, including but not limited to, all payments made in connection with the administration of the receivership estate;

4.    Authorizing the Receiver to destroy all records pertaining to the receivership estate in the Receiver's possession or custody within 30 days after the Receiver serves written notice on the SEC of the Receiver's intention to destroy such records;

5.    Providing that neither the Receiver nor any agent, employee, member, officer, independent contractor, attorney or representative of the Receiver shall have any liability to any person or entity for any action taken in connection with carrying powers, duties and responsibilities in connection therewith, and directing that the Receiver, its agents, employees, members,

officers, independent contractors, attorneys and representatives are: (i) discharged; (ii) released from all claims and liabilities arising out of and/or pertaining to the receivership; and (iii) relieved of all duties and responsibilities pertaining to the receivership; and

6.    Granting such additional relief in connection with the wind up and closing of the receivership estate as the Court may determine to be just and proper under the circumstances.

Dated:  November 20, 2023                Respectfully submitted,

HOLLAND & KNIGHT LLP

/s/ *Kristina S. Azlin*

Jose A. Casal (*pro hac* vice)
Kristina S. Azlin (SBN 235238)
Samuel J. Stone (SBN 317013)

*Attorneys for Josias Dewey, Court-appointed Receiver for Receivership Entities*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6.1

The undersigned, counsel of record for Josias N. Dewey, the Court appointed Receiver for the estates of Defendants Titanium Blockchain Infrastructure Services Inc. and its subsidiaries and/or affiliates, certifies that this brief contains 5,574, which complies with the word limit of L.R. 11-6.1.

DATED: November 20, 2023                By:    /s/*Kristina S. Azlin*

Kristina S. Azlin

Final Report, Accounting, and Winding Up          Case No.:  18-4315 DSF (JPRx)

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 400 S. Hope Street, 8th Floor, Los Angeles, CA 90071.

On **November 20, 2023**, I served the document described as the Receiver's **(I) NOTICE OF MOTION AND MOTION FOR ORDER APPROVING FINAL REPORT AND FINAL ACCOUNTING, DISCHARGING RECEIVER AND GRANTED RELATED RELIEF; (II) EXHIBIT A, DECLARATION OF RECEIVER, JOSIAS N. DEWEY, IN SUPPORT THEREOF, AND ITS CORRESPONDING EXHIBITS; (III) [PROPOSED] ORDER** on the interested parties in this action as follows:

[X] (**BY Electronic Transfer to the CM/ECF System**) In accordance with Federal Rules of Civil Procedure 5(d)(3) and Local Rule 5-4, I uploaded via electronic transfer a true and correct copy scanned into an electronic file in Adobe "pdf" format of the above-listed document(s) to the U.S. District Court Central District of California's Electronic Case Filing (CM/ECF) system on this date.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **November 20, 2023**, Los Angeles, California.

/s/*Kristina S. Azlin*
Kristina S. Azlin (SBN 235238)

---

22

Final Report, Accounting, and Winding Up          Case No.: 18-4315 DSF (JPRx)